# Exhibit 3

# Reaching opposite findings on inequitable conduct

## Both 'Purdue' and 'Ferring' focused on materiality and intent.

**By Arie M. Michelsohn**
SPECIAL TO THE NATIONAL LAW JOURNAL

FRAUD ON THE Patent Office—"inequitable conduct" in the modern language of patent law—renders the patent unenforceable. To establish inequitable conduct, one must prove both materiality and intent. In two recent biotechnology/pharmaceutical cases, *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 438 F.3d 1123 (Fed. Cir. 2006), and *Ferring B.V. v. Barr Laboratories*, 437 F.3d 1181 (Fed. Cir. 2006), different panels of the U.S. Court of Appeals for the Federal Circuit measured materiality and intent and drew virtually opposite conclusions. These decisions suggest uncertainty in the law and demonstrate the problems faced by practitioners when confronted with an allegation of inequitable conduct.

Rule 56 of the U.S. Patent and Trademark Office (PTO) Code of Federal Regulations, 37 C.F.R. 1.56(a), requires that applicants for patents act with "candor and good faith" during the patent application process. This obligation includes a duty to disclose to the PTO all information known to the applicants to be "material to patentability." Id. The definition of "material" includes information that is not cumulative of information already before the examiner and that would, by itself or in combination with other information, establish "a prima facie case of unpatentability of a claim" (as further defined in the regulation), or be inconsistent with positions taken by the applicant during the patent examination process.

To find a breach of this duty, a court traditionally needs to determine not only that omitted information was material, but also that the omission happened with intent to deceive the PTO. Settled law mandates that a court balance materiality and intent to determine whether inequitable conduct occurred. See, e.g., *American Hoist & Derrick Co. v. Sowa & Sons Inc.*, 725 F.2d 1350, 1364 (Fed. Cir. 1984).

As a general rule, the more material the information at issue, the less proof of intent is necessary to establish inequitable conduct. See, e.g., *Kangaroos U.S.A. Inc. v. Caldor Inc.*, 778 F.2d 1571, 1573 (Fed. Cir. 1985). Still, as an en banc Federal Circuit emphasized in *Kingsdown Medical Consultants Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988), "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive."

A contemporaneous panel of the court, in *Burlington Industries Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988), noted further that resolution of the inequitable conduct issue on summary judgment "ought to be, and can properly be, rare indeed."

### 'Purdue': reversal of fortune

Purdue Pharma asserted three patents against Endo Pharmaceuticals' generic version of Purdue's highly successful opioid pain medicine, controlled-release oxycodone, better known as Oxycontin. According to the patents, Purdue inventors "surprisingly discovered" that the claimed controlled-release oxycodone formulations can control pain over a substantially narrower dosing range in most patients, relative to opioid analgesics generally. The patents later explain the "clinical significance" of the narrower dosage range as permitting doctors to determine more efficiently dosing regimens capable of relieving

## In 'Purdue,' Federal Circuit reconsidered the materiality issue.

pain in individual patients without causing unacceptable side effects.

During prosecution of its patents, Purdue submitted arguments that distinguished its formulations over the prior art based on the "surprising result" of narrower dosage ranges and more efficient dosing. One of the named inventors filed a declaration in support of patentability that discussed clinical studies comparing the blood levels of controlled-release oxycodone to immediate-release oxycodone and the "clinical significance" of a narrower dosing range for pain management. Later during prosecution, Purdue further contended that the dosing parameters set forth in its patent claims "are specifically related to the surprising results obtained by the invention." At the time it prosecuted its patents, however, Purdue had not actually performed clinical studies to support these assertions, and did not reveal this fact to the examiner.

Following a bench trial, the district court concluded that Purdue's multiple representations made it look to the PTO as if Purdue had discovered its invention based on experiment rather than insight, and that this reflected a "clear pattern of intentional misrepresentation." Purdue attempted to convince the court of its good-faith belief in the veracity of its assertions to the examiner by submitting as evidence its application to the Food and Drug Administration (FDA) for approval of a labeling claim that its Oxycontin drug was the most efficient dose-adjustable analgesic. The trial court rejected this evidence, however, because Purdue's attempts to seek FDA approval were, by Purdue's own admission, unsuccessful.

On appeal, the Federal Circuit acknowledged that under the patent statute, 35 U.S.C. 103(a), it does not matter to patentability whether an invention is made through insight or experiment. *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 410 F.3d 690 (Fed. Cir. 2005). The court also acknowledged that Purdue never expressly stated that the discovery of the narrow dosage range was based on the results of clinical studies. Nonetheless, it affirmed, reasoning that such a conclusion "was clearly to be inferred from the language used by Purdue in both the patents and prosecution history" and that Purdue's representations evinced a "deliberate decision to withhold and misrepresent the origin of its 'discovery' to the PTO." Id. at 698, 701.

On a motion for reconsideration, the court changed its position: "Our further review has persuaded us that the trial judge may have erred in how he viewed certain of the evidence, and that this may have caused an error in the balancing step." 438 F.3d at 1126. Specifically, while affirming its conclusion that Purdue's failure to tell the PTO that its discovery was based on insight constituted a material misrepresentation, the panel remeasured the misrepresentation's materiality, finding it "not especially high" and "not as material as an affirmative misrepresentation would have been."

On the issue of intent, the panel stressed it "important to remember" that materiality does not presume intent and referred to intent as a "separate and essential component of inequitable conduct." Id. at 1134. The panel then found error in the trial court's discounting of Purdue's seeking a labeling claim before the FDA as evidence of good faith, since "evidence regarding the difficulty in proving the titration claim is not inconsistent with Purdue's asserted belief that it had discovered" the more effective dosage range of its formulations. Id. Overall, the panel found, errors in measuring materiality and intent required the district court to "reweigh" these factors on remand while "keep[ing] in mind that when the level of materiality is relatively low, the showing of intent must be proportionately higher." Id. at 1135.

### 'Ferring': intent per se?

A different result was arguably reached in *Ferring*. There, Ferring asserted its patent, directed to a solid oral dosage form of a peptide used to treat diabetes, against Barr Laboratories. A prior Ferring patent taught the use of this peptide through "peroral" application. The patent examiner contended during an interview with one of the patent's named inventors that this teaching may have suggested oral administration for gastrointestinal (GI) absorption in the manner claimed by Ferring in its pending patent application. The inventor argued that "peroral" as used in the prior patent did not teach oral administration for GI absorption, but rather for absorption through the walls of the mouth. Apparently not convinced, the examiner suggested that Ferring submit evidence

## In 'Ferring,' Federal Circuit inferred an intent to mislead.

from a noninventor.

Over several rounds of prosecution before two examiners and on appeal to the PTO, Ferring submitted declarations from four noninventors. The inventor whom the examiner interviewed helped prepare two of the declarations. One of the declarants was a former research director at Ferring, and the other three had received research funding from Ferring and were later characterized on Ferring's privilege log as "consultants." Ferring did not make any of these relationships known to the PTO.

Barr adduced evidence that Ferring knew of these relationships when it submitted the declarations, and moved for summary judgment of inequitable conduct. Granting Barr's motion, the district court determined that the declarations were " 'highly material' " to the prosecution of the patent and that their submission after several rounds of rejection " 'speaks loudly as to motive and intent.' " 437 F.3d at 1186 (quoting the district court). The district court reasoned that "[w]hile credibility determinations from a courtroom observation may at times be necessary on the issue of intent, here, the entire record presents clear and convincing evidence of an intent to mislead." Id.

On appeal to the Federal Circuit, a panel majority affirmed over a strongly worded dissent. The majority viewed the declarations as "pivotal" and reasoned that the examiner's request for noninventor declarations evidenced a clear concern about the objectivity of the declarants that was communicated explicitly to Ferring. "Under such circumstances," the majority asserted, "the applicant is on notice as to the materiality of information regarding the declarants' ties to Ferring." Id. at 1190.

On the issue of intent, the majority concluded that Barr had suitably established Ferring's knowledge of the declarants' relationships and that Ferring knew these relationships were material. Pointing to *Refac International Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1581 (Fed. Cir. 1996), the majority stated that "[u]nder similar circumstances…the omission of prior employment with the patentee supported a showing of intent." 437 F.3d at 1193. Citing to *Paragon Podiatry Laboratory Inc. v. KLM Laboratories Inc.*, 984 F.2d 1182, 1191 (Fed. Cir. 1993), a case in which the Federal Circuit previously affirmed summary judgment of inequitable conduct, the majority concluded that no credibility determinations were necessary because "[c]redibility can only become an issue once a party offers a declarant's testimony in support or in opposition to summary judgment," which Ferring did not do. 437 F.3d at 1192. As such, summary judgment was appropriate.

Judge Pauline Newman dissented: "Today my colleagues on this panel not only ignore *Kingsdown* and restore a casually subjective standard, they also impose a positive inference of wrongdoing…even in the total absence of evidence." Id. at 1196. Pointing to the declarants' eminent reputations as scientists, Newman considered the majority's inference of bias and deceptive intent a "travesty." Newman further noted that the law does not require affidavits in opposing motions for summary judgment, and that in any event, Ferring had presented deposition testimony in its opposition to Barr's motion that appeared to negate intent. Newman "at a minimum" would have remanded the case for trial.

### Uncertainty in the law

The panel majority in *Ferring* relied in part on the *Refac* and *Paragon* decisions. But in *Refac*, there was a full trial, and "[s]ignificantly," by the Federal Circuit's own description in that case, "determining whether there was an intent to mislead the PTO involved credibility determinations." 81 F.3d at 1582. Also notable is that in *Paragon*, the declarants at issue owned Paragon stock and were paid company consultants, and in their declarations were openly evasive on the issue of stock ownership and explicitly stated that they were not employed by the

SEE 'INEQUITABLE CONDUCT' PAGE S3

---

*Arie M. Michelsohn (arie.michelsohn@finnegan.com) is an associate at Washington-based Finnegan, Henderson, Farabow, Garrett & Dunner, an intellectual property law firm, where he practices patent litigation and strategic counseling as a member of the biotechnology/pharmaceutical practice group. Two attorneys at the firm wrote an amicus brief on behalf of Purdue Pharma in the Purdue rehearing proceeding.*

# Divergent conclusions

'INEQUITABLE CONDUCT' FROM PAGE S2
company. The court accordingly considered the declarations "deceptive, if not outright[ly] false." 984 F.2d at 1192. The *Ferring* decision thus appears to overstep *Refac* and *Paragon* by making credibility determinations virtually unnecessary on the issue of intent when the materiality of omitted information is found to be "high" enough. But when is enough, enough?

In *Purdue*, the Federal Circuit itself equivocated on the issues of materiality and intent, as is apparent from the panel's changed decision on reconsideration. In *Ferring*, a panel majority felt assured that it could pass judgment summarily on the issue of intent, while the dissent strongly disagreed. To what can one attribute the difference in positions of the panels and the individual judges? Unfortunately, the *Purdue* and *Ferring* cases provide little guidance about which omissions a court will consider so "highly material" as to warrant a pass over trial on the issue of intent, and which it will consider relatively benign and thus no obstacle to patent enforceability.

Because of such uncertainty in the law, some—including the American Intellectual Property Law Association (AIPLA)—have called for elimination of the inequitable conduct defense altogether. See, e.g., Statement of Michael K. Kirk, executive director, AIPLA, before the Senate Subcommittee on Intellectual Property, April 25, 2005, http://Judiciary.senate.gov/testimony.cfm?id=1475&wit_id=4232. Pending House legislation would refer inequitable conduct investigations to the PTO Office of Enrollment and Discipline and provide a threshold before a court can rule a patent unenforceable. See H.R. 2795 (Industry "Redline"/Coalition Print, Sept. 1, 2005). In the meantime, *Purdue* and *Ferring* leave patent practitioners with mixed messages. **NLJ**