## Quinn Emanuel's Margret Caruso



Margret Caruso first learned about Quinn Emanuel in early 2002. At the time, she was an associate at Orrick Herrington and was having breakfast with Jeff Conciatori and Mike Carlinksy, with whom she had been working for almost a year. They had just resigned from Orrick that morning and asked her to join them at Quinn Emanuel's then fledgling New York office. It was an easy sell. "The firm they described, with its sole focus on litigation, its unparalleled depth of trial experience, and the outstanding quality of the lawyers they had met, sounded like a dream job. My only hesitation was that it sounded almost too good to be true." A few short hours later though, Margret had signed on.

Margret looks back on that day as a time when fortune smiled upon her. "I have represented extraordinary clients, worked with incredibly talented lawyers, and litigated terrific cases — cases in which I have helped make new law and done some pretty neat things, like depose Billy Joel, analyze possible trademark and copyright violations in one of the highest-grossing movies of all time, inspect Hermès handbags, and tour the set of 'Six Feet Under.' And I became a partner, just six years out of law school."

Before taking the leap of faith that landed her at Quinn, Margret worked at Orrick Herrington, and before that, Latham & Watkins. Not surprisingly, given that "big firm" background, she initially found Quinn's New York office, where she was one of only two associates, a bit of a culture shock. But she acclimated quickly. "We started hiring associates, and cases came flooding in." It did not take long to get back to her comfort zone — preparing for trial. By the time Margret joined Quinn, four years out of law school, her successful courtroom experience included two trials (a high-profile copyright defense in the Southern District of New York and a patent infringement hearing before the International Trade Commission), preliminary injunction hearings and TRO applications in trademark and patent actions, oral arguments, and the first-chair role in a contested asylum hearing. Margret's eagerness for even greater challenges made Quinn Emanuel a perfect fit, and a few months later she was back in federal court, successfully moving to have a TRO vacated in a trademark dispute, successfully arguing for denial of class certification, and moving to dismiss various copyright infringement claims.

Margret thrives on trials, but takes equal pride in a series of defense judgments won through briefing alone. She firmly believes that lawyers need to provide value to their clients every day — not simply the "big moments" like trial, oral argument, or depositions — because laying the ground work to capitalize on those moments is essential. Still, the energy of trials, preliminary injunctions and TROs is unique, and what helped draw her to Quinn.

One trial in particular stands out for her. "We were hired a month before the re-trial of a copyright infringement action in the Southern District of New York. The client was concerned about its prior counsel's lack of trial experience and wanted lawyers who were comfortable in the courtroom. In the short time leading up to trial, we not only had to do the usual trial preparation work, we also had to immerse ourselves in the client's business. Margret did both, identifying new documents and even a witness who would be helpful to the case, but none of them were identified on the pretrial order that Quinn had inherited. "We were able to persuade the Court to supplement the pre-trial order, so one week, I was interviewing this new witness for the first time, preparing her to testify, and defending her deposition; the next week I was eliciting her testimony at trial." The Quinn

*(continued on page 11)*

5

6



*Quinn Emanuel conceived a multi-pronged strategy to pick apart the plaintiff's claims.*

### Summary Judgment in Trade Secret Case

Quinn Emanuel recently obtained summary judgment in favor of one of the world's largest tool and equipment rental businesses on trade secret claims brought by a software developer. At first, the facts looked grim. In 2003, the client decided to replace its antiquated software system. One of the client's managers then persuaded friends from the software industry to give up retirement to found a new company for the purpose of developing an entirely new software package. He and other client employees urged the plaintiff to submit a variety of proposals over the course of a year and a half, asking the plaintiff to team up with another well-established software company, then asking the plaintiff to go it alone. Plaintiff incurred over $1 million in out-of-pocket expenses and was paid just $60,000 by our client. When our client eventually said it had no interest in proceeding, it nevertheless asserted that it could make whatever use it wanted of the materials and information that plaintiff had provided in the course of analyzing the client's needs — notwithstanding that the materials were provided pursuant to a non-disclosure agreement (that our client had drafted). Plaintiff claimed that our client had already earned tens of millions of dollars by incorporating its ideas into the client's existing program.

Quinn Emanuel conceived a multi-pronged strategy to pick apart the plaintiff's claims. First, Quinn Emanuel pursued an aggressive discovery plan, obtaining key admissions from the plaintiff's principals and getting an order barring most of the plaintiff's experts from testifying at trial. Next, the firm obtained summary judgment on the plaintiff's California unfair competition and related claims, arguing that the law of another state applied to the action. Then, when the firm brought subsequent motions for summary judgment, attacking the plaintiff's remaining liability and damages theories, the Court agreed with the firm's arguments and found that the plaintiff had disclosed neither confidential nor trade secret material to our client. The Court dismissed the remainder of the action and entered judgment in the client's favor.

### Quinn Emanuel Obtains Dismissal of Insider Trading Claim

Continuing its recent success in securities cases, Quinn Emanuel recently obtained dismissal of an insider trading claim against the firm's client, the co-CEO of a large investment banking firm. The plaintiff, a former officer and shareholder of the firm, brought the claim alleging that the firm and the co-CEO defrauded him into selling his shares. Arguing that our client could not be held liable for insider trading because he did not purchase plaintiff's shares directly, Quinn Emanuel obtained dismissal of the claim at the pleading stage and plaintiff was denied leave to amend his complaint.

### Quinn Emanuel Forces Favorable Settlement

In a recent multi-million dollar adversary proceeding in federal bankruptcy court in the Southern District of New York, Quinn Emanuel represented fourteen former directors and officers of an entrepreneurial web hosting company, as well as related entities. In its far-reaching complaint, the plaintiff Creditors' Committee alleged that, prior to the "tech bubble bursting" in 2000, our clients had engaged in fraudulent transfers and preferences in violation of the U.S. Bankruptcy Code, and had breached their fiduciary duties to the company and its creditors by conceiving and implementing a "roll-up" growth model in which numerous web and service companies would be acquired

*Facing a trial without witnesses or proof, the Committee reluctantly accepted a settlement, as documented in the public bankruptcy court files, of less than its legal fees.*

and integrated under one umbrella. Quinn Emanuel took over the case after our clients had lost a motion to dismiss the complaint and their counsel had been disqualified. It was, under the circumstances, a challenging engagement.

Commanding the fray from the outset, Quinn Emanuel pushed for an accelerated schedule requiring that extensive discovery be completed in five months. The Committee's discovery defaults mounted throughout this period, culminating in its failure to conduct the noticed depositions of the bulk of our clients within the deadline. With the broad array of claims in the pleading still at play, we filed a comprehensive motion for summary judgment and prepared for argument. Having failed to develop a sufficient factual record, the Committee was compelled to consent to the dismissal of its transfer and preference claims with prejudice. With only the fiduciary duty claims remaining, the court requested supplemental briefing on several novel issues of Delaware corporate law, including the nature and scope of the alleged duty of "good faith," a board member's right to rely on the advice and opinions of outside advisors and board sub-committees and the plaintiff's burden to prove that an individual director's alleged breach of fiduciary duty caused actual damages to the corporation. At the same time, we successfully opposed the Committee's untimely attempt to introduce a crucial expert report. With its optimistic hundred million dollar D&O claim having been thoroughly gutted, and facing a trial without witnesses or proof, the Committee reluctantly accepted a settlement, as documented in the public bankruptcy court files, of less than its legal fees.

7

## Quinn Lawyers Among Top Women Litigators in CA

Quinn Emanuel lawyers Adrian Pruetz and Kathleen Sullivan have been named by the *Los Angeles Daily Journal* as two of California's top seventy-five women litigators. It is the fifth time that Adrian Pruetz has received the honor and the second time for Kathleen Sullivan.

Adrian Pruetz is co-chair of Quinn Emanuel's Intellectual Property Litigation group, which she built when she joined the firm 12 years ago, and has been recognized as a top IP lawyer and trial lawyer by *The Los Angeles Daily Journal*, *Los Angeles Magazine*, *Chambers U.S.A.* and *Global Counsel*. She has won significant patent cases for clients such as Genentech and Nike, and continues to represent those clients as well as Monsanto, Avery Dennison, Roche Molecular Systems, Mattel and other clients of the firm in patent, trademark and copyright matters.

Kathleen Sullivan is former Dean of Stanford Law School and is recognized as one of the leading appellate attorneys in the country. She joined Quinn Emanuel just over a year ago to lead its appellate practice and has already built it into the largest United States Supreme Court practice in California. Under her leadership during the past year, Quinn Emanuel's appellate group has submitted twelve briefs to the country's highest court. A highly accomplished academic and appellate advocate, Kathleen has argued over thirty appeals in federal court and three cases before the U.S. Supreme Court, recently winning a decision there that struck down state laws that prohibited consumers from receiving direct shipments of wine from out-of-state wineries when in-state wineries were permitted to make such shipments.

*(Continued from page 4)*

about whether some of the claims were anticipated or obvious, the Patent Office requested supporting declarations from persons "other than the inventors." Ferring submitted five declarations, but failed to disclose that four of the five supposedly third-party declarations came from scientists connected to Ferring, including: the former research director of the company then serving as a paid consultant; a scientist receiving research funding from the company at the time he submitted his declaration and while the patent was being prosecuted; and a researcher whose research was funded with Ferring funds. The court noted that these relationships "were not isolated, nor were they confined to the distant past." *Ferring*, 437 F.3d at 1189. It found that the declarants' prior relationships with Ferring were material, and Ferring's failure to disclose such relationships to the examiner constituted inequitable conduct. The court was careful to explain that there was nothing inherently improper about patent applicants consulting other persons skilled in the art with whom they have or had a professional relationship, and did not seek to discourage this practice. Rather, the court emphasized that when such a relationship exists, it must be disclosed.

The Federal Circuit has found inequitable conduct in other situations when there is an undisclosed past or current relationship between the patent applicant and an individual submitting a supporting declaration. In *Refac International, Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1581-82 (Fed. Cir. 1996), the court found inequitable conduct where a patent applicant failed to disclose that at least one of three affidavits purporting to be from people "other than the inventors" was from a person formerly employed by the inventors' company. Similarly, in another case, the court affirmed a finding of inequitable conduct where one of the affidavits from a purportedly "disinterested third party" was from a person who owned stock in the inventor's company and had previously been a consultant to the company. *See Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182 (Fed. Cir. 1993).

But it is not only the intentional failure to disclose past or current relationships with a declarant that can render a patent unenforceable. The Federal Circuit has also emphasized the need to disclose a declarant's prior conflicting statements. In *Pharmacia Corp. v. Par Pharmaceutical, Inc.*, 417 F.3d 1369 (Fed. Cir. 2005), the court focused on the failure to disclose in a declaration conflicting information relevant to a key issue in the patent examination. In that case, the court found that a declaration was misleading on novelty, a point of material significance, because the declarant's statements directly conflicted with an article he co-authored, as well as two other articles cited in the declarant's article. These conflicting articles were not disclosed to the patent office. The Federal Circuit affirmed the district court's finding that, because this misleading declaration went to the very point of novelty, it was so highly material that it was proper to infer intent to deceive the Patent Office.

Finally, the Federal Circuit has emphasized the requirement that information submitted cannot be false. The submission of false information, even if there is no subjective belief that such information is deceptive, is a ground for finding inequitable conduct. The Federal Circuit recently held that proof of a subjective belief that a submission is false is not required to find inequitable conduct. *See Frazier v. Roessel Cine Photo Tech., Inc.*, 417 F.3d 1230 (Fed. Cir. 2005). In that case, Frazier supported his patent application by submitting video footage illustrating the uniqueness of the optical system, which was purportedly shot using the claimed lens system, but was in fact shot

> *The submission of false information, even if there is no subjective belief that such information is deceptive, is a ground for finding inequitable conduct.*

8