> When an applicant knows that material information is either undisclosed or misleadingly presented, the court is likely to infer an intent to deceive the Patent Office.

> The Federal Circuit appears more willing to affirm a finding of inequitable conduct based on circumstantial evidence of intent.

using a different lens. Frazier insisted that, even though the footage was shot using a different lens, he was capable of recreating the submitted footage with the claimed lens. Therefore, he could not have intended to deceive the Patent Office, because he did not believe the video footage was a false demonstration of the capabilities of the claimed lens.

The court rejected this argument, holding that proof of subjective intent to deceive is not required to show inequitable conduct. Rather, in the absence of a credible explanation, "intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information." *Frazier*, 417 F.3d at 1235-36 (quotation and citation omitted). Because Frazier submitted a video to the Patent Office in order to represent the capabilities of the claimed lens, knowing that portions of the video were shot with a different lens, it was appropriate for the court to infer intent to deceive the Patent Office. Similarly, if an application contains a claim that has not been successfully performed at the time of filing, a "prophetic" application claiming otherwise will still be grounds for inequitable conduct. *See Novo Nordisk Pharms., Inc. v. Bio-Technology General Corp.*, 424 F.3d 1347 (Fed. Cir. 2005) (finding inequitable conduct when the inventor filed an application falsely indicating that a claim had been successfully performed at the time of filing, even though the claim had been successfully performed on one occasion subsequent to filing and through a laboratory accident).

The underlying theme of these recent decisions is that, given the *ex parte* nature of patent examinations, it is particularly important that the examiner have all information needed to determine whether and to what extent she should rely on the evidence presented by the applicant. Because only the patent applicant presents information to the Patent Office, the Federal Circuit appears to be strictly enforcing the applicant's duty of candor. Accordingly, when an applicant knows that material information is either undisclosed or misleadingly presented, the court is likely to infer an intent to deceive the Patent Office. As a result, a patent that may otherwise be valid could be rendered unenforceable.

***Preventing Inequitable Conduct.***
Given the Federal Circuit's increased willingness to affirm inequitable conduct findings, patent applicants should be mindful of certain pitfalls during the application process:

- Disclose past relationships, particularly "ongoing and mutually beneficial relationships," with individuals submitting declarations in support of the application. There is nothing per se improper about asking a former or current colleague to submit a supporting declaration, but this information should generally be disclosed to the patent examiner.
- Be careful about submitting "draft declarations" to non-inventors who are planning to submit a declaration in support of your patent application, as this could be viewed as compromising the independence of the third-party non-inventor. If you do participate in the drafting of non-inventor declarations, this information generally should be disclosed.
- Exercise care in proclaiming accomplishments, especially where a claim has not yet been successfully performed. Deceptive intent may be drawn from "prophetic" statements, even if the inventor believes that an application is capable of being performed.
- Avoid relying solely on one's own good intentions. The Federal Circuit appears more willing to affirm a finding of inequitable conduct based on circumstantial evidence of intent, without proof of subjective intent to deceive.

9

10



*The side that does the best job helping jurors believe they understand the technology is often the side that prevails.*

### What Jurors Know (or Think They Know) in Patent Cases

One of the age old questions confronting trial lawyers is how to keep a patent juror interested during trial. Most litigators assume that patent jurors know nothing or next to nothing about patent law and the technology at issue during a trial. Most also assume that jurors in patent cases tend to be pro-patentee, and that those jurors believe the United States Patent and Trademark Office ("Patent Office") does not make mistakes. A recent study by Trial Behavior Consulting ("TBC"), suggests otherwise.

TBC is a California-based consulting group that specializes in mock trials and focus groups. According to Mike Tiktinsky, Ph.D., M.P.H., a senior consultant at TBC, the study shows that the most critical factor in keeping jurors interested is not their actual understanding of the technology and the law, but their belief that they understand.

***The Study.*** The study gathered mock trial data in patent cases from five venues: the Northern District of California, the Eastern District of Texas, the District of Delaware, the Northern District of Texas and the Southern District of Mississippi. TBC selected 262 mock jurors based on those five venues. Those mock jurors were shown the Federal Judicial Center ("FJC") Patent video, which explains the basics of patent law, including the application process, infringement, and validity. TBC then asked the jurors to assess how well they understood the concepts taught in the video.

The key to TBC's study is juror self-assessment, not answers to factual questions. TBC wanted to show that if jurors believe they understand a concept, they are more likely to pay attention, feel confident that they can evaluate the evidence, and be more engaged in the trial. TBC's data from actual trials indicate that, even if jurors do not actually understand the technology involved, they have to believe they understand it. In other words, the side that does the best job helping jurors believe they understand the technology is often the side that prevails.

***Juror Understanding of Patent Principles.*** A commonly held belief is the inability of most jurors to understand patents and patent principles. The study showed, however, that most jurors (over 54%) felt they understood at least some parts of a patent, and a majority indicated that they could understand *and* explain a patent. The study showed that mock jurors claimed to understand infringement, invalidity and prior art. For example, over 35% of the jurors said they understood and can explain the concept of infringement. Over 28% said they understood and can explain invalidity, and about 34% understood and could explain the concept of a "person of ordinary skill." Interestingly, a smaller percentage claimed to understand the specific invalidity principles of anticipation and obviousness.

***Faith in the Patent Office.*** It is also widely assumed that a defendant's chances of invalidating a patent depend on juror's belief in the fallibility of the Patent Office. Many attorneys believe that the outcome of a patent case is dictated by the ability of jurors to believe that the Patent Office can make mistakes in granting a patent. Mock jurors were asked about the likelihood of mistakes by the Patent Office in allowing a patent. (The study did not take into account any pre-existing negative bias against the U.S. government.) Surprisingly, over half of the mock jurors responded that they believed the Patent Office can make mistakes in granting patents. Over ten percent believed it was very likely that the Patent Office errs in granting a patent. However, the study found that the same mock jurors found in favor of the patent holder over 60% of the time in the mock trials. These conflicting results suggest diminished importance of juror deference to the Patent Office, contrary to conventional wisdom. The

> *Despite the general dislike of the FJC patent video by attorneys, it can be an effective tool to help jurors believe they understand patents.*

results also suggest that jurors have faith in the correctness of government action despite the potential for mistakes.

**Venue Matters.** The study compared juror reactions among five different venues. The results, while lacking a clear distinction between venues on all points, suggest some trends. As commonly believed, the Northern District of California and Delaware jurors seemed to be the most patent-savvy, with over 70% in each venue responding that they can understand and explain a patent. Over half of mock jurors from the Northern District of California responded that they understood and can explain invalidity, compared to just over 25% of jurors from the Eastern District of Texas, a widely accepted pro-patent jurisdiction. Surprisingly, almost 45% of mock jurors from the Eastern District of Texas believed that the Patent Office could make mistakes granting patents. That jurisdiction has a reputation for jury pools that do not find patents invalid, adding to its pro-patent reputation.

TBC's study suggests that jurors are not necessarily intimidated by patent trials, and believe, with the proper guidance, that they can understand patent principles and be effective patent jurors. The lawyers that fulfill that belief, for both the patent principles and the technology at issue, are the most likely to succeed at trial. According to the study, despite the general dislike of the FJC patent video by attorneys, it can be an effective tool to help jurors believe they understand patents.

*For more information, you can contact Mike Tiktinsky at mtiktinsky@trialbehavior.com.* ₷

---

Quinn Emanuel's Margret Caruso *(continued from page 5)*

team also had to overhaul the prior counsel's theory of damages, which they discovered was inconsistent with the law, and work carefully with the client's CFO to develop a factually accurate picture. "The fact that our team of three attorneys was able to accomplish this phenomenal amount of work in such a short time frame and win the trial really captures the spirit of Quinn Emanuel."

Last year, at the invitation of Kathleen Sullivan, the noted constitutional scholar and former Dean of Stanford Law School, Margret transferred to Quinn Emanuel's Silicon Valley office. At the time, Kathleen had recently joined Quinn and was looking for partners with finely honed brief writing skills to help her develop an appellate practice group. But the wealth of intellectual property opportunities Silicon Valley offers also made the move very attractive on the litigation side. In moving to Quinn's Silicon Valley office Margret has enjoyed the best of both worlds. Over the last few months, she worked on three briefs for the U.S. Supreme Court, defended against a temporary restraining order and preliminary injunction in federal court in Missouri, and sought a TRO in the Northern District of California. Although it was not easy to leave her colleagues in the New York office (which had grown exponentially from its early days), they remain closely connected. The common bond of the Quinn Emanuel culture, which transcends geographic boundaries, helped ease the transition — although learning to drive was another matter entirely for the long-time Manhattanite.

*A summa cum laude, Phi Beta Kappa* graduate of Boston University, Margret earned her J.D. degree with honors from Cornell Law School, where she was an Articles Editor of the *Cornell Law Review*. Margret is happy to call Silicon Valley home, and enjoys the great Peninsula weather with her husband, Ron Turiello, and their daughter, Grace. ₷

11

## Quinn's New York Office Moves

Quinn Emanuel's New York Office is pleased to announce that it has moved to new office space. Driven by its phenomenal growth, the firm's New York Office has just completed its third move since opening its doors less than five years ago. The new office space spans two and a half floors in the historic New York Life Insurance building, adjacent to Madison Square Park in Manhattan's "Flatiron District" (so named after the landmark Flatiron Building). With the move to bigger space in a vibrant neighborhood, the New York Office has found a home for many years to come. The new contact information for the New York Office is:

Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
*Main Phone:* (212) 849-7000
*Main Fax:* (212) 849-7100.

("Supreme Court Approves New E-Discovery Rules" continued from page 3)

discovery, including requiring the requesting party to pay part or all of the cost of obtaining that information.

A safe harbor against sanctions will be provided to any entity that loses or destroys electronically stored information as a result of "the routine, good faith operation of an electronic information system." However, this does not mean that a party to a lawsuit can turn a blind eye toward automated destruction of electronically stored information. The Committee Notes specifically contemplate that "good faith may require that a party intervene to suspend certain features of the routine operation of an information system" when its obligations to preserve evidence are triggered.

Collectively, these amendments promise to have a substantial impact on discovery. The amendments not only put electronic discovery on the agenda for all cases, they create broad, standardized obligations for the preservation and production of electronically stored information. As such, litigants and their attorneys will soon need to pay closer attention to how electronic information is created, stored and ultimately produced in litigation.

Published by Quinn Emanuel Urquhart Oliver & Hedges, LLP as a service to clients and friends of the firm. It is written by the firm's attorneys. For more information, visit us at www.quinnemanuel.com.

The Noted with Interest section is a digest of articles and other published material. If you would like a photocopy of the complete text of anything summarized here, please contact David Henri at 213-443-3000.

• We are a 280+ lawyer business litigation firm — the largest in the United States devoted solely to business litigation.
• Our lawyers have tried over 1151 cases and won 1058 or 92%.
• When representing defendants, our trial experience gets us better settlements or defense verdicts.
• When representing plaintiffs, our lawyers have garnered over $6.2 billion in judgments and settlements.

865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
213-443-3000

51 Madison Ave., 22nd Floor
New York, NY 10010
212-849-7000

50 California St., 22nd Floor
San Francisco, CA 94111
415-875-6600

555 Twin Dolphin Dr., Suite 560
Redwood Shores, CA 94065
650-801-5000

4445 Eastgate Mall, Suite 200
San Diego, CA 92121
858-812-5107

©2006 Quinn Emanuel Urquhart Oliver & Hedges, LLP.

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017

PRESORTED
STANDARD
U.S. POSTAGE
PAID
PERMIT NO. 14954
LOS ANGELES, CA

AsiaLaw.com



SUBSCRIBE | LOG-ON | PASSWORD REMINDER | FREE TRIAL | ASIALAW FAQ

SEARCH

COVER STORY
FEATURES
IN FOCUS
IN BRIEF
IN PRACTICE
PEOPLE MOVES
CO-PUBLISHED FEATURE
LEGAL ANALYSTS
SUPPLEMENTS
FREE E-NEWS ALERT
ARCHIVE
ADVANCED SEARCH
INFORMATION
FREE TRIAL
HOW TO SUBSCRIBE
ABOUT US
CONTACT US
EVENTS
MEDIA KIT

March 2006:

# Clarifying the Inequitable Conduct Standard

Joel Lutzker



In recent decisions made within days of each other, the United States Court of Appeals for the Federal Circuit has clarified the standard applied in the US for establishing the inequitable conduct defence in patent litigation. The assertion that a patent was procured through the applicant's inequitable conduct before the United States Patent and Trademark Office is a frequent defence raised in US patent litigation. In general, it requires showing that the applicant made a material misstatement to the Patent and Trademark Office with the intent to deceive. If established, inequitable conduct renders the patent, and perhaps related patents, unenforceable.

In its recent decisions in *Digital Control vs The Charles Machine Works* and *Ferring vs Barr Laboratories*, the Court of Appeals for the Federal Circuit took the opportunity to clarify the legal standards for proving inequitable conduct. The Court of Appeals for the Federal Circuit has exclusive nationwide jurisdiction over patent appeals and its patent decisions are binding on all US courts, unless overturned by the US Supreme Court.

The Digital Control case involved the allegation that a patent applicant had committed inequitable conduct by:

(i) misstating in a sworn declaration the nature of the test he had conducted in the course of developing the invention, and

(ii) failing to disclose prior art of which he was aware.

The lower court had found that there was inequitable conduct on both bases. In reviewing this finding, the Federal Circuit focused on whether either the misstatement or omission was material and considered whether recent rule changes by the Patent and Trademark Office had altered the materiality standard which must be applied by the courts.

The court concluded that although the Patent and Trademark Office rule changes had arguably narrowed the obligation of disclosure the patent office expects of a patent applicant, the legal standard of materiality to be applied by the courts remains unchanged. Under that standard, a misstatement or omission is material if a reasonable patent examiner would have considered the information important to his decision-making process.

The Federal Circuit went on to explain that there is an intimate relationship between the materiality standard and the level of evidence necessary to prove intent to deceive. Where the misstatement or omission concerns information that a reasonable patent examiner would have considered important but not crucial, a higher level of proof of intent to deceive is required than when the information would have been considered crucial by a reasonable examiner.

The Ferring case also involved a sworn statement by an applicant, this time concerning the meaning of certain terminology used in a prior art patent. The applicant had submitted a sworn statement by the inventor, as well as a sworn statement by another individual. This other individual had received significant funding from the applicant corporation, but this fact was not disclosed in either of sworn statements. The patent examiner, who had specifically asked the applicant to provide a statement from a non-inventor, was thus left with the impression that there was independent corroboration of the inventor's statement when, in fact, the corroboration came from someone who was affiliated with the applicant.

Applying the reasonable examiner standard of materiality, the Federal Circuit found that the failure to disclose the affiliation was highly material and pivotal and that therefore a lower level of proof of intent was sufficient to establish inequitable conduct.

While the inequitable conduct defence available under United States law has often been criticized as an aberration which is inconsistent with the standards applied by other countries and establishes a trap for the unwary, the Digital Control and Ferring decisions make clear that it remains vital to US patent jurisprudence.

SCHULTE ROTH & ZABEL LLP

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Tel: 212-756-2430   Fax: 212-593-5955
Email: joel.lutzker@srz.com   Website: http://www.srz.com