# Exhibit 18

1659P

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re application of | : | HELMER HAGSTAM and |
| | | HANS VILHARDT |
| Serial No. | : | 809,937 |
| Filed | : | December 17, 1985 |
| For | : | DDAVP ANTIDIURETIC AND |
| | : | METHOD THEREFOR |
| Examiner | : | J. Stone |
| Group Art Unit | : | |

Honorable Commissioner of Patents
 and Trademarks
Washington, D.C. 20231

### PRELIMINARY AMENDMENT

Sir:

Prior to the examination of the above-identified patent application, kindly amend the application as follows:

### IN THE SPECIFICATION

At page 1, before the heading "BACKGROUND OF THE INVENTION", kindly insert the following paragraph:

--CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of our application Serial No. 705,701 filed February 26, 1985 which, in turn, is a continuation of our application Serial No. 613,779 which was filed on May 24, 1984--.

### IN THE CLAIMS

Kindly cancel claims 1 and 6 without prejudice and insert new claims 11 through 13 as follows:

11.  An antidiuretic composition for humans comprising a gastrointestinally absorbable, antidiuretically effective, amount of 1-deamino-8-D-arginine vasopressin and a pharmaceutically acceptable carrier in solid oral dosage form for absorption in the gastrointestinal tract of said humans.

12.  A method for initiating antidiuresis comprising administering a gastrointestinally absorbable, antidiuretically effective, amount of 1-deamino-8-D-arginine vasopressin to a human for absorption in the gastrointestinal tract of said human.

13.  A method for treating diabetes insipidus comprising administering a gastrointestinally absorbable, antidiuretically effective, amount of 1-deamino-8-D-arginine vasopressin to a human for absorption in the gastrointestinal tract of said human.

Claims 2, 3 and 4, line 1, kindly delete "1" and insert therefor --11--.

Claims 7, 9, and 10, line 1, kindly delete "6" and insert therefor --12--.


### REMARKS


The specification has been amended to refer to the earlier applications pursuant to 35 USC §120.

Claims 1 and 6 have been cancelled without prejudice and new claims 11 through 13 have been added.  The dependency of claims 2, 3, 4, 7, 9, and 10 has been amended accordingly.

Support for these new claims is set forth in the original specification and originally filed claims, particularly at page 3 of the specification.

An interview was held with Examiners Moyer and Stone, Dr. Hans Vilhardt, one of the co-inventors of the subject matter of the instant application, and the undersigned on May 28, 1986. At that interview, the two references of record were discussed as well as a new reference (U.S. Patent No. 3,454,549 to Boissonnas) which Examiner Moyer brought to applicants' attention for the first time at the interview. Examiner Moyer refused to consider or discuss any evidence or reference not already of record via the Office Action in the parent application, except for the Boissonnas reference.

This Preliminary Amendment is supported by several Declarations and references. Annexed hereto as Exhibit A is a first Declaration of Hans Vilhardt; Exhibit B is a second Declaration of Hans Vilhardt; Exhibit C is a Declaration of Paul Czernichow; and Exhibit D is a Declaration of Myron Miller. These Declarations establish the fact that the prior art of record neither teaches nor suggests the presently claimed invention.

The present invention is directed to an antidiuretic composition for humans. The composition comprises a gastrointestinally absorbable, antidiuretically effective, amount of DDAVP and a pharmaceutically acceptable carrier in oral dosage form for absorption in the gastrointestinal tract of humans.

The present invention is also directed to a method for initiating antidiuresis, particularly for treating diabetes insipidus, using the composition of the invention.

The gist of the present invention is the fact that DDAVP, a known peptide useful for initiating antidiuresis, can be administered orally for gastrointestinal absorption by humans.

-3-

In the past, it was not believed that such absorption was possible and the art taught against the administration of DDAVP in this manner.

Two references, Zaoral and Kinter, were cited against all claims in the parent application Serial No. 705,701. Those references do not teach or suggest, alone or in combination, the presently claimed invention for the reasons set forth hereinbelow.

<u>The Zaoral Patent</u>

The presently claimed invention is not anticipated by Zaoral. The claims are directed to either a composition in solid oral dosage form for gastrointestinal absorption by humans or to a method for initiating antidiuresis, specifically for treating diabetes insipidus, comprising administering DDAVP to a human for absorption in the gastrointestinal tract of the human. Zaoral neither teaches nor suggests oral administration for gastrointestinal absorption by humans.

No example in Zaoral teaches or suggests any kind of administration whatever. The only disclosure by Zaoral with respect to administration is at column 3, lines 16 through 33 as follows:

> The polypeptide I of the invention may be used as the free base or in the form of its salts with inorganic or organic acids, without or with additives such as stabilizers, preservatives, sweetening agents, aromatic compounds, flavoring agents or detergents to obtain the suitable form, as desired, for the parenteral, peroral, intranasal, subcutaneous, intramuscular, or intravenous application. Thus, e.g., hydrochloric acid, phosphoric acid, and boric acid can be used as inorganic acids,

-4-

acetic acid, citric acid, and
tartaric acid as organic
acids, and tannin as a
material having an acidic
function. Furthermore,
starch, lactose, natural or
hydrogenated oils, talc, and
glycerol can be used as
further additives.

The preferred way of
administration is
subcutaneous but the drug can
also be used by intranasal
application. The dose is
about 5-10 ng./kg./day in the
first case. The dose for
intranasal administration is
approximately 200 ng./kg./day.

The quoted language illustrates that there are two
sentences in Zaoral with respect to administration (or
application) of DDAVP. The latter sentence expresses a
preference for subcutaneous administration but states that "the
drug can also be used by intranasal application" (col. 3, lines
29 & 30), implying that subcutaneous and intranasal are the
only ways of administering DDAVP. The disclosure of Zaoral
with respect to dosages is consistent with this interpretation
because dosage levels are provided only for the subcutaneous
and intranasal means of administration (see col. 3, lines
31-33).

Furthermore, interpreting Zaoral to mean administration via
the subcutaneous and intranasal means is consistent with the
state of knowledge in the art at that time since subcutaneous
and intranasal administration were the only means known in the
late 60's, and indeed up until 1984, to administer DDAVP.

The sentence in Zaoral at column 3, lines 16 through 23,
refers to various "applications" of DDAVP. The applications
include "peroral" as well as several other means. No dosage
information is given in the patent for any of these listed

-5-

applications including "peroral", except for the intranasal and
subcutaneous method. Furthermore, the sentence appears to
conflict with the latter statement of Zaoral (col 3, lines
29-33) which, fairly read, infers only two means of
administration - subcutaneous and intranasal - particularly
since dosage information is given only for those routes of
administration.

Ignoring for the moment the ambiguity raised by Zaoral's
apparently conflicting sentences concerning the
application/administration of DDAVP, we further note that the
term "peroral" in Zaoral means literally "through the mouth".
Those skilled in this art considered "peroral" in Zaoral to
mean "sublingual" and/or "buccal" administration because it was
known in the late 60's that DDAVP-like peptides could be
absorbed via the mucous membranes in the mouth and it was also
believed at that time that DDAVP would be decomposed in the
stomach. "Peroral" in Zaoral does not mean "orally for
gastrointestinal absorption by humans" because the art taught
away from the use of the oral/gastrointestinal route at that
time and even for more than a decade after the issuance of the
Zaoral patent - until the instant inventors conceived of the
presently claimed invention.

At the interview on May 28, 1986, Examiner Moyer asked Dr.
Vilhardt whether he read the Zaoral patent before he made his
invention and whether the term "peroral" in fact taught Dr.
Vilhardt the presently claimed invention. Dr. Vilhardt replied
that he had indeed read the Zaoral patent on several occasions
prior to making his invention because he was employed as the
Research Director for Ferring Pharmaceuticals, the exclusive
licensee of the Zaoral patent (see first Vilhardt Declaration,

par. 5). Dr. Vilhardt was interested in developing some method of getting DDAVP into the stomach while avoiding the decomposition which the art, not excluding Zaoral, thought would take place in the stomach. Dr. Vilhardt devised an elaborate, complex system in an attempt to overcome the "decomposition in the stomach " problem taught by the art. Dr. Vilhardt's group attempted to get DDAVP into the gut by microencapsulation in liposomes. The purpose of the microencapsulation was to protect the DDAVP from the degrative action of the enzymes in the gut. The present invention was discovered when he conducted the "control" experiment - i.e., the testing of DDAVP which was not microencapsulated. To the surprise of Dr. Vilhardt and his group, and contrary to the reason for which they were conducting the microencapsulation experiment, the "control" experiment produced a substantial and unexpected antidiuretic effect (first Vilhardt Declaration, par. 9).

At the interview on May 28, Examiner Moyer asked if Dr. Vilhardt's Declaration indicated that Dr. Vilhardt considered the term "peroral" in Zaoral to mean "sublingual or buccal" and Dr. Vilhardt indicated that it did (first Vilhardt Declaration, par. 6). Examiner Moyer suggested that applicants obtain evidence from a non-inventor to the same effect. The annexed Declaration of Dr. Czernichow (Exhibit C) and Dr. Miller (Exhibit D) confirm Dr. Vilhardt's interpretation of Zaoral.

Dr. Czernichow is a world-class researcher in peptide chemistry with numerous publications and awards, as set forth in his curriculum vitae. Dr. Czernichow indicates in his Declaration that the Zaoral patent, particularly the disclosure

at column 3, lines 16 through 34, did not teach him or, in his
opinion, did not teach others skilled in this art to administer
DDAVP in oral dosage form for gastrointestinal absorption by
humans (Czernichow Declaration, par. 3).  Dr. Czernichow has
been in the field of peptide research, including DDAVP, since
at least 1965 (Czernichow Declaration, par. 1), prior to the
filing of the Zaoral patent.

Dr. Czernichow states that if the Zaoral patent had
disclosed the use of DDAVP in oral dosage form for
gastrointestinal absorption by humans, then the teachings of
the art and the activities of those skilled in this art would
have been inconsistent with the disclosure of Zaoral.  Dr.
Czernichow states that it is well known that administering
drugs orally for gastrointestinal absorption is vastly
preferable to subcutaneous, sublingual or buccal administration
if the oral/gastrointestinal absorption route is available.  He
further states that those knowledgeable of DDAVP-like peptides
always believed that DDAVP could not be administered via this
highly preferred mode because it was believed that DDAVP was
inactivated in the gut (Czernichow Declaration, par. 4).

The manner in which Dr. Czernichow first recognized that
DDAVP could be administered orally to humans for
gastrointestinal absorption further establishes the
unobviousness of the present invention and the fact that Zaoral
does not teach those skilled in the art this means of
administration.  Dr. Czernichow first recognized that DDAVP
could be administered via the claimed route in 1984 when he
attended a talk by Dr. Vilhardt, one of the co-inventors
herein.  He was surprised to learn from that talk that DDAVP
had been successfully administered by the claimed route to

human volunteers. He was surprised because Dr. Vilhardt's finding was contrary to Dr. Czernichow's understanding concerning DDAVP administration based on Dr. Czernichow's review of the literature, his own personal research, and discussions with colleagues in the peptide field (Czernichow Declaration, par. 6).

Dr. Czernichow then confirmed Dr. Vilhardt's discovery by treating certain of his patients with DDAVP via the claimed route and found, to his surprise, an antidiuretic response (Czernichow Declaration, par. 7).

Dr. Czernichow further confirms Dr. Vilhardt's conclusion that the term "peroral" at column 3, line 22 of the Zaoral patent meant to him and to others skilled in this art that DDAVP could be administered "through the mouth" for sublingual or buccal administration, not via the gastrointestinal absorption route (Czernichow Declaration, par. 8).

This interpretation of the term "peroral" is also confirmed by Dr. Myron Miller, Chief of Geriatric Medicine at the V.A. Medical Center in Syracuse, New York. Dr. Miller has been intimately involved with peptide research, particularly research relating to DDAVP. He has read the Zaoral patent and concluded that the term "peroral" refers to sublingual and/or buccal administration and does not indicate oral administration of DDAVP for gastrointestinal absorption by humans (Miller Declaration, par. 8).

In his Declaration, Dr. Miller indicates that the present invention - i.e., an antidiuretic composition of DDAVP in a carrier in oral dosage form for gastrointestinal absorption by humans, is an important invention and one which was unobvious to Dr. Miller and, in his view, unobvious to others skilled in

this art even after a review of the cited references (Miller Declaration, par. 2).

Dr. Miller co-authored the chapter entitled "Disorders of the Neurohypophysis" which appears at pages 604-614 of Harrison's well known treatise on internal medicine entitled "Principals Of Internal Medicine". That chapter, which was published in 1983 just before Dr. Vilhardt's invention, discusses the known treatment (as of 1983) of diabetes insipidus. Dr. Miller did not know in 1983 of Dr. Vilhardt's invention and thus, wrote:

> "As is true of most peptides, oral
> administration of vasopressin is
> ineffective"

Vasopressin is the parent molecule of DDAVP and the quoted statement concerning vasopressin is equally applicable to DDAVP (Miller Declaration, pars. 3 & 4).

In 1983, Dr. Miller did not believe that vasopressin and its derivatives could be orally administered. Accordingly, the method of administration recommended by Dr. Miller in Harrison's well known treatise is the use of the intranasal administration route, with all the problems associated with that kind of drug administration (Miller Declaration, pars. 5 & 6).

Dr. Miller also discusses in his Declaration the "AMA Drug Evaluations" reference which was also published in 1983. This text indicates that DDAVP should be administered intranasally through a rhinyle. It further states that two new intranasal forms have been developed and are currently under investigation: a conventional nasal spray and sublingual lozenges (Miller Declaration, par. 7).

-10-

Dr. Miller concludes that if the oral/gastrointestinal route had been obvious, this method of administration would have been disclosed in the AMA Drug Evaluations article since this route of administration would be by far the most economical, most efficient, and safest method then known (Miller Declaration, par 7; see also second Vilhardt Declaration, par. 9).

Dr. Miller confirms the interpretation of Drs. Vilhardt and Czernichow with respect to the term "peroral" in the Zaoral patent (Miller Declaration, par. 8).

The commercial practice after the issuance of the Zaoral patent is also pertinent to the fact that Zaoral did not teach the oral/gastrointestinal absorption DDAVP administration route for humans. While DDAVP initially may have been administered subcutaneously because of the expense of peptides such as DDAVP and the unwillingness to tolerate the loss associated with intranasal administration, substantially all of the DDAVP sold to date worldwide has been administered intranasally. Ferring Pharmaceuticals, the exclusive licensee under the Zaoral patent, is the sole vendor (with its sub-licensee) of DDAVP worldwide. Sales of DDAVP have constantly and substantially increased from 1973 to date, with the result that almost 30 million dollars worth of DDAVP was sold in 1985 alone. All of that DDAVP was provided in a form for intranasal administration to humans. None of it was provided in a form for oral administration via gastrointestinal absorption (second Vilhardt Declaration, par.10).

Other researchers in this art were searching, for more than a decade after the issuance of Zaoral, for other, less onerous, methods of administering this important drug. In 1980, two well known research groups, one in London and the other in

-11-

Hungary, developed and published alternatives to the disadvantageous subcutaneous/intranasal methods of administering DDAVP.  These researchers considered use of a nasal spray and sublingual lozenges.  Neither group even considered that DDAVP could be absorbed via the gastrointestinal tract (first Vilhardt Declaration, par. 23; second Vilhardt Declaration, par. 9).

Accordingly, Zaoral does not anticipate or render obvious the presently claimed invention.  The overwhelming evidence of record establishes that those skilled in this art interpreted the term "peroral" in Zaoral to mean "sublingual and/or buccal" but not oral administration for gastrointestinal absorption. At best, the reference is ambiguous on this point and an ambiguous reference cannot form the basis of a rejection under 35 USC §102.  Anticipation must be clear, definite and unambiguous.

Nor does Zaoral render obvious the claimed invention. There is nothing in Zaoral to suggest, and art both before and after Zaoral teaches away from, oral administration of DDAVP for gastrointestinal absorption by humans.  Furthermore, the inventor himself, after reading the Zaoral patent on several occasions, attempted to provide a complicated solution to a problem which was universally art recognized at the time.

The teachings of the art prior to the present invention are not inconsistent with present evidence concerning administration of other vasopressin derivatives.  The compound 1-deamino-4-asparagine-8-D-arginine-vasopressin (4-Asn-DDAVP) has only a marginal effect on urine volume and no effect at all on urine osmality when given orally while DDAVP produces a profound and prolonged antidiuretic response when given

orally.  Both compounds produce comparable antidiuretic effect when given intranasally (second Vilhardt Declaration, pars. 12 & 13).

Kinter

The Kinter article discloses an antidiuretic effect when DDAVP is given to rats via their drinking water.  Kinter does not teach or suggest either treating humans or using a solid oral dosage form of the DDAVP composition.  Furthermore, there is no teaching or suggestion in Kinter that the DDAVP was absorbed gastrointestinally by his rats.  The evidence, in fact, suggests that absorption, if any, takes place via the mucous membranes in the mouth and esophagus.

The Kinter rats obtain their DDAVP through drinking water. The process whereby a rat drinks is a drop by drop ingestion thus maximizing absorption through the mucous membranes of the mouth and esophagus.  Furthermore, even if the DDAVP was gastrointestinally absorbed by the rats, there is no evidence of record to suggest that the mechanism of gastrointestinal absorption in rats for DDAVP would be the same as, similar to, or transferable to humans.

The evidence of record establishes just the opposite.  At paragraphs 19 through 22 of the first Vilhardt Declaration, Dr. Vilhardt indicates that DDAVP and 4-Asn-DDAVP are equally potent in their antidiuretic action when tested intravenously and when given orally for gastrointestinal absorption by rats. Furthermore, when given intravenously to hydrated human volunteers, 4-Asn-DDAVP gave the same antidiuretic response as DDAVP.  However, when 4-Asn-DDAVP was administered orally for gastrointestinal absorption to the human volunteers, the

-13-

antidiuretic response was practically absent even after the highest dosage of analogue tested.

These results contrast with the results obtained with humans in which there was a clear antidiuretic response when as little as 20 ug of DDAVP were administered orally. Accordingly, 4-Asn-DDAVP is readily absorbed from the gut of a rat but not from the human intestinal tract (first Vilhardt Declaration, par. 19; second Vilhardt Declaration, pars. 12 & 13).

<u>Boissonnas</u>

The Boissonnas reference (U.S. Patent No. 3,454,549) was first brought to Dr. Vilhardt's attention at the interview on May 28, 1986 by Examiner Moyer. At the interview, Examiner Moyer asked Dr. Vilhardt to indicate in his Declaration when he first saw the Boissonnas reference. Dr. Vilhardt first saw this reference during the May 28, 1986 interview (first Vilhardt Declaration, par. 24).

Boissonnas discloses an isomer of DDAVP, a compound substantially different from DDAVP despite the isomerism. Unlike other chemical compounds, differences between peptide isomers are almost always so substantial, in terms of their properties, that the two isomers are considered completely different compounds (first Vilhardt Declaration, par. 24). Accordingly, gastrointestinal absorption in humans cannot be predicted from one isomer to another. While Boissonnas does disclose an isomer of DDAVP, the biological properties of DDAVP and its isomer are so substantially different that they are considered totally different compounds. In particular, the ratio of antidiuretic response to pressor effect for DDAVP is about 4000, for example, whereas the same ratio for the Boissonnas isomer is about 4. On the basis of these extremely

-14-

significant biological property differences, one could not predict the biological utility and properties of one compound based upon a knowledge of the other (first Vilhardt Declaration, par. 25).

Accordingly, any prima facie case of obviousness which may have been presented by Boissonnas is rebutted by the evidence of record.  No combination of Boissonnas with either Zaoral or Kinter is appropriate since the compound disclosed in Boissonnas is different from those of the other references.

### Saffron

The Saffron article has not been cited but is discussed in the first Vilhardt Declaration at paragraphs 12 through 22. This article neither teaches nor suggests the presently claimed invention either alone or in combination with the other references of record.

### Other References Cited In The
### Information Disclosure Statement

The other references submitted with the Information Disclosure Statement have been reviewed and are considered of even less pertinence to the presently claimed invention.

Accordingly, no rejection based on Zaoral, Kinter, Boissonnas, Saffron, or the other references listed in the Information Disclosure Statement would be appropriate in this application.

A good faith effort, including the interview on May 28, 1986, and the several declarations of record, has been made to place this application in condition for allowance.  If there is any further point requiring attention prior to allowance, the

-15-

Examiner is respectfully requested to contact the undersigned
attorney for applicants to resolve the matter.

Respectfully submitted,

Paul T. Meiklejohn, Esq.
Reg. No. 26,569
Hopgood, Calimafde, Kalil,
Blaustein & Judlowe
60 East 42nd Street
New York, New York 10165
(212) 986-2480

Dated:  June 12, 1986

-16-