# Exhibit 26



4268E

#16

RECEIVED GROUP 180

JUL 0 7 1988

<u>IN THE UNITED STATES PATENT AND TRADEMARK OFFICE</u>

| | | |
|---|---|---|
| In re application of | : | HELMER HAGSTAM and<br>HANS VILHARDT |
| Serial No. | : | 809,937 |
| Filed | : | December 17, 1985 |
| For | : | DDAVP ANTIDIURETIC AND METHOD<br>THEREFOR |
| Examiner | : | J. Stone |
| Group Art Unit | : | 123 |

Hon. Commissioner of Patents
    and Trademarks
Washington, D.C.  20231

<u>BRIEF FOR APPELLANT</u>

Sir:

   This is an appeal from the final rejection of claims 2-5
and 7-13.

   An oral hearing is requested.

                                                              Page

Introduction  . . . . . . . . . . . . . . . . . . .    2

   I.  Claims on Appeal . . . . . . . . . . . .    2

  II.  The Invention  . . . . . . . . . . . . .    4

 III.  The References . . . . . . . . . . . . .    4

  IV.  Extrinsic Evidence . . . . . . . . . . .    6

   V.  The Rejection . . . . . . . . . . . . . .    7

  VI.  Discussion . . . . . . . . . . . . . . .    8

              A)   The Subject Invention is Novel and
                   Unobvious In View of Zaoral

              B)   The Subject Invention is Unobvious
                   In View of Zaoral In Combination
                   With Kinter, Boissannas and/or
                   Saffron

 VII.  Conclusion  . . . . . . . . . . . . . . .   24

VIII.  Appendix

              Exhibit A (1st Vilhardt Declaration)

              Exhibit B (2nd Vilhardt Declaration)

              Exhibit C (Czernichow Declaration)

              Exhibit D (Miller Declaration)

              Exhibit E (Document Evidence)

INTRODUCTION

This Appeal is made in response to the Final Rejection entered by the Examiner in the Office Action of August 14, 1984, finally rejecting all the claims in the above patent application.

The invention on appeal is directed to DDAVP* a peptide analogue of the hormone vasopressin. DDAVP, a known pharmaceutic, is disclosed as having significant antidiuretic effect in humans when delivered orally for gastrointestinal absorption. The claims are directed to compositions containing DDAVP for gastrointestinal absorption in humans by oral delivery. These claims also cover specific dose limitations in the composition and a method for initiating antidiuresis and controlling Diabetes Insidipus in humans based on these compositions.

The rejection of the claims on appeal is under 35 U.S.C. § 102(b) and/or § 103 in view of the references cited by the Examiner. Appellants submit that the cited references fail to teach or suggest Appellants' novel invention. Support for this is presented below.

I.  CLAIMS ON APPEAL

Since additions and amendments in response to previous Office Actions have placed some dependent claims out of numerical order with respect to independent claims, Appellants have for the convenience of the board, arranged the below listed claims on appeal in order of dependency.

---

*  1-Deamino 8-D-Arginine Vasopressin.

- 2 -

11. An antidiuretic composition for humans comprising a gastrointestinally absorbable, antidiuretically effective, amount of 1-deamino-8-D-arginine vasopressin and a pharmaceutically acceptable carrier in solid oral dosage form for absorption in the gastrointestinal tract of said human.

2. The composition of claim 11 wherein said composition is in the form of a tablet.

3. The composition of claim 11 wherein said composition is in the form of a capsule.

4. The composition of claim 11 wherein the amount of said dosage of 1-deamino-8-D-arginine vasopressin is from about 50 to about 200 micrograms per 70 kilogram human per dosage.

5. The composition of claim 4 wherein the amount of said dosage of 1-deamino-8-D-arginine vasopressin is from about 50 to about 100 micrograms per 70 kilogram human per dosage.

12. A method for initiating antidiuresis comprising administering a gastrointestinally absorable, antidiuretically effective, amount of 1-deamino-8-D-arginine vasopressin to a human for absorption in the gastrointestinal tract of said human.

7. The method of claim 12 wherein the amount of said 1-deamino-8-D-arginine vasopressin is from about 50 to about 200 micrograms per 70 kilogram human per dosage.

8. The method of claim 7 wherein the amount of said 1-deamino-8-D-arginine vasopressin is from about 50 to about 100 micrograms per 70 kilogram human per dosage.

9. The method of claim 6 wherein said 1-deamino-8-D-arginine vasopressin is administered in the form of a tablet.

10. The method of claim 6 wherein said 1-deamino-8-D-arginine vasopressin is administered in the form of a capsule.

13. A method for treating diabetes insipidus comprising administering a gastrointestinally absorbable, antidiuretically effective, amount of 1-deamino-8-D-arginine vasopressin to a human for absorption in the gastrointestinal tract of said human.

- 3 -

## II.  THE INVENTION

The present invention is directed to an antidiuretic composition for humans.  The composition comprises a gastrointestinally absorbable, antidiuretically effective, amount of DDAVP and a pharmaceutically acceptable carrier in oral dosage form for absorption in the gastrointestinal tract of humans.

The present invention is also directed to a method for initiating antidiuresis, particularly for treating diabetes insipidus, using the composition of the invention.

In summary, the present invention is the known peptide DDAVP for initiating antidiuresis in humans through oral administration for gastrointestinal absorption.  The invention also included the dosage range required to provide an antidiuretic response.  In the past, it was not believed that such absorption was possible and the art taught against the administration of DDAVP in this manner.

## III.  THE REFERENCES

1.  U.S. Patent No. 3,497,491 to Zaoral et al, (1970).  (hereinafter "Zaoral")

2.  Oral Antidiuretic therapy:  Studies in the diabetes insipidus rat, Kinter et al (1982).  (hereinafter "Kinter")

3.  A Model For the Study of Oral Administration of Peptide Hormones, Saffran, et al (1979).  (hereinafter "Saffran")

- 4 -

4.  U.S. Patent No. 3,454,549 to

Boissonnas, et al (1969).

(hereinafter "Boissonnas")

The references are briefly described below, and will be treated in more detail in Appellants' discussion regarding the final rejection of the claims on appeal.

1 – Zaoral.  The Zaoral patent is directed to the peptide DDAVP, a vasopressin analogue, and its use in the treatment of Diabetes Insipidus.  Zaoral is the basic patent on the peptide DDAVP and prompted a cascade of research on all aspects of treatment with DDAVP.  A substantial amount of research was directed to various routes of administration, which ultimately led to the present invention.

Zaoral discusses several means for the administration of DDAVP, but fails to teach or suggest oral administration of DDAVP for gastrointestinal absorption in humans.

2 – Kinter.  The Kinter article provides a study on vasopressin and DDAVP peptides in the drinking water of rats, and the resulting impact on rat urine osmolality.  The study is primarily focused on the use of water as a peptide carrier to provide treatment for diuretic prompted thirst.  DDAVP was found to be more effective than vasopressin on the rats tested.

Kinter does not discuss, nor suggest that DDAVP could be effective in humans by oral delivery for gastrointestinal absorption.

3 – Saffran.  The Saffran article studies the effect of orally administered peptide hormones on rats.  The study involves LVP (Lysine Vasopressin) and   d-4-Val-DAVP (a vasopressin analogue).  Saffran did not study DDAVP.  The methods used by Saffran and the results obtained cannot be related to Appellants' invention.

– 5 –

4 - <u>Boissonnas</u>.  The Boissonnas patent is directed to desamino-Arg-vasopressin, an isomer of DDAVP.  This compound is substantially different from DDAVP, despite its isomerism.  In contrast with other chemical compounds, differences between peptide isomers are almost always so substantial, in terms of their properties, that the two isomers are considered completely different compounds.


IV.  <u>EXTRINSIC EVIDENCE</u>

During the prosecution of the claims on appeal, extrinsic evidence was entered by the Appellants.  This evidence is listed below:


A.  <u>DECLARATIONS</u>

1 - Declaration of Hans Vilhardt (dated May 27, 1986).  Dr. Vilhardt is co-inventor of the claims on appeal and an expert in the field of peptide research.  The Declaration has been attached as Exhibit A.

2 - Declaration of Hans Vilhardt (dated May 29, 1986).  A second Declaration by Dr. Vilhardt, addressing issues raised in the Interview with the Examiner on May 28, 1986.  This Declaration has been attached as Exhibit B.

3 - Declaration of Paul Czernichow, Dr. Czernichow is Professor of Pediatrics at Hospital des Enfants - Malades, Paris.  The Declaration has been attached as Exhibit C.

4 - Declaration of Myron Miller (June 9, 1986).  Dr. Miller is Chief of Geriatric Medicine, Medical Services, V.A. Medical Center, New York.  The Declaration has been attached as Exhibit D.

B.  OTHER DOCUMENTS

During the prosecution of the subject patent application, several papers were submitted to the Examiner.  These papers show the continued study of alternate modes of DDAVP administration after the publication of Zaoral.  These references indicate dissatisfaction with the accepted administration routes, and efforts to circumvent the problems therein.  No researcher attempted oral delivery of DDAVP for gastrointestinal absorption in humans prior to the work by Appellants leading to the subject invention.

1 - Treatment of Central Diabetes Insipidus In Adults and Children with Desmopressin. Ziai, et al.

2 - Two New Modes of Desmopressin (DDAVP) Administration. Grossman, et al.

3 - Effects of Vasopressin Analogues (DDAVP, DVDAVP) In the Form of Sublingual Tablets in Central Diabetes Insipidus. F. Laczi, et al.

4 - Desmopressin Urine Concentration Test. Monson, et al.

5 - Management of Cranial Diabetes Insipidus With Oral Desmopressin (DDAVP). Cunnah, et al.

6 - In Vitro Intestinal Transport of Vasopressin and Its Analogues. Vilhardt, et al.

The above references have been attached as Exhibit E.

V.  THE REJECTION

The claims on appeal have been rejected under 35 U.S.C. § 102(b) as anticipated by the Zaoral reference.  The Examiner has cited the use of the term "peroral" in Zaoral as anticipating DDAVP in oral dosage form for gastrointestinal

- 7 -

absorption (Claim 11) in tablet or capsule form (Claims 2 and 3); as anticipating the dosage concentration ranges (Claims 4 and 5), and further anticipating the method of treating diabetes insipidus by administering DDAVP via the gastro-intestinal tract (Claims 7-13).

The claims on appeal have also been rejected under 35 U.S.C. § 103 as obvious in view of Zaoral alone or in combination with Kinter, Boissannas, and Saffron. The Examiner alleges that these secondary references suggest the oral delivery route of DDAVP for gastrointestinal absorption in humans even though not one of these secondary references involves the use of DDAVP in humans.

Any prima facie obviousness rejection that may have been established by the Examiner has been successfully rebutted by the arguments, Declarations and other papers of record.

VI. DISCUSSION

The subject invention involves the confluence of two tightly related technologies. The first technology is in the field of peptide biochemistry and more specifically the role of certain peptide hormones and their analogues in the regulation of certain functions in the human body. The second field of interest is the delivery system chosen for the introduction to the human body of these peptide hormones in pharmaceutical form. The delivery system chosen for a particular pharmaceutic will strongly depend on the individual undergoing treatment (e.g., age, sex, disabilities, if any) and the biological stability, activity, and availability of that pharmaceutic when delivered by the chosen administration route.

- 8 -

In general, pharmaceutics are introduced to the human body by a variety of administration routes. These include intravenous intramuscular, subcutaneous, sublingual, buccal, intranasal, rectal, parenteral, inhalation and oral for gastrointestinal absorption. By far the most convenient administration route is the oral route for gastrointestinal absorption, where the pharmaceutic is in the form of a tablet or capsule. Oral administration for gastrointestinal absorption is universally chosen if the pharmaceutic can survive the digestion process and remain active. If the oral route to the digestive tract is precluded, then a second mode of administration is selected.

It has been found that certain peptide hormones and their analogues will act as specific regulators of human body functions. More particularly, the role of the peptide hormone "vasopressin" and its linkage to the control of the urine excretion and osmolality has led to major breakthroughs in the treatment of Diabetes Insipidus (DI). It has been found that certain analogues of vasopressin (i.e., DDAVP) promote a strong and lasting antidiuretic response in humans, and therefore provide effective relief to patients suffering from the diuresis associated with DI. DDAVP was quickly adopted as the favored pharmaceutic in the treatment of DI.

At the time DDAVP was recognized as an effective pharmaceutic, those skilled in this art universally believed that peptide hormones such as vasopressin, insulin, and DDAVP were subject to attack and degradation by the enzymes in the gastrointestinal tract of a human. This belief, in effect, precluded the use of DDAVP in oral dosage form for gastrointestinal absorption, and led to the testing and experimentation of the alternate routes discussed above.

- 9 -

Although these routes were generally effective, each suffered certain drawbacks. Researchers in this field expended substantial resources in addressing these problems. For example, throughout the 1970's DDAVP was mostly administered intranasally through the use of a device called a "rhinyle". This administration technique is difficult to perform, especially for the elderly, and can often lead to infections and damage to the mucous membrances of the nose. Difficulties with the rhinyle led to studies using sublingual tablets or less offensive nasal sprays. But, due to the continued belief that peptide hormones (and therefore DDAVP) are deactivated in the human intestines, no researcher studied DDAVP on humans as administered in oral form for gastrointestinal absorption.

In view of the clear benefits associated in the oral administration route to the intestines, some effort was made to develop adjuvants to DDAVP, that in combination would inactivate the enzymes in the intestines, sufficiently to permit the gastroingestinal absorption of DDAVP. In fact, research in this area by the inventors led to the subject invention. More particularly, when Dr. Vilhardt ran a "control" (i.e., DDAVP without the protective adjuvants) in comparison to a "protected" DDAVP tablet, as ingested by human subjects, he discovered that both the protected and unprotected DDAVP tablets produced strong antidiuretic responses in the test subjects. DDAVP, contrary to all the teachings and understandings of those skilled in the art at that time, was capable of withstanding the gastric enzymes in the intestine. Oral administration for gastrointestinal absorption, the generally preferred route for most pharmaceutics, could now be used with DDAVP.

A. The Subject Invention Is Novel
   and Unobvious In View Of Zaoral

The Examiner contends that Zaoral teaches and/or suggests
the administration of DDAVP by the oral route for
gastrointestinal absorption in humans.  The Zaoral reference,
reviewed as a whole, does not support the Examiner's contention.

Zaoral is directed to DDAVP as an antidiuretic compound in
humans.  Zaoral teaches the structure of DDAVP and the method
for its production.  Only two sentences in Zaoral relate to the
administration of DDAVP.  These are found at col. 3, lines
16-23 and state as follows:

> The polypeptide I of the invention may be
> used as the free base or in the form of its salts with
> inorganic or organic acids, without or with additives such
> as stabilizers, preservatives, sweetening agents, aromatic
> compounds, flavoring agents or detergents to obtain the
> suitable form, as desired, for the parenteral, peroral,
> intranasal, subcutaneous, intramuscular, or intravenous
> application.  Thus, e.g., hydrochloric acid, phosphoric
> acid, and boric acid can be used as inorganic acids, acetic
> acid, citric acid, and tartaric acid as organic acids, and
> tannin as a material having an acidic function.
> Furthermore, starch, lactose, natural or hydrogenated oils,
> talc, and glycerol can be used as further additives.

> The preferred way of administration is
> subcutaneous but the drug can also be used by intranasal
> application.  The dose is about 5-10 ng./kg./day in the
> first case.  The dose for intranasal administration is
> approximately 200 ng./kg./day.

The term "peroral" means literally "through the mouth".  In
the context of the Zaoral patent "peroral" teaches sublingual
and buccal administrations.  The Examiner's contention that
peroral teaches DDAVP in oral dosage form for gastrointestinal
absorption is in error for the following reasons:

- 11 -

1 — All the "applications" listed in Zaoral avoid the gastrointestinal tract of humans. For example, "parenteral" specifically means administration "outside" the intestine. This is understandable, since the state of the art clearly taught that peptides like DDAVP were rendered useless by gastric enzymes.

2 — Zaoral lists the preferred application as "subcutaneous". If the oral route for gastrointestinal absorption was being taught, it would clearly have been listed as the preferred route.

3 — The syntax of the second sentence in the segment above implies that only subcutaneous and intranasal administration are operable. This clearly introduces an ambiguity into the general topic of administration routes as dealt with by Zaoral. Such an ambiguity renders the reference void as a teaching on the topic of administration routes.

Upon the issuance of Zaoral, the DDAVP compound became the focus of substantial research. A large portion of this research was directed to selected routes of drug administration. The accepted means for administration of DDAVP, i.e., intravenous and intranasal had significant drawbacks, and researchers in this field attempted to address these problems. For example, see "Effects of Vasopressin Analogues (DDAVP, DVDAVP) in the Form of Sublingual Tablets in Control Diabetes Insipidus" Laczi et al., <u>International Journal of Clinical Pharmacology, Therapy and Toxicology</u>, Vol. 18, No. 12 (1980) pp. 63-68 (attached as Paper No. 3 in Exhibit E). In this paper, the authors cite the problems associated with intranasal application of DDAVP. Prolonged use involving intranasal delivery often leads to lesions in the nasal mucous membranes. Further, persons suffering catarrh of the upper respiratory tract are precluded altogether from intranasal delivery. In view of the problems associated with intravenous and intranasal delivery, the authors concluded that <u>sublingual</u> administration offered the preferred method of DDAVP administration. This conclusion was

explicitly based on the lack of peptidase enzymes in saliva.
The implicit premise underlying the Laczi research was that
gastrointestinal absorption by oral delivery (which is
specifically claimed in the instant application) was precluded
due to the existence of these peptidase enzymes in the
stomach. It was apparent that, although DDAVP was a wonderful
new drug, its perceived limitations in administration narrowed
its scope of use.

Moreover, those skilled in this art believed that Zaoral
taught the use of DDAVP exclusive of the gastrointestinal
absorption of an orally delivered dose. In support of this,
Appellants have supplied the sworn statements of several
researchers in this field.

Dr. Czernichow is a world-wide researcher in peptide
chemistry with numerous publications and awards, as set forth
in his curriculum vitae. Dr. Czernichow indicates in his
Declaration that the Zaoral patent, particularly the disclosure
at column 3, lines 16 through 34, did not teach him or, in his
opinion, did not teach others skilled in this art to administer
DDAVP in oral dosage form for gastrointestinal absorption by
humans (Czernichow Declaration, par. 3). Dr. Czernichow has
been in the field of peptide research, including DDAVP, since
at least 1965 (Czernichow Declaration, par. 1), prior to the
filing of the Zaoral patent.

Dr. Czernichow states that if the Zaoral patent had
disclosed the use of DDAVP in oral dosage form for
gastrointestinal absorption by humans, then the teachings of
the art and the activities of those skilled in this art would
have been inconsistent with the disclosure of Zaoral. Dr.
Czernichow states that it is well known that administering
drugs orally for gastrointestinal absorption is vastly

- 13 -

preferable to subcutaneous, sublingual or buccal administration if the oral/gastrointestinal absorption route is available. He further states that those knowledgeable of DDAVP-like peptides always believed that DDAVP could not be administered via the highly preferred mode because it was believed that DDAVP was inactivated in the gut (Czernichow Declaration, par. 4).

The manner in which Dr. Czernichow first recognized that DDAVP could be administered orally to humans for gastrointestinal absorption further establishes the unobviousness of the present invention and the fact that Zaoral does not teach those skilled in the art this means of administration. Dr. Czernichow first recognized that DDAVP could be administered via the claimed route in 1984 when he attended a talk by Dr. Vilhardt, one of the co-inventors herein. He was surprised to learn from that talk that DDAVP had been successfully administered by the claimed route to human volunteers. He was surprised Because Dr. Vilhardt's finding was contrary to Dr. Czernichow's understanding concerning DDAVP administration based on Dr. Czernichow's review of the literature, his own personal research, and discussions with colleagues in the peptide field (Czernichow Declaration, par. 6).

Dr. Czernichow then confirmed Dr. Vilhardt's discovery by treating certain of his patients with DDAVP via the claimed route and found, to his surprise, an antidiuretic response (Czernichow Declaration, par. 7).

Dr. Czernichow further confirms Dr. Vilhardt's conclusion that the term "peroral" at column 3, line 22 of the Zaoral patent meant to him and to others skilled in this art that DDAVP could be administered "through the mouth" for sublingual or buccal administration, not via the gastrointestinal absorption route (Czernichow Declaration, par. 8).

- 14 -

This understanding of the term "peroral" is also confirmed by Dr. Myron Miller, Chief of Geriatric Medicine at V.A. Medical Center in Syracuse, New York. Dr. Miller has been intimately involved with peptide research, particularly research relating to DDAVP. He has read the Zaoral patent and concluded that the term "peroral" refers to sublingual and/or buccal administration and does not indicate oral administration of DDAVP for gastrointestinal absorption by humans (Miller Declaration, par. 8).

In his Declaration, Dr. Miller indicates that the present invention - i.e., an antidiuretic composition of DDAVP in a carrier in oral dosage for gastrointestinal absorption by humans, is an important invention and one which was unobvious to Dr. Miller and, in his view, unobvious to others skilled in this art even after a review of the cited references (Miller Declaration, par. 2).

Dr. Miller co-authored the chapter entitled "Disorders of Neurohypophysis" which appears at pages 604-614 of Harrison's well known treatise on internal medicine entitled "Principles of Internal Medicine". That chapter, which was published in 1983 before Dr. Vilhard't invention, discusses the known treatment (as of 1983) of diabetes insipidus. Dr. Miller did not know in 1983 of Dr. Vilhardt's invention and thus, wrote:

> "As is true of most peptides, oral administration of vasopressin is ineffective".

Vasopressin is the parent molecule of DDAVP and the quoted statement concerning vasopressin is equally applicable to DDAVP (Miller Declaration, pars. 3 & 4).

- 15 -

In 1983, Dr. Miller did not believe that vasopressin and its derivatives could be orally administered. Accordingly, the method of administration recommended by Dr. Miller in Harrison's well known treatise is the use of the intranasal administration route, with all the problems associated with that kind of drug administration (Miller Declaration, pars. 5 & 6).

Dr. Miller also discusses in his Declaration the "AMA Drug Evaluations" reference which was also published in 1983. This text indicates that DDAVP should be administered intranasally through a rhinyle. It further states that two new intranasal forms have been developed and are currently under investigation: a conventional nasal spray and sublingual lozenges (Miller Declaration, par. 7).

Dr. Miller concludes that if the oral/gastrointestinal route had been obvious, this method of administration would have been disclosed in the AMA Drug Evaluations article since this route of administration would be by far the most economical, most efficient, and safest method then known (Miller Declaration, par. 7; see also second Vilhardt Declaration, par. 9).

Dr. Miller confirms the understanding of Drs. Vilhardt and Czernichow with respect to the term "peroral" in the Zaoral patent (Miller Declaration, par. 8).

The commercial practice after the issuance of the Zaoral patent is also pertinent to the fact that Zaoral did not teach the oral/gastrointestinal absorption DDAVP administration route for humans. While DDAVP initially may have been administered subcutaneously because of the expense of peptides such as DDAVP and the unwillingness to tolerate the loss associated with intranasal administration, substantially all of the DDAVP sold

- 16 -

to date worldwide has been administered intranasally. Ferring Pharmaceuticals, the exclusive licensee under the Zaoral patent, is the sole vendor (with its sub-licensee) of DDAVP worldwide.  Sales of DDAVP have constantly and substantially increased from 1973 to date, with the result that almost 30 million dollars worth of DDAVP was sold in 1985 alone.  All of this DDAVP was provided in a form for intranasal administration to humans.  None of it was provided in a form for oral administration via gastrointestinal absorption (second Vilhardt Declaration, par. 10).

Other researchers in this art were searching, for more than a decade after the issuance of Zaoral, for other, less onerous, methods of administering this important drug.  In 1980, two well known research groups, one in London and the other in Hungary, developed and published alternatives to the disadvantageous subcutaneous/intranasal methods of administering DDAVP.  These researchers considered use of a nasal spray and sublingual lozenges.  Neither group even considered that DDAVP could be absorbed via the gastrointestinal tract (first Vilhardt Declaration, par. 23; second Vilhardt Declaration, par. 9).

Accordingly, Zaoral does not anticipate or render obvious the presently claimed invention.  The overwhelming evidence of record establishes that those skilled in this art understood the term "peroral" in Zaoral to mean "sublingual and/or buccal" but not oral administration for gastrointestinal absorption.

For a reference to anticipate an invention, every element of the claimed invention must be present in that single reference.  In re Marshall (CCPA 1978) 557 F.2d 301, 198 U.S.P.Q. 344.  In addition, the reference must provide a clear and unambiguous teaching of the invention as claimed.  In the

present context, Zaoral fails to anticipate the present claims, as it does not teach the oral route for DDAVP for gastrointestinal absorption as claimed in <u>all</u> of the claims on Appeal. In addition, Zaoral provides absolutely no discussion, or suggestion of the appropriate dosage amounts of DDAVP for gastrointestinal absorption in humans. In the subject Appeal, claims 4, 5, 7 and 8 each provide specific dosage limitations to the use of DDAVP for gastrointestinal absorption. In view of these specific limitations, and the (at best) ambiguous teaching of Zaoral on the subject of administration of DDAVP, the rejection under 35 U.S.C. § 102(b) must fall.

Nor does Zaoral render obvious the claimed invention. There is nothing in Zaoral to suggest, and the art both before and after Zaoral teaches away from, oral administration of DDAVP for gastrointestinal absorption by humans. Futhermore, the inventor himself, after reading the Zaoral patent on several occasions, attempted to provide a complicated solution to a problem which was universally art recognized at the time.

The teachings of the art prior to the present invention are not inconsistent with present evidence concerning adminis- tration of other vasopressin derivatives. The compound 1-deamino-4-asparagine-8-D-arginine-vasopressin (4-Asn-DDAVP) has only a marginal effect on urine osmality when given orally while DDAVP produces a profound and prolonged antidiuretic response when given orally. Both compounds produce comparable antidiuretic effect when given intranasally (second Vilhardt Declaration, pars. 12 & 13). Any prima facie case of obviousness, based on Zaoral, has been succinctly rebutted by the evidence of record, including the Declarations of those skilled in this art.

- 18 -

B. The Subject Invention Is Unobvious
In View Of Zaoral In Combination
With Kinter, Saffran, and Boissannas

Zaoral was published in 1970. Peptide chemistry was and remains a fast paced, high profile field of research with significant developments made at a high frequency. For more than twelve years after Zaoral was published, and during a period of significant research on DDAVP and the means for its administration, no studies were made on the gastrointestinal delivery of DDAVP to humans by oral dose.

The secondary references relied upon by the Examiner in combination with Zaoral fail to contribute to Zaoral in any meaningful way. The Kinter reference involves a study of DDAVP as administered to rats via the rats' drinking water. Kinter does not disclose gastrointestinal absorption of DDAVP. Kinter does not test DDAVP on humans. All that Kinter can contribute is the impact DDAVP has on rats when delivered via their drinking water. It is well known that the drop-by-drop ingestion process by rats will result in a significant portion of DDAVP absorption through the mucous membranes of the mouth. The authors were careful not to conclude that the DDAVP was reaching the gastrointestinal tract, and in fact reached no conclusion whatsoever as to the actual mechanism involved. The Kinter paper is directed to a urine osmolality model, simplified by the use of rats and drinking water.*

In addition, although research on rats can suggest the applicability of some pharmaceutics on humans, this is not so for most peptide hormones, where species differences normally

* The rat diuresis triggers thirst, thus directing the
  rat to drink the medicated water.

- 19 -

render experiments involving drug delivery with animals almost useless as predictors of human physiological response. For example, 4-Asn-DDAVP and DDAVP are equally potent in their antiuretic action where tested <u>intravenously</u> and <u>orally for gastrointestinal absorption</u> in rats. When 4-Asn-DDAVP is given intravenously to a human, a strong antidiuretic response results. But when 4-Asn-DDAVP is administered orally for gastrointestinal absorption to a human, the antidiuretic response is practically absent. These results contrast directly with DDAVP in humans where a dose as small as 20 mg. of DDAVP promotes a significant and lasting antidiuretic response. Accordingly, 4-Asn-DDAVP is readily absorbed from the gastrointestinal tract of a rat, but <u>not</u> from a human intestinal tract.

The Boissonnas reference discloses the use of 1-D-8-Arg vasopressin, an analogue of vasopressin that is an isomer of DDAVP. Unlike other chemical compounds, differences between peptide isomers are almost always so substantial in terms of their properties, that the two isomers are considered completely different compounds (first Vilhardt Declaration, par. 24). Accordingly, gastrointestinal absorption in humans cannot be predicted from one isomer to another. While Boissonnas does disclose an isomer of DDAVP, the biological properties of DDAVP and <u>its isomer are so substantially different that they are considered totally different compounds</u>. In particular, the ratio of antidiuretic response to pressor effect for DDAVP is about 4000, for example, whereas the same ratio for the Boissonnas isomer is about 4. On the basis of these extremely significant biological property differences, one could not predict the biological utility and properties of one compound based upon a knowledge of the other (first Vilhardt Declaration, par. 25).

- 20 -

The Examiner has recognized the cited biological differences between DDAVP and the Biossonnas isomer, but suggests that this could be compensated by regulating the dosage. Appellants strongly disagree. Peptide isomers not only differ in biological activity, but also in absorption rates - which cannot be predicted by biological activity. In this regard, see "In Vitro Intestinal Transport of Vasopressin and its Analogues". Vilhardt et al., Acta Physical Scand. 126 (1986) pp. 601-607 (annexed as Peper No. 6 in Exhibit E). In this publication, it is disclosed that the analogue 1-deamino-2-tyr-(O-ethyl) oxytocin, which is without biological activity, is absorbed much faster from the intestine than oxytocin, which of course, possesses substantial biological activity.

Therefore, the Examiner's comments as to dose are meaningless in this context, and further clearly inappropriate as to specifically claimed dosage ranges in the claims on appeal.

Accordingly, any prima facie case of obviousness which may have been presented by Boissonnas is rebutted by the evidence of record. No combination of Boissonnas with either Zaoral or Kinter is appropriate since the compound disclosed in Boissonnas is different from those of the other references.

The Saffran reference also fails to contribute to Zaoral in any meaningful way. Primary is the fact that Saffran did not study DDAVP. This reference was a comparative work on vasopressin and a vasopressin analogue, 1-d-4-Val-8-D AVP. Also, Saffran's study was on anesthesized rats and the antidiuretic response of these rats when the peptides were administered intragastrically.

- 21 -

More particularly, the Saffran study employs techniques that would actually lead those skilled in this art to believe that intragastric absorption of DDAVP in humans was not likely. These techniques included the use of "fasting rats" anesthesized with alcohol via gastric tube. Alcohol is an irritant to the mucous membranes of the stomach. Such irritants are capable of inducing a response from peptides that, without the alcohol, would produce no response. For example, Saffran found trasylol in the blood stream of the rats. Trasylol is a large peptide (6000 molecular weight) similar in size with insulin and normally is not absorbed in the gastric tract. Its existence in the blood stream clearly indicates the unusual absorption conditions existing in Saffran's sudy. Saffran also hydrated the rats by introducing relatively large volumes of water via the gastric tube. This would "balloon" the stomach with a resulting extension of the epethelial lining, and thus creating a totally abnormal absorption condition. The above problems with the Saffran study, and others are discussed in more detail in the first Vilhardt Declaration (Exhibit A - paragraphs 12-19).

In addition, the Saffran study focuses on the oral administration of insulin. In this regard, it actually teaches away from appellants' invention as the authors stress the importance of avoiding breakdown of lysine vasopressin by enzymes in the gut through the use of specific adjuvants, such as diisopropylfluorophosphate, liposomes or Trasylol (a potent enzymatic inhibitor). In control experiments without these inhibitors, no absorption of insulin took place. The other peptides discussed in Saffran (p. 549) are either di- or tripeptides and albumin; each involving a fundamentally different absorption mechanism. Saffran reflects the

- 22 -

understanding of those skilled in this art that gastrointestinal absorption of peptides was critically inhibited by enzymatic cleavage of the peptides in the digestive process.  It is clear from this analysis of Saffran that the reference cannot be properly combined with Zaoral or the other secondary references in a manner that suggest appellants' novel invention.

Finally, as with Zaoral, none of these secondary references provide any information as to a suitable dosage level of DDAVP for gastrointestinal absorption in humans.  When DDAVP is discussed (as in Kinter), the dosage used bears no relationship, much less suggestion as to the effective levels as specifically claimed in claims 4, 5, 7 and 8 on appeal.

In summary, Zaoral does not anticipate appellants invention as the clear understanding by those skilled in this art was that Zaoral taught DDAVP via administration routes exclusive of the gastrointestinal tract in humans (Claim 11 of the appealed claims).  Zaoral does not discuss the use of tablets or capsules for gastrointestinal absorption (Claims 2 and 3). Zaoral does not disclose dosage ranges of DDAVP for gastrointestinal absorption (Claims 4 and 5).  Finally, Zaoral does not teach the above compounds as used in a method to treat diabetes insipidus (Claims 7-13).  It is clear that Zaoral does not contain every element of each appealed claim and, in fact, each claim is distinguishable from Zaoral by the extent limitation to oral delivery for gastrointestinal absorption.

Further, Zaoral alone, or in combination with Kinter, Boissannas and/or Saffran fails to suggest the subject invention.  Any prima facie obviousness case that the Examiner may have presented has been rebutted by the Declarations of record.  The claims are patentably distinct from all known art, including the references of record.

VII.   UNDERLINED CONCLUSION

In view of the facts set forth above, it is respectfully requested that the Board of Patent Appeals and Interferences reverse the Examiner's final rejection and allow the claims.

A check for the amount of $240.00 is enclosed, which covers the fee for filing the appeal brief as well as the request for oral hearing.  The Commissioner is hereby authorized to charge any additional fees or credit any overpayment to Deposit Account No. 08-2776.

Respectfully submitted,

Dennis J. Mondolino
Reg. No. 27,148
HOPGOOD, CALIMAFDE, KALIL,
   BLAUSTEIN & JUDLOWE
60 East 42nd Street
New York, N. Y.  10165
(212) 986-2480

Dated: *March 13*, 1988.

- 24 -

Exhibit A

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re application of | : | HELMER HAGSTAM and HANS VILHARDT |
| Serial No. | : | 809,937 |
| Filed | : | December 17, 1985 |
| For | : | DDAVP ANTIDIURETIC AND METHOD THEREFOR |
| Examiner | : | J. Stone |
| Group Art Unit | : | 123 |

Honorable Commissioner of Patents
    and Trademarks
Washington, D.C. 20231

DECLARATION OF HANS VILHARDT

Sir:

Hans Vilhardt declares and states that:

1.    I am one of the co-inventors of the subject matter of the above-identified patent application.

2.    I am presently Professor of Medical Physiology C at the University of Copenhagen.  A copy of my curriculum vitae is annexed hereto as Exhibit 1.  A list of my publications is annexed hereto as Exhibit 2.

3.    I have reviewed and am familiar with each of the references which is listed in the Information Disclosure Statement which was filed on May 27, 1986.

4.    Our invention is directed to an antidiuretic composition.  This composition comprises a gastrointestinally absorbable antidiuretically effective amount of 1-deamino-8-D-arginine vasopressin ("DDAVP") and a pharmaceutically acceptable carrier.  The composition is in oral dosage form for absorption in the gastrointestinal tract of humans.

5.    As far as I know, no one had ever known that DDAVP, administered orally, would be absorbed by the gastrointestinal tract of humans and thus exhibit an antidiuretic effect. Indeed, those skilled in this art have stated that peptides like vasopressin and oxytocin are degraded by the enzymes in the gut.  Goodman & Gilman, <u>The Pharmacological Basis Of Therapeutics</u>, (5th Ed. 1975) (Exhibit 3, page 854), for example, teach that ADH, lypressin and their congeners, when given orally, "are quickly inactivated by trypsin".  So is oxytocin (pg. 870).  <u>See also</u> <u>Ganong</u>, Review Of Medical Physiology (11th ed. 1983) at 380--81.  (Exhibit 4).

6.    While proteolytic enzymes are present in the gut and these enzymes are presumed to degrade peptides, no such enzymes are secreted by the nasal mucosa so it was recognized that peptides such as DDAVP and AVP (arginine vasopressin) would not be degraded if administered intranasally.

7.    Accordingly, AVP and DDAVP, as well as posterior pituitary extracts containing vasopressin, have been administered intranasally  for numerous years.  These posterior pituitary extracts, for example, have been described by Blumgart ("The Antidiuretic Effect of Pituitary Extract Applied Intranasally In A Case Of Diabetes Insipidus", 29 Archs. Intern. Med. 508 (1922)) for intranasal use more than sixty years ago for patients suffering from diabetes insipidus.  This same mode of administration is used even today.  In 1922, Blumgart stated:

> "Failure has attended practically
> all attempts to diminish the
> urinary output by dried extract
> given by mouth".

-2-

8. DDAVP and other vasopressin analogs have all been administered to humans intranasally despite the problems associated with this mode of administration. Intranasal administration is, for example, difficult to carry out for many patients, particularly the elderly. Furthermore, nasal administration adversely affects the cilia such that virus and bacteria may more readily pass the mucosa. Also, DDAVP in solution must be refrigerated and a preservative must be added for the solution to remain stable.

9. Furthermore, it is, and has been, well known that for pharmaceuticals generally oral ingestion is the "safest, most convenient and most economical" route of administration, See "The Pharmacological Basis Of Therapeutics," Goodman et al (5th Ed.) at pages 5 through 8 (copy annexed hereto as Exhibit 5), yet there is no teaching or suggestion in any of the references listed in the Information Disclosure Statement that oral/gastrointestinal absorption of DDAVP is contemplated. Indeed, as late as 1980, ten years after the issuance of the Zaoral patent on DDAVP, oral administration of DDAVP for gastric absorption was not considered possible. See Grossman et al, 2 Brit. Med. J. 1215 (1980) (annexed hereto as Exhibit 6) and Laczi et al, 18 Int. J. Clin. Pharmacol Ther. Tox. 63 (1980) (annexed hereto as Exhibit 7).

10. DDAVP is a very important drug which is commercially successful. This drug has been sold from 1973 to present. The worldwide sales of DDAVP (in 2.5 milliter vials for intranasal administration) has increased from 1973 through 1985 as shown in the graph which is annexed hereto as Exhibit 15. Almost thirty million dollars ($30,000,000.00) worth of DDAVP has been sold worldwide in 1985 alone (Exhibit 16). None of the DDAVP sold to date has been sold in a form for oral administration. All of the DDAVP sold to date has been sold by the exclusive licensee of the Zaoral patent or by its sublicencees.

-3-

11.   The prior art listed in the Information Disclosure Statement referred to in paragraph 3 hereof neither teaches nor suggests, either alone or in any combination, the antidiuretic composition which is the subject of this invention.  In particular, no one or combination of these references teaches or suggests that DDAVP in oral dosage form will be absorbed within the gastrointestinal tract of humans.  This finding was and is of key interest to the scientific community and has been the subject of various scientific talks and papers.  See, for example, a publication of which I am co-author, entitled "Antidiuretic Effect Of Perorally Administered DDAVP In Hydrated Humans," 105 Acta Endocrinol 474 (1984) (Exhibit 8).

12.   Our finding that DDAVP is useful in oral dosage form for absorption in the gastrointestinal tract of humans is contrary to the findings with respect to other vasopressin compounds.  In this connection, I or those under my direct supervision conducted experiments with both DDAVP and 1-deamino-4-aspargine-8-D-Arginine-vasopressin (4-Asn DDAVP) via both oral and intranasal modes of administration as follows:

a)   Six experiments were performed on volunteers of both sexes at the Department of Medical Physiology C, University of Copenhagen.  Upon arrival at the laboratory, the volunteers emptied their bladders and drank a volume of tap water corresponding to 1.5% of their body weight.  Throughout the experiment urine was voided every 15 minutes and the volume was measured.  The volunteers replaced their fluid loss by drinking corresponding volumes of tap water.

b)   When urine production rate exceeded 150 ml/15 minutes, 4-Asn-DDAVP was administered perorally, either in solution (50 ml) or as a tablet (100 ug or 200 ug).  Most of the volunteers received more than one dose of 4-Asn-DDAVP and, for some volunteers, 4-Asn-DDAVP was also administered

-4-

intranasally. One of the volunteers also received a peroral dose of DDAVP. For each 15 minute period, urine volume and osmolality were measured.

c) The results of the six experiments are shown on the graphs of individual experiments annexed hereto as Exhibits 9 through 14.

d) Perorally administered 4-Asn-DDAVP had no effect on diuresis or urine osmolality. In a few cases, urine volumes decreased somewhat after administration of the highest doses of 4-Asn-DDAVP, but urine osmolality remained unaffected.

e) However, when 4-Asn-DDAVP was administered intranasally (Exhibits 10 through 12), a full antidiuretic response was observed with marked reduction of urine volumes and increases in osmolality over a long period of time, comparable to the response found after intranasal administration of DDAVP.

f) DDAVP administered perorally to one of the volunteers (Exhibit 13) caused a profound and prolonged antidiuretic response as previously described by me in the Exhibit 8 article of which I am co-author.

13. I conclude from the above experiments that when DDAVP and 4-Asn-DDAVP are each administered intranasally, they produce a comparable antidiuretic effect. On the other hand, when 4-Asn-DDAVP is given orally, even the highest dosages tested had only a marginal effect on urine volume and no effect on urine osmolality. This finding is consistent with the expectations of the scientific community with respect to the oral administration of vasopressin compounds but is in contrast to our discovery that DDAVP when administered orally, unexpectedly produced a profound and prolonged antidiuretic response.

-5-

14. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this statement is directed.

Hans Vilhardt

Dated:   May 27, 1986

-6-