In fact, the work performed by Dr. Czernichow was clinical trials of the oral

formulation of DDAVP.  Czernichow Tr. 24-27 (A2902). [26]  The funds he received

from Ferring were for test equipment necessary to conduct the clinicals.  *Id.* at 26

(A2902).

Dr. Czernichow was not paid for his declaration.  *Id.* at 120 (A2925).  He had

and has no financial interest in whether the '398 patent issued when he executed his

declarations or at any other time.  *Id.* at.15-16 (A2899).

b.     Dr. Barth was a member of the Czech group that had synthesized

DDAVP decades before his declaration.  In the mid-1980s, Dr. Barth had worked

for Ferring on an unrelated peptide for an unrelated indication that did not work out.

Barth Tr. 18 (A5379).  Between 1988 and 2000, he worked a month most years in

Dr. Vilhardt's laboratory for which he was paid a maintenance stipend.  *Id.* at 134-

---

[26]     The first part of this study was listed as item 41 on p. 28 of Dr. Czernichow's
*curriculum vitae* attached to his 1980 Declaration provided to the PTO.

"41.  FJELLESTAD A, RAPPAPORT R, CZERNICHOW P., Oral treatment
of central diabetes insipidus (DI) in children by DDAVP tablets.  Second
Joint Meeting of LWPES-ESPE.  Baltimore, USA. 1985 Ped Res 1985; 19:
604".  If Dr. Czernichow was deliberately seeking to hide his prior contact
with Ferring, it seems unlikely that he would have kept this publication in his
*curriculum vitae.*

139 (A5408-09).  Dr. Barth was <u>not</u> a consultant to Ferring[27] and the District Court's factual finding to the contrary (A17) on summary judgment was error.

Dr. Barth was not paid for his declarations.  Barth Tr. 77, A5393.  He had and has no financial interest (whatever) in whether the '398 patent did or did not issue when he executed his declarations or at any other time.

c.      Dr. Robinson was Research Director at Ferring between 1985 and 1986 and consulted (as to non-DDAVP products) for three years thereafter. Robinson Tr. 30-31; 38-39 (A2855, 2857).  By 1990 when he executed his declaration, Dr. Robinson held no position at Ferring; and has and had no financial interest in whether the '398 patent issued when he executed his declarations or at any other time.  Robinson Tr. 80 (A2867).

d.      Dr. Miller, who filed two declarations, is not identified as being any part of the inequitable conduct.  Dr. Miller provided declarations on both the understanding in the field before the '398 invention that peptides could not be orally administered to humans and, later, regarding the lack of merit of the Vavra rat study.  Miller Decls. (A3634-37, A3709-12).

---

[27]      "Q:   Entry number 38 describes you as a Ferring consultant.
        A:   Definitely I was not paid for being a consultant of Ferring.
        Q:   Were you a Ferring consultant at all?
        A:   No, I wasn't."

Barth Tr. 38 (A5384).

* * * *

The District Court found no actual evidence of intent to withhold any prior contacts with applicants, and Barr offered none. On deposition, Barr's counsel did not ask Dr. Vilhardt or any other declarant a single question which would bear on the issue of intent. They were never asked if they considered the prior contacts significant, or even whether they had them in mind at all when preparing their declarations.

Rather the District Court <u>inferred</u> the fact of intent solely from its finding that the prior contacts constituted material omissions. The Opinion concludes that the inequitable omission charged "should have been, and … that it must have been clear to Dr. Vilhardt".[28]

The Opinion did not consider or discuss any contrary inferences that could be drawn from the predicate facts that would not constitute fraudulent intent or any intent at all, reasonable inferences favorable to appellants which must be drawn on summary judgment. These include that the prior contacts were not material; that the declarants never contemplated the prior contacts when preparing their declarations; that the declarants did recall the contacts but did not consider them

---

[28]    "Should have been" and its full equivalent here "must have been" are not sufficient for inequitable conduct unenforceability. *Nordberg Inc. v. Telsmith, Inc.*, 82 F.3d 394, 397 (Fed. Cir. 1996); *American Hoist & Derrick Co. v. Sowa & Sons Inc.*, 725 F.2d 1350, 1362 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 821 (1984).

pertinent; or that the omissions could have arisen from oversight or negligence –
any of these inferences would foreclose a finding of inequitable conduct on
summary judgment.

The District Court relied heavily on *Paragon Podiatry Laboratory, Inc. v.
KLM Laboratories, Inc.*, 984 F.2d 1182 (Fed. Cir. 1993) and *Refac Int'l Ltd. v.
Lotus Development Corp.*, 81 F.3d 1576 (Fed. Cir. 1996). (A14-18). *Refac* in fact
held that, even <u>after trial</u> when credibility could be and was weighed, omitted
disclosure of prior contacts that two PTO declarants had had with the assignee of
the patent in question did <u>not</u> suffice for materiality or intent, and did not constitute
inequitable conduct. [29] *Refac* specifically observed that omissions of a declarant's
employment history were at best only "an arguably minor omission". *Id*. at 1584.
This is not reflected in the Opinion here.

*Paragon* involved an express deceit by declarants that they had no interest in
the patent assignee when in fact they had been shareholders and at least one had
been a consultant. 984 F.2d at 1191.[30]

---

[29]   The result differs for a third declarant. *See* p. 42-46, *infra* (discussing *Refac in toto*).

[30]   *Please see Cardiac Pacemakers Inc. v. St. Jude Medical Inc.*, 2002 WL
1801525, *48 (S.D. Ind. 2002), *aff'd in part, rev'd – but on other grounds*,
381 F.3d 1371 (Fed. Cir. 2004):

"Unless the courts intend to foster the 'absolute plague' decried by the
Federal Circuit, *Paragon Podiatry* must be regarded as one of these

The authorities of this Court make clear that it is more difficult and a greater burden to prove inequitable conduct intent for omissions than for misrepresentations. *Hoffman-LaRoche Inc. v. Promega Corp.*, 323 F.3d 1354, 1367 (Fed. Cir. 2003); *Rohm and Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983). Misrepresentations arise in one of only two ways (error or purposeful falsehood). Omissions can arise in many more ways – p. 50-51 as exemplars among others.

*Refac* employed the "clearly erroneous" standard of review applicable after trial, and decided in deference to the district court's post-trial decision that the "arguably minor" prior contact omission of one of three declarants could not be held as a matter of law to not constitute a sufficient basis for inequitable conduct. 81 F.3d at 1584-85. Here, the District Court misapplied the *Refac* conclusion as a logical and legal imperative:

> "In other words, deliberate omission of a relevant part of an affiant's employment history on an affidavit in support of a patent <u>would be</u> inequitable conduct."

(A15) (emphasis added). That is, the District Court found that an omitted prior contact mandated a holding of inequitable conduct rather than permitting or not

---

'extreme cases,' as 'rare indeed.' The evidence there was extraordinarily powerful. In this case, the evidence of inequitable conduct was debatable. The evidence would have permitted but did not compel a finding of intent to deceive."

permitting such a conclusion as facts warrant.  There is no discussion of this distinction between misrepresentations and omissions.  Nor does the District Court cite any case where inequitable conduct has ever been found on summary judgment based solely on an omission.  Barr's summary judgment moving papers cited no such case either.

## 2.  Non-Infringement

### a. Claim Construction

The District Court construed the claim term "1-deamino-8-D-arginine vasopressin" as limited to the free base form of desmopressin – and found no literal infringement because the accused Barr product is in the acetate salt form.  The Opinion found unpersuasive:

(i)      That since the early 1970s, all DDAVP (in whatever administration form) has contained the active ingredient in its acetate salt form. That is the only 1-deamino-8-D-arginine vasopressin which the FDA or any foreign regulatory authority has ever approved.  (Verbalis Tr. 216-19, A2120-21; Kinter Tr. 216-18, A2427-28; Vilhardt Tr. 100, 164, A5479, 5495);

(ii)     Expert deposition testimony/reports by Drs. Verbalis, Kinter, and Coy that "DDAVP" was used indistinguishably to refer to the acetate salt and the free base.  (Verbalis Supp. Rep. p. 19, A2488; Verbalis Tr. 200-201, 253-254,

A2116, A2129-30; Kinter Rep. p. 17, A3300; Kinter Tr. 216-217, A2427; Coy Rep. p. 4-5, A4985-86);

> (iii)    The court disregarded the disclosure of the Zaoral '491 patent on the ground that the patent was not incorporated by reference into the '398 patent application (A29);[31]

> (iv)    The Swedish priority application to the '398 patent specifically identifies desmopressin <u>acetate</u> as the active ingredient in both examples (A2367); and

> (v)    This Court's authorities construing a pharmaceutically based patent claim recitation to include its pharmaceutical salts.[32]

The District Court Opinion relies prominently on a statement at oral argument by Ferring's counsel as reported:

> "Tellingly, Plaintiffs concede that their product is not the same as that described in the patent, which the Defendant allegedly infringes. *See* Hearing Transcript at 31 (The Court: "[H]e tells me that neither side of the case practices the patent. Everybody sells desmopressin acetate." Mr.

---

[31]    This was error. It is black letter law that a prior art reference cited in a patent or its prosecution history constitutes intrinsic evidence to ascertain the meaning of a claim term. *See Kaplesh Kumar v. Ovomic Battery, Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) (basing claim construction, *inter alia*, on prior art patent cited in the asserted patent and considered by both the applicant and the examiner as highly pertinent prior art).

[32]    *See e.g., Merck & Co. v. Teva Pharmaceuticals USA Inc.*, 347 F.3d 1367 (Fed. Cir. 2003); *Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269 (Fed. Cir. 2004).

> Mondolino (attorney for Plaintiffs): "Well, we agree. We don't practice our own invention."

(A33 and *please see also* fn. 5 at A6).

Whether as a result of misreporting or attorney misspeaking, the immediately following sentence in the hearing transcript[33] makes clear that the '398 patent claims <u>do</u> cover the acetate salt that Ferring has always manufactured and sold and the appellants' counsel had no intention of stating otherwise:

> "This patent is listed in the Orange Book, which is the book that tells the world what patents cover our product. So, in fact, we have listed publicly that this patent covers our desmopressin product, which, in fact is the DDAVP acetate form that we sell."

(A6449).

### b.    <u>Literal Infringement</u>

The District Court found no literal infringement <u>only</u> because the active ingredient recited in the patent claims was construed as the free base only and not literally encompassing the acetate salt form.[34]  If appellants are favored by the claim construction they seek (free base and its salts including acetate), there is no issue and there is literal infringement.

---

[33]    Confirmed as the only position taken by plaintiffs in their papers (A2039, 4365), a position acknowledged by Barr's counsel (7/9/03 Tr. 59, 71, A414, 426).

[34]    Thus on this appeal appellants need confront this issue only.

Even under the District Court's construction, there is literal infringement. The acetate salt is formed during synthesis where the positively charged base is ionically associated with a negatively charged acetate ion. (Verbalis Tr. 219-220, A2121; Kinter Tr. 217-218, A2427-28). Indeed, Barr admitted ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (Request for Admission ("RFA") Response No. 3, A4183).

There is also pro-drug literal infringement. In the GI tract, Barr's

████████████████████████████████████████████

████████████ (Bioequivalence Report, A4172, p. 26, *supra*). Barr's expert Dr. Amidon agrees. (Amidon Resp. Rep. p. 6 ¶ 31, A2461). The District Court never decided this basis for literal infringement.

### c.    **Infringement by Equivalents**

The desmopressin in Barr's tablets whether in its free base or acetate salt form has the same function (develops a concentration in plasma) in the same way (following oral ingestion and absorption from the GI tract) to achieve the same result (therapeutic antidiuresis). (A4172 and p. 63-64, *infra*). The sole basis for the District Court's finding of no infringement under the doctrine of equivalents was counsel's alleged statement discussed at p. 34 *supra*, which was said to disclaim

36

coverage of the acetate form.  In fact, there was no such disclaimer, as is made clear in the very next sentence of the oral argument transcript. *Id.*

## VI.    SUMMARY OF THE ARGUMENT

1.    The District Court erred in granting summary judgment that the '398 patent is unenforceable because of the patentees' inequitable conduct during patent prosecution "by many people over a long time." (A19). In particular:

a.    In deciding the "materiality" issue, the District Court erred by impermissibly applying the principle that all declarations in aid of patentability are material, while not invoking or recognizing the authorities making clear that not everything omitted from such declarations (and specifically a prior contact with the patent assignee) necessarily rises to the level of materiality. (Point B of Argument).

b.    The District Court erred in resolving a contested issue of material fact when it determined that three scientists who submitted declarations to the Patent Office during prosecution to distinguish prior art made material omissions when they did not identify prior contacts with appellant Ferring, the assignee of the patent in suit. (Point B of Argument).

c.    In deciding the intent issue, the District Court erred when, in the absence of any evidence in the record of intent to mislead the Patent Office by any person, it (i) inferred intent solely from the omissions of prior contacts, and (ii) adopted an inference of an intent to mislead instead of other available

reasonable inferences explaining why the prior contacts were not included in the declarations. (Point C of Argument).

    2.    The District Court erred in granting summary judgment of non-infringement of claims 1-3, 5-9 and 11 of the '398 patent. In particular:

    a.    There was error in construing the recited claim term "1-deamino-8-D arginine vasopressin" (desmopressin or DDAVP) to not encompass its ubiquitous acetate salt that had been used exclusively for a decade, and where the artisans in the field (including appellee Barr) used desmopressin and DDAVP to refer to both desmopressin in its free base and acetate salt forms. (Point D.2. of Argument).

    b.    The District Court erred in not finding at least a contested issue of material fact concerning both literal infringement and infringement under the doctrine of equivalents – both under the claims as construed by the District Court and under the corrected claim construction appellants urge here. (Points D.3. and D.4. of Argument).

# VII.  ARGUMENT

## Point I.  The Standard of Review

This Court reviews the District Court's claim construction, a matter of law, *de novo,* without deference. *Cyber Corp. v. AS Etches, Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998).  This Court reviews a District Court's grant of a motion for summary judgment *de novo,* without deference, applying the decisional rules appropriate for a summary judgment motion. *See Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362-63 (Fed. Cir. 2003) (reversing summary judgment of inequitable conduct); *Beckson Marine Inc. v. NFM Inc.*, 292 F.3d 718, 722 (Fed. Cir. 2002).  In ruling on a motion for summary judgment, the court "must view the evidence presented through the prism of the substantive evidentiary burden and," "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  Summary judgment may not be granted on an issue if there is a contested issue of material fact. *Id.*; Rule 56(c), Fed. R. Civ. P.

## Point II.    The District Court Erroneously Granted Summary Judgment Holding the '398 Patent Unenforceable for Inequitable Conduct

### A.    The Law of Inequitable Conduct

A finding of inequitable conduct requires (1) clear and convincing proof of a material misrepresentation or omission during the prosecution of the patent in suit,

and (2) clear and convincing evidence that the applicants or others associated with the prosecution acted with intent to deceive the patent office. *Kingsdown Med. Consultants v. Hollister, Inc.*, 863 F.2d 867, 872 (Fed. Cir. 1988); *Allen Eng. Corp. v. Bartell Inds., Inc.*, 299 F.3d 1336, 1351-52 (Fed. Cir. 2002). Both materiality and intent are issues of fact. If the facts are reasonably disputed, they are not amenable to summary disposition. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1566 (Fed. Cir. 1987).

Even where materiality and intent are proven by clear and convincing evidence, the Court must balance the culpability of the conduct against the consequences and decide whether or not a sanction of patent unenforceability is warranted. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).

An analysis of inequitable conduct should be made with the realities of patent prosecution in mind. It is not a matter of strict liability. "'[A] patentee's oversights are easily magnified out of proportion by one accused of infringement'". *Northern Telecom Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990); *see also Kingsdown Medical Consultants Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1986).

**B.    The Prior Contacts Of The Declarants**
**With Applicants Were Not Material**

The District Court found that prior contacts which three non-inventor declarants had with the patent assignee Ferring and co-inventor Dr. Vilhardt prior to

41

their declarations – were material omissions.  (A16; p. 27, 30-31, *supra*).  There is

no challenge in the Opinion – or in Barr's underlying motion – to the technical

merit and accuracy of the declarations.

"'[I]nformation is material where there is a substantial likelihood that a

reasonable examiner would consider it important in deciding whether to allow the

application to issue as a patent.'  37 C.F.R.  § 1.56(a) (1991)."  (Opinion, A12).

The Manual of Patent Examining Procedure § 716(3) (5th ed. 1983-1994) in effect

at that time provided:

> Affidavits or declarations should be scrutinized closely
> and the facts presented weighed with care.  The affiant's
> or declarant's interest is a factor which may be
> considered, but the affidavit or declaration cannot be
> disregarded solely for that reason.

(Emphasis added); *Molins PLC*, 48 F.3d at 1179 n.8, 1180.

A declarant's prior contact with an assignee can be of some significance if it

is intertwined with the substance of a declaration (*Refac*) or other special

circumstances prevail.  In other instances, past contact without more would not

represent an "interest" – financial or otherwise – which logically might cause bias

or an imperative to deceive at a later time when a declaration is executed.

The District Court relied heavily on *Refac International, Ltd. v. Lotus*

*Development Corp.*, 81 F.3d 1576 (Fed. Cir. 1996).  In *Refac*, "each of the affiants

42

had a prior association with the inventor's company, Lanpar, Ltd." which was not disclosed in their declarations. *Id.* at 1579. The Patent Office had rejected the claims for insufficiency of disclosure, *i.e.*, that the specification did not teach how to practice the invention. *Id.* at 1578. Each declaration was to the effect that the respective declarant could practice the invention simply by reading the patent specification.

The difficulty with respect to each declarant was in relation to his prior contact with assignee Lanpar, during which, to different extents, each affiant learned the details of the patented computer program for converting software source code to object code. *Id.* at 1579. Thus the key statements in each declaration were compromised by the fact that the declarant had a special technical background, experience and a head start in understanding the software that transcended what was disclosed in the specification. *Id.* at 1581. This was meaningful with respect to the substance of the declarations that stated the declarants could have generated the code simply from the patent disclosure.

All this notwithstanding, two of the three accused declarants were held not to have committed inequitable conduct by omitting their prior contacts with the patent assignee. Prior to his declaration, Bullen had worked with an inventor of the patent in suit and also had knowledge of the program's use at Bell Canada with which Bullen had an association. The undisclosed association with the patent's assignee –

43

and even with the patented program – was held to <u>not</u> constitute materiality for inequitable conduct purposes. *Id.* at 1579.

A second declarant Cikra worked with the patented software to enable the program to operate with another software system. None of this was disclosed in the Cikra affidavit - but was held to <u>not</u> be a basis for inequitable conduct materiality. *Id.* at 1579-80.

> Inequitable conduct was found, <u>after trial</u>, for declarant Jones who:
>
> (b) [w]hile at Lanpar and prior to executing his affidavit .. learned internal details of the LANPAR Program and acquired an understanding of its concepts. (c) While at Lanpar and prior to executing his affidavit, Jones received personal instruction from Landau [one of the inventors] in the internal logic of the LANPAR Program, observed the LANPAR Program in operation, and examined source code listings, flow charts and other explanatory materials relating to it. (d) While at Lanpar and prior to executing his affidavit, Jones drafted the text for what became the introduction to what was later produced as the LANPAR Program Logic Manual."

*Id.* at 1580.

The undisclosed Jones prior contact was highly material <u>to the subject of his declaration</u>, *i.e.*, because of his earlier LANPAR training he became a totally inappropriate person to opine that the program was reproducible to a person of ordinary skill in the art <u>only</u> from the patent specification.

Thus, on far stronger facts than here, the undisclosed prior contacts of Bullen and Cikra were held not to be material for inequitable conduct purposes.

The *Refac* case was decided after a trial on the merits where credibility was important (and credibility was discussed no less than five times in the Federal Circuit's affirmance). *Id.* at 1582-84. The inequitable conduct ruling by that District Court ruling was reviewed under the "clearly erroneous" standard applicable after trial, and not under the much more stringent summary judgment standard. The Federal Circuit put the prior contact omissions as a genre into perspective:

> "Holding that the omission of an aspect of one's employment history to be inequitable conduct might thus seem to be unduly severe, a heavy penalty <u>for an arguably minor omission</u>." (Emphasis added).

*Id.* at 1584. However under the "clearly erroneous" standard of review, the Federal Circuit affirmed, noting:

> "We cannot hold as a matter of law that omission of a relevant part of one's employment history on an affidavit intended to show the adequacy of the patent specification to one of ordinary skill in the art, when such an affidavit by the inventor was earlier rejected, does not constitute inequitable conduct.

*Id.* at 1585.[35]

---

[35]   "However, the district court here made findings of materiality and intent to deceive, based partly on credibility findings, and given our standard of review, we do not consider the findings to be clearly erroneous or the conclusion to be an abuse of discretion." *Id.*

The District Court quotes from this passage, and then immediately states:

In other words, deliberate omission of a relevant part of an affiant's employment history on an affidavit in support of a patent would be inequitable conduct. (A15).

The Court's statement that omitting a prior contact in a declaration as a matter of law <u>can</u> be inequitable conduct has become the equation that an omission <u>is</u> in equitable conduct. We submit that this is error.

We deal here with summary judgment not post-trial review. Our facts are very different from *Refac*. The prior contacts discussed in the Opinion were not factually intertwined with the statements contained in the declarations. The content of the declarations here is not challenged. The conclusion that a prior contact with the patent's assignee is necessarily material mischaracterizes the *Refac* decision.

We respectfully urge that there was no inequitable conduct here precisely for the reason that there was no inequitable conduct held for the undisclosed prior contacts of Bullen and Cikra. These were "arguably minor omissions" which should not rise to the level of inequitable conduct materiality.

The lack of materiality is also clear under *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728 (Fed. Cir. 2002). One Boulahanis filed a declaration in support of patentability which did not set forth that Boulahanis was a former employee of an Orange Bang distributor that was commonly owned with Orange Bang, <u>the</u>

46

<u>patent assignee</u>. *Id.* at 732. However, this omission was unrelated to the subject of

his declaration and "every statement in the declaration [was] a true statement." *Id.*

at 744. This Court held that the omission was not material:

> "Every statement in the declaration relating to the claimed
> invention is true. The relevant inquiry before the
> examiner was whether the claimed invention solved a
> long-felt need, not who said the invention solved the long-
> felt need. While the court is bothered by the Strattons'
> failure to correct the examiner's misunderstanding, the
> clarified identity of Boulahanis's employer <u>was
> immaterial to the issue before the examiner</u>."

*Id.* at 744 (emphasis added).

We respectfully submit that here the holding of materiality for the omitted

prior contacts was error and that summary judgment of inequitable conduct is

erroneous for this reason. This is particularly true given the changed ethos and

heightened sensitivity for Patent Office declarations that followed *Paragon*

*Podiatry Lab., Inc.* and *Refac*. The declarations here were executed in 1986 and

1990 – years before *Paragon* and *Refac*.

### C.    <u>The Finding of an Intent to Mislead was Erroneous</u>

#### 1.    <u>The District Court Improperly Inferred Intent Solely From its Finding of Materiality</u>

Intent (fraudulent state of mind) is rarely amenable to summary judgment.

*Monsanto Co. v. Bayer Bioscience N.V.*, 363 F.3d 1225, 1241 (Fed. Cir. 2004);

*KangaROOS v. Caldor, Inc.*, 778 F.2d 1571, 1576-7 (Fed. Cir. 1985); *Copelands*

*Enterprises Inc. v. CNV Inc.*, 945 F.2d 1563, 1567 (Fed. Cir. 1991).

The District Court pointed to no evidence of intent to deceive in the record

but, rather, inferred intent solely from what it held to be material omissions.  We

respectfully suggest this was improper:

> "Peachtree refers to no evidence whatsoever of
> intent to deceive or mislead, but argues that intent to
> deceive or mislead should be inferred from the fact that
> certain information was not provided to the examiner.
> That theory of inferential culpability was definitively laid
> to rest in Kingsdown, wherein this court *en banc* held that
> invalidity for inequitable conduct requires a showing, by
> clear and convincing evidence, of intent to deceive or
> mislead the patent examiner into granting the patent."

*Therma-Tru Corp. v. Peachtree Doors Inc.*, 44 F.3d 988, 996 (Fed. Cir. 1995)

(emphasis added); *see also Dayco Products, Inc. v. Total Containment, Inc.*,  329

F.3d 1358, 1366-67 (Fed. Cir. 2003); *Union Pacific Res. Co. v. Chesapeake Energy*

*Corp.*, 236 F.3d 684, 694 (Fed. Cir. 2001); *Upjohn Co. v. Mova Pharm. Corp.*, 225

F.3d 1306, 1312 (Fed. Cir. 2000); *Fiskars Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318,

1327 (Fed. Cir. 2000); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996);

*Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 822 (Fed. Cir. 1992); *Northern*

*Telecom, Inc. v. Datapoint Corp.* 908 F.2d 931, 939 (Fed. Cir. 1990).

We urge that the District Court's inference of intent, solely based on the

finding of material omissions is error, and that the summary judgment of

48

inequitable conduct is erroneous for this reason as well as the other reasons stated in the Brief.

> **2.    It was Error on Summary Judgment to Choose an Inference Unfavorable to the Nonmoving Parties Rather Than Other Reasonable Inferences Inimical to Grant of Summary Judgment**

In deciding a motion for summary judgment, all of the reasonable inferences for an issue upon which the movant has the burden of proof must be drawn in favor of the non-moving party. *United States v. Diebold*, 369 U.S. 654 (1962) and its extensive progeny including *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986); *Prima Tek II LLC v. Polypop S.A.R.L.*, 318 F.3d 1143, 1147-48 (Fed. Cir. 2003).

A reasonable inference is "a process of reasoning by which a fact or proposition sought to be established ... is deduced as a logical consequence from other facts or a state of facts, already proved or admitted." *Computer Identics Corp. v. Southern Pacific Co.*, 756 F.2d 200, 204 (1st Cir. 1985); *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992); *Greiner v. Volkswagenwerk Aktiengesellschaft Volkswagen of America, Inc.*, 429 F.Supp. 495, 498 (E.D. Pa. 1977); Black's Law Dictionary p. 793 (8th Ed. 2004). Where multiple inferences can be drawn from underlying facts at *final trial*, the trier of fact can weigh credibility and probability, and elect between them.

Not on summary judgment.

On summary judgment, if multiple inferred conclusions can be drawn from the underlying facts, only those inferences most favorable to the non-moving party (appellants Ferring and Aventis here) may be taken. Summary judgment is denied by the district court or, if granted, reversed on appeal when this is not done. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-159 (1970); *Dayco Products Inc.*, 329 F.2d at 1367; *Leggett & Platt Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1359-60 (Fed. Cir. 2002); *Burlington Industries Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988) (summary judgment of inequitable conduct unenforceability reversed when the evidence allowed a reasonable inference of honest mistake rather than intentional deceit); *Al-Site Corp. v. The Bonneau Co.*, 30 USPQ2d 1123, 1130 (C.D. Cal. 1993) ("Conjecture alone is not sufficient to show an intent to deceive to support the defense of inequitable conduct."); *please see also Intel Corp. v. Via Technologies Inc.*, 176 F. Supp. 2d 991, 1003 (N.D. Cal. 2001) (where summary judgment has been denied by district courts based on a possible inference (among contrary inferences) that favor the non-moving party).

The only predicate facts in this case relevant to any inference of intent are that the individuals submitting declarations in aid of patentability were experts in their fields; some had prior contacts with Ferring that were not included in the declarations; the declarants had no financial or other interest in whether the patent

application underlying the '398 patent issued or did not issue at the time of making the declarations (or ever); the statements were cumulative to those of another declarant having no prior contact with Ferring; and, importantly, everything expressed in all of these declarations was correct.

There are several reasonable inferences why the prior contacts were not included in the respective declarations other than the District Court's inference of intent to deceive. It may simply have never occurred to Drs. Barth, Czernichow or Robinson that their prior contacts had any possible bearing or purpose to a reader of their declarations concerning knowledge in the art regarding the oral DDAVP invention.

Another reasonable inference from these predicate facts is that the declarants considered identifying their prior contacts – but decided in good faith that the examiner would not find them important. The declarants' professional stature may have suggested to them that no one would seriously believe they would lie or dissemble on matters of literally uncontested and uncontestable technical facts within their professional experience because of prior contacts. This does not constitute inequitable conduct intent. *Nordberg Inc. v. Telsmith Inc.*, 82 F.3d 394, 397-98 (Fed. Cir. 1996).

It could also reasonably be inferred that the prior contacts were omitted through oversight or through negligence. This also would not satisfy the legal

requirements for inequitable conduct intent. *Kingsdown Med. Consultants, Inc. v. Hollister, Inc.*, 863 F.2d 867, 873 (Fed. Cir. 2000); *KangaROOS U.S.A. Inc.*, 778 F.2d at 1576; *Orthopedic Equipment Co. Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed. Cir. 1983).

In short, it is a reasonable inference that each of the declarants simply did not consider his prior contacts significant or important to the declarations at hand – and not that there was any intent to omit or repress something that was considered important.

There is no evidence to the contrary. Indeed, defendant's counsel deposed each of the declarants and did not even ask any of them whether they considered the prior contacts important or relevant to their declarations or whether or not they intentionally withheld any of this information.

Moreover, it was improper for the District Court to infer inequitable conduct because Dr. Vilhardt "should have known" that the declarations did not represent "objective evidence". (Opinion, A16-17). "Should have known" is not sufficient for inequitable conduct. *Nordberg Inc.*, 82 F.3d at 397 (Fed. Cir. 1996); *Halliburton Co. v. Schlumbergertechnology Corp.*, 925 F.2d 1435, 1443 (Fed. Cir.

1991)[36]; *American Hoist & Derrick Co. v. Sowa & Sons Inc.*, 725 F.2d 1356, 1362 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 821 (1984).

Appellants urge that the summary judgment of inequitable conduct be reversed on this basis as well as for the other reasons set forth herein.

---

[36]    In reversing inequitable conduct based upon "should have known" materiality which the district court elevated to an intent to mislead, this Court observed:

"As Kingsdown made abundantly clear, gross negligence alone does not compel the inference of intent to deceive.  Gross negligence cannot elevate itself by its figurative boot-straps to an intent to mislead based on the identical factors used to establish gross negligence in the first instance unless all the facts and circumstances indicate sufficient culpability."

**Point III.    The District Court Erred In
Granting Barr's Motion For
<u>Summary Judgment Of Noninfringement</u>**

**A.    <u>The Law of Patent Infringement</u>**

Patent infringement analysis is a two-step process.  First, the claims must be properly construed as a matter of law; then the words of the claim as properly construed must be compared to the accused product.  *See Desper Prods., Inc. v. Accusound Labs., Inc.,* 157 F.3d 1325, 1332 (Fed. Cir. 1998); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996).  If every limitation in the claim as construed by the court is found in the accused product, there is literal infringement.  *Southwall Tex., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed. Cir. 1995).

If an accused product lacks an element that literally corresponds to a claim term, but includes structure or a process step that is equivalent to that term, infringement may be found under the doctrine of equivalents.  *See Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 607-608 (1950).  Infringement under the doctrine of equivalents exists to protect against "an infringer who appropriates the invention but avoids the literal language of the claims."  *Atlas Powder Co. v. E.I. duPont de Nemours & Co.,* 750 F.2d 1569, 1579 (Fed. Cir. 1984).  If the accused product performs the same function in substantially the same way to achieve substantially the same result, infringement under the doctrine of

equivalents is proven. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *Graver Tank*, 339 U.S. at 608.

"The meaning of a technical term in a patent claim is determined in accordance with its usage in the specification, elaborated if appropriate by the prosecution history and with due consideration to usage in the field of the invention." *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1326 (Fed. Cir. 2004). Words in a claim are given "the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002); *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003); *Merck & Co. v. Teva Pharm., Inc.*, 347 F.3d 1367, 1370-71 (Fed. Cir. 2003).

Unless compelled otherwise, a court should give a claim term the full range of its ordinary meaning as understood by persons skilled in the relevant art. *Texas Digital*, 308 F.3d at 1202. If more than one definition is consistent with the use of the words in the specification and prosecution history, the claim term should be construed to encompass all consistent meanings. *Brookhill-Wilk 1, LLC*, 334 F.3d at 1300. The claim language also should be interpreted in light of the "fundamental purpose and significance" of the invention. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1566-67 (Fed. Cir. 1992).

B.    **The Court's Construction of the Claim Term
"1-deamino-8-D-arginine vasopressin" as
Covering Desmopressin Only in its Free Base Form
And Not in its Acetate Salt Form Was Incorrect**

The District Court based its judgment that Barr did not infringe any claim of

the '398 patent on its incorrect claim construction that the term "1-deamino-8-D-

arginine vasopressin" (desmopressin or DDAVP) as used in the '398 patent claims

means only the free base form of the active ingredient and not its acetate salt form.

Appellants urge this is error.

The '398 patent states that:

"This invention relates to the antidiuretic compound 1-deamino-8-D-
arginine vasopressin, <u>which is commonly known as DDAVP</u>".

(A60, col. 1, lns. 15-18, emphasis added).  Describing more than a decade of past

use of the medicine which had always been the acetate salt, the '398 specification

notes:

"The present most common form for administering DDAVP requires
use of rhinyle."

(*Id.*, col. 1, lns. 30-32).  All the examples of the '398 patent employed desmopressin

acetate.  *Please see* the Swedish priority application.  (p. 6, A2367).  The Swedish

priority case is relevant to this claim construction.  *Caterpillar Tractor Co. v. Berco*

*S.P.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983); *see also Glaxo Group Ltd. v.*

*Ranbaxy Pharmaceuticals, Inc.*, 262 F.3d 1333, 1337 (Fed. Cir. 2001).

"DDAVP" has been used in the art for decades to identify both the "1-deamino-8-D-arginine" desmopressin in its free base form and its acetate salt form. That is the testimony of the expert witnesses;[37] and that usage is reflected in the usage of DDAVP in the field.[38, 39] *Please see* ███████████████

---

[37]     Dr. Verbalis stated:

"I do not agree that the ordinary meaning of this element is limited to the free base as Dr. Amidon contends ... [the '398 patent] refers to the same compound disclosed in the Zaoral patent . . . Zaoral states that desmopressin can be used in a free-base form . . . [and] tracks the synthesis of the acetate salt". (Verbalis Supp. Rep. p. 19, A2488; Verbalis Tr. 200-201; 253-254, A2116).

Dr. Kinter stated:

"I respectfully disagree with Dr. Amidon's opinion that the terms '1-deamino-8-D-arginine vasopressin', DDAVP or desmopressin would be distinguished to mean anything but the same pharmacological agent to a pharmacist, pharmaceutical scientist, pharmacokineticist and particularly to a pharmacologist". (Kinter Rep. p. 17, A3300; Kinter Tr. 216-217, A2427).

Dr. Coy stated:

"As a medicinal chemist who is intimately familiar with how peptides are synthesized and purified, the term "1-deamino-8-D-arginine-vasopressin" must refer to the salt form. This is because salts would be the product of known synthetic and purification methods which employ the acids trifluoracetic acid and/or acetic acid (resulting in trifluoroacetate or acetate salts of desmopressin) . . ." (Coy Rep. p. 4-5, A4985).

*See also* Amidon Tr. 92-93; 95; 98-99, A2298-2300.

[38]     "Modification of the natural vasopressin hormone molecule to form desmopressin acetate (DDAVP) resulted in a compound with prolonged antidiuretic activity and virtual elimination of vasopressor activity . . . [a]n example of the therapeutic potential of such synthetic polypeptides is provided by 1-desamino-8-D-arginine vasopressin (desmopressin acetate)

57

██████████████████████████████████

████████████████████ (A4166).

Appellants urge that the claim language "1-deamino-8-D-arginine vasopressin" thus should be construed to mean the free base and the salt (acetate) form. That is its recognized and plain meaning and usage. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981, 986 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996); *Metabolic Laboratories v. Laboratory Corp. of America*, 370 F.3d 1354, 1360 (Fed. Cir. 2004); *TI Group Automotive Systems (North America) Inc. v. VDO North America, LLC,* 375 F.3d 1126, 1133-34 (Fed. Cir. 2004).

This construction also accords with the mandate that a claim construction is "rarely, if ever" correct if it excludes the preferred embodiment. *Abbott Laboratories Inc. v. TorPharm Inc.*, 300 F.3d 1367, 1372 (Fed. Cir. 2002); *Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1583 (Fed. Cir. 1996); *Modine Mfg. Co. v. U.S.I.T.C.*, 75 F.3d 1545, 1550 (Fed. Cir. 1986). Desmopressin in its

---

[DDAVP]) [1-$\beta$-mercaptopropionic acid, 8-D arginine] vasopressin . . . used for the treatment of central diabetes insipidus." (Ziai (1978), A4410; also cited in Req. for Recon. p. 4, A4401).

[39] "In the last few years several vasopressin analogues have been produced by changing the molecular structure of the natural hormones. . . . Thus in 1966 1-deamino-8-D-arginine vasopressin (DDAVP) . . . [was] synthesized." (Laczi (1980), A3561; cited in Req. for Recon. p.5, A4402).

acetate salt form is the preferred embodiment – and the only embodiment sold in the 25-year history of the pharmaceutical in all its administration forms.

This construction is also consistent with *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367, 1369, 1371-72 (Fed. Cir. 2003), and *Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269, 1274 (Fed. Cir. 2004). Those in the art understood that desmopressin is the active moiety administered as the acetate salt; the specification references to the prior uses of DDAVP would be understood to be to the acetate salt form.

This construction is also indicated by and consistent with analogous legislation in the field. The FDA explicitly recognizes that the "therapeutic moiety" of an active ingredient includes both its free base (or ionic) form as well as its salt. *See* 21 C.F.R. § 60.3(b)(10) ("Human drug product means the active ingredient of a new drug or human biologic product . . . including any salt or ester of the active ingredient, as a single entity or in combination with another active ingredient."); *see also* 21 C.F.R. § 320.1 ("pharmaceutical equivalents means drug products in identical dosage forms that contain identical amounts of the identical active ingredient, *i.e.*, the same salt or ester of the same therapeutic moiety . . .").

Similarly, in drafting legislation relating to patent term extensions for pharmaceutical products, Congress also recognized the interchangeability of active ingredients and their salt forms. *See, e.g.*, 35 U.S.C. § 156(f)(2) which explicitly

defines "product" as "the active ingredient of a new drug . . . including any salt or ester of the active ingredient . . . ." *Pfizer Inc. v. Dr. Reddy's Labs.*, 359 F.3d 1361, 1365-66, 1366 (Fed. Cir. 2004).

As discussed in *Eli Lilly & Co. v. American Cynamide Co.*, 82 F.3d 1568, 1571 (Fed. Cir. 1996), the Process Patent Amendments Act, 35 U.S.C. § 271(g), exempts from infringement a product made abroad by a process protected by a U.S. patent that is "materially changed by subsequent processes" before it is imported. Its legislative history makes clear that Congress did not intend that a chemical compound be considered to have been "materially changed" within the meaning of the statute if the subsequent modifications were only "trivial or conventional in nature" such as "modifications which result in the formation of simple derivatives, including salts or esters . . . " *Eli Lilly & Co.*, 82 F.3d at 1575; *see also id.* at 1577 ("Usually a change in the physical form of a product . . . or minor chemical conversion, *e.g.* conversion to a **salt, base, acid** hydroid, ester, or addition removal of a protection; would not be a "material" change.") (Emphasis added).

The Court distinguished these authorities on the ground that they were not directed to claim construction. (A29-30). However, we believe these authorities to be highly relevant as to how "salts" is viewed in the art and by the legal authorities.

60

We respectfully submit that "1-deamino-8-D-arginine vasopressin" recited in the claims should be construed to mean desmopressin in its free base and its salts — including the acetate salt.

### C.    Barr's ANDA Product Literally Infringes However the Claims are Construed

If this Court corrects construction of the claims of the '398 patent to mean desmopressin in its acetate salt form as well as in its free base form, it is beyond dispute that Barr's ANDA desmopressin acetate formulation literally infringes the asserted claims of the '398 patent.  (*See* Claim Chart, A4346-47 (summarizing infringement evidence from Barr's ANDA and witnesses); and RFA Responses Nos. 1, 2, 3, 10, 15, 16, 38, 41, 53, 56, 117, 121, A4181-85, 4192, 4197, 4218-19; and Verbalis Op. Rep. p. 11-14 (A2233-36).

There is literal infringement even under the District Court's construction. Claims 1-5 of the patent-in-suit are directed to "an antidiuretic composition for . . ." Claims 6-11 recite "a method for initiating antidiuresis . . ." and "a method for treating diabetes insipidus."

Barr's ANDA  (A4172, quoted at fn.24, *supra*).  There is pro-drug infringement of both the method and composition claims.  *See Hoechst-Roussel Pharm., Inc. v. Lehman*, 109 F.3d 756,

759 (Fed. Cir. 1997) (infringement occurs if administered product is converted *in vivo* to claimed product); *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1380 (Fed. Cir. 2003).

There is also literal infringement ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ Infringement is not avoided by adding something to supplement the claimed combination. *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997);[40] *Fiskars Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1324 (Fed. Cir. 2000); *Water Technologies Corp. v. Calco Ltd.*, 850 F.2d 660, 666-67 (Fed. Cir. 1988); *Atlas Powder Co. v. E.I. Dupont de Nemours*, 750 F.2d 1569, 1580 (Fed. Cir. 1984).

Finally, the Hatch-Waxman Act requires that an ANDA applicant filing a Paragraph IV Certification must supply "for each claim of a patent alleged not to be infringed, a full and detailed explanation of why the claim is not infringed." 21 C.F.R. § 314.95(c)(6)(i). The purpose of the disclosure requirement is to possibly avoid litigation by requiring the generic manufacturer to supply the patentee with sufficient information upon which to determine whether or not to

---

[40]    "This interpretation of the count is consistent with the open-ended term 'comprising.' "Comprising" is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim. *In re Baxter*, 656 F.2d 679, 686 (CCPA 1981).

bring suit for patent infringement. *See Inwood Labs., Inc. v. Young,* 723 F. Supp. 1523, 1526 (D.D.C. 1989) (submitting detailed information to patent holder so that it doesn't file suit makes valuable contribution to opening up markets to generic drugs). It is a reasonable inference on summary judgment that Barr's failure to provide <u>any</u> non-infringement argument to support a non-infringement defense in their Notification Letter means they have no such defense.

Barr's proposed ANDA 

Plaintiffs-appellants urge that there is literal infringement – the issue is at least one of contested material fact inimical to summary judgment disposition.

### D. The District Court's Finding Of Noninfringement Under The Doctrine <u>of Equivalents Is Clearly Erroneous</u>

The District Court based its ruling that Barr's product does not infringe under the doctrine of equivalents almost entirely[41] on the statement allegedly made by

---

[41]    The Court rejected Barr's argument regarding the Citizen Petition filed by Ferring.

63

plaintiffs' counsel during oral argument wherein he purportedly agreed that the patent-in-suit does not cover desmopressin acetate. (A33, quoted at p. 34, *supra*).

This statement relied upon by the District Court was either a transcription error by the court reporter or a miselocution by plaintiffs' counsel. Counsel continued in the very next transcript passage, confirming that the patent does cover plaintiffs' marketed product. (Tr. 31, A6449; quoted at p.34, *supra*).

The '398 patent does, in fact, cover appellants' commercial embodiments as repeatedly confirmed in plaintiffs' summary judgment and claim construction papers. *See, e.g.*, Pl. Cl. Constr. Br. (A2039); Pl. Resp. Cl. Const. Br. (A4365) (the patent includes the acetate salt). Given that, as Barr has told the FDA ███████ ██████████████████████████████████████ does exactly the same thing in exactly the same way to achieve exactly the same result as the patented invention, the court's finding of noninfringement under the doctrine of equivalents was clearly erroneous.[42] *See Abbott Labs. v. Torpharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002) (description of drug in ANDA controls infringement inquiry).

---

[42]    Barr's proposed tablets ███████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

# VIII. <u>CONCLUSION</u>

For the above-stated reasons, the district court's grant of summary judgment that the '398 patent is unenforceable due to inequitable conduct and that no claim of the '398 patent is infringed either literally, or under the doctrine of equivalents, should be reversed.

Dated:        April 25, 2005                Respectfully submitted,

Dennis J. Mondolino
Stephen B. Judlowe
Esther H. Steinhauer
Edward M. Reisner
Jeffrey M. Gold
Timothy P. Heaton
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY  10178
(212) 309-6000

*Attorneys for Plaintiff-Appellant*
*Ferring B.V.*

## CERTIFICATE OF COMPLIANCE WITH FED.R.APP.P. 32(A)(7)(C)

The undersigned attorney of record hereby certifies, pursuant to Rule 32(a)(7)(C), Fed.R.App.P., that the foregoing brief of Plaintiff-Appellant Ferring B.V. contains no more than 14,000 words as provided in Rule 32(a)(7)(B). As provided in Rule 32(a)(7)(C), I have relied upon the word count of the word-processing system used to prepare the brief, which indicates that the brief contains 13,932 words.

Date:    April 25, 2005

_Timothy P. Heaton_
Timothy P. Heaton