50a
*Appendix B*

**APPENDIX B - MEMORANDUM AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

CASE NO. 02 CIV. 9851
HON. CHARLES L. BRIEANT

FERRING B.V. and
AVENTIS PHARMACEUTICALS, INC.

Plaintiffs,

-against -

BARR LABORATORIES, INC.

Defendants.

Decided: February 7, 2005

MEMORANDUM AND ORDER

Brieant, J.

Before this Court are three motions for summary judgment, filed on April 16, 2004, by Defendant Barr Laboratories, Inc. ("Barr"), seeking an Order stating that: (1) Defendant did not infringe Plaintiffs' ("Ferring") patent-in-suit (Doc. # 119); (2) claims 6 and 11 of the patent-in-suit are invalid (Doc. # 121); and (3) the patent-in-suit is unenforceable for Plaintiffs' inequitable conduct during the patent prosecution (Doc. # 123). On May 21, 2004, Plaintiffs filed a motion for summary judgment of

51a

*Appendix B*

Defendant's infringement of their patent, but by letter dated July 1, 2004, withdrew the motion. The remaining motions were argued on July 7, 2004. The Court has received continued letter brief correspondence from the parties through January of 2005.

## Facts

Familiarity of the reader with all prior proceedings is assumed. Plaintiff Ferring B.V. "Ferring") is a privately held company organized under the laws of the Netherlands. Ferring is the owner and assignee of the U.S. Patent No. 5,407,398 entitled "DDAVP Antidiuretic and Method Therefor" ("'398 patent"). The '398 patent issued on September 10, 1991. The invention disclosed and claimed in the '398 patent is an orally effective form of desmopressin ("DDAVP") designed to be absorbed by the body through the gastrointestinal tract. Desmopressin is a synthetic analog of a naturally occurring pituitary hormone. The invention is the antidiuretic compound 1-deamino-8-D-arginine vasopressin, and is useful in treating diabetes insipidus.[1]

Plaintiff Aventis Pharmaceuticals, Inc. ("Aventis") is a Delaware Corporation licensed to market and sell the invention of the '398 patent in the United States. Aventis is the holder of an approved new drug application ("NDA"), No. 019-955, for desmopressin acetate tablets which are marketed in the United States under the product name DDAVP®.

---

[1] Webster's Third New International Dictionary (1993) defines "diabetes insipidus" as a disorder of the pituitary gland characterized by intense thirst and the excretion of great amounts of dilute urine.

52a
*Appendix B*

In November 2002, Plaintiffs received notice from Defendant that it had filed an abbreviated new drug application ("ANDA") prior to the expiration of the '398 patent, seeking approval from the FDA to market its generic version of desmopressin acetate tablets.

On December 13, 2002, within 45 days of the filing of Defendant's ANDA, Plaintiffs filed this patent infringement suit, pursuant to 35 U.S.C. § 271, *et seq.*, and 21 U.S.C. § 355, seeking declaratory judgment and an injunction. Defendant answered and asserted counterclaims of patent invalidity and non-infringement.

### Discussion

Fed. R. Civ. P. 56(c) provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

### I. *Motion for Summary Judgment based on Inequitable Conduct*

Defendant argues that summary judgment for inequitable conduct by Ferring is appropriate because the inventor, Dr. Vilhardt, misled the PTO examiner by submitting declarations in support of the '398 application without revealing the conflicting interests of declarants, Drs. Czernichow, Barth and Robinson, discussed below, who were undisclosed consultants to Ferring. Ferring denies any

53a
*Appendix B*

wrongdoing, claiming that the relationships were too remote and did not constitute material adverse interests necessitating disclosure to the PTO examiner. Plaintiffs also assert that there is insufficient evidence of intent to deceive or mislead the PTO examiner.

*Prosecution History of the '398 Patent*

On December 17, 1985, Ferring filed an application, for what ultimately issued as the '398 patent. The two inventors on the '398 application were Dr. Hans Vilhardt, a former research director at Ferring, and Mr. Helmer Hagstam, who was then the technical director at Ferring.[2] On May 28, 1986, Dr. Vilhardt and his attorney appeared at a preliminary interview with PTO Examiners Moyer and Stone, during which they discussed the '398 application and prior art, in particular, U.S. Patent No. 3,497,491 ("Zaoral" or " '491") and U.S. Patent No. 3,454,549 ("Boissonnas" or "'549"). The examiner's written summary of the interview states that Dr. Vilhardt and his attorney argued to the examiner "that prior art does not teach administration via stomach route and that peroral implies 'buccal' etc., and that one skilled in the art would not think otherwise." *See* Gold Decl., Ex. 1.[3] Applicants agreed to "consider amending the

---

[2]On May 21, 1984, Dr. Vilhardt and Mr. Hagstam assigned their rights, title and interest in the "DDAVP Antidiuretic and Method Therefor" invention to Ferring. *See* Karen Robinson Decl., Ex. E. FERB 023548.

[3]Webster's Third New International Dictionary defines "peroral" as occurring through or by way of the mouth. It defines "buccal" as 1: of an oral structure: directed toward the cheek; 2: of, relating to, or involving the cheeks; 3: of, relating to, involving, or lying within the mouth: oral. It defines "sublingual" as 1: situated or occurring under the tongue 2: of, relating to, or situated near the sublingual gland.

54a
*Appendix B*

claims and filing declarations" and the examiner agreed to wait two weeks before giving a first action. *Id.* According to the attorney for the inventors, Examiner Moyer "suggested that applicants obtain evidence from a non-inventor" which supported Dr. Vilhardt's understanding that the term "peroral" in the Zaoral patent meant "sublingual or buccal" administration only, and not through the stomach. *See Gold Decl.*, Ex. 2 at FERB 023555.

On June 12, 1986, Ferring submitted a preliminary amendment, which added three new claims, and also submitted four declarations in support of issuing the '398 patent. Of the four declarations, Dr. Vilhardt submitted two, Dr. Czernichow submitted one and Dr. Miller submitted one. *See* Robinson Decl., Ex. E at FERB 023722-753; FERB 023755-779. Each of these declarations were submitted with CV's attached. Dr. Czernichow's and Dr. Miller's declarations asserted that one skilled in the art who read the '491 Zaoral patent line describing peroral administration in connection with DDAVP would conclude that the term "peroral" referred to sublingual and/or buccal administration of DDAVP, and not to oral administration for gastrointestinal absorption.

On November 20, 1986, the USPTO, at the request of Ferring, cancelled Claims 1 and 6. It also rejected Claims 2-5 and 7-13 as anticipated by or obvious over Zaoral. On May 20, 1987, Ferring filed a request for reconsideration, arguing that the Zaoral patent did not expressly, impliedly or inherently teach the claims of the '398 application. Ferring submitted several articles relating to the subject matter in support of its position that those skilled in the art would not find the '398 patent obvious in light of Zaoral. *See* Robinson Decl., Ex. E at FERB 023573-781.

55a
*Appendix B*

On August 14, 1987, the USPTO again rejected the claims of the '398 application based on the prior art. Ferring appealed the PTO's decision on November 13, 1987. On September 21, 1990, the Board of Patent Appeals and Interferences affirmed the examiner's rejection of the '398 patent, concluding that the "peroral" recitation by Zaoral coupled with the knowledge of the prior art, disclosed in Vavra[4], is suggestive of and anticipated the oral administration of DDAVP for gastrointestinal absorption in humans. The 1974 Vavra study involved the administration of desmopressin to rats by stomach gavage and showed that DDAVP caused antidiuresis in rats. *See* Steinhauer Decl., Ex. 13 at 9.

On November 21, 1990, Ferring responded to this rejection by the Board of Patent Appeals by filing an "Amendment After Appeal." *See* Gold Decl., Ex. 9. Along with the amendment, Ferring filed five declarations submitted by Dr. Vilhardt, Dr. Miller[5], Dr. Czernichow, Dr. Robinson and Dr. Barth. *See* Gold Decl., Exs. 10-14.

---

[4]Vavra *et al.*, "Antidiuretic Action of 1-Deamino-[8-D-Arginine]-Vasopressin in Unanesthetized Rats," The Journal of Pharmacology and Experimental Therapeutics, Vol. 188, No. 1 (1974). *See* Steinhauer Decl., Ex. 3 (U.S. Patent and Trademark Office, Board of Patent Appeals and Interferences Decision, Appeal No. 89-0259).

[5]Dr. Myron Miller was a doctor of geriatric medicine and is not challenged on this motion. He opined that the invention was unobvious to him and would be to others skilled in the art, even after a review of the references, and that the use of "peroral" in the Zaoral patent did not indicate oral administration of DDAVP for gastrointestinal absorption by humans. *See* Gold Decl., Ex. 4.

56a

*Appendix B*

On April 8, 1991, the USPTO issued a Notice of Allowability, allowing claims 2-5 and 7-13 of the '398 patent. *See* Gold Decl. Ex. 15. The patent issued on September 10, 1991, with no written explanation as to the reason for allowing these claims after several iterations of rejection.

Barr now claims that Ferring and Dr. Vilhardt committed inequitable conduct by presenting 'noninventor' declarations in support of the '398 patent application to the PTO without disclosing the declarants' relationships with Ferring. *See* Def.'s Memo. at 11. Specifically challenged by Barr are a declaration submitted by Dr. Czernichow in 1986, and three declarations submitted by Drs. Czernichow, Barth and Robinson in 1990, after the Board of Patent Appeals affirmed the examiner's earlier rejections. Dr. Barth's and Dr. Robinson's declarations did not include CV's. Defendant argues that Ferring misled the PTO examiners by failing to disclose to them that each of these three declarants had been a consultant to Ferring and that there were other relationships requiring disclosure as adverse or conflicting. Defendant contends, and this Court agrees, that the PTO must have relied substantially on these declarations, as there is no alternative explanation offered for the Board's final allowance of the claims after several prior rejections by the PTO.

*Dr. Czernichow*

Dr. Czernichow, a professor of pediatrics, provided two declarations in support of the issuance of the '398 patent. The first was dated June 4, 1986, and was in direct response to the examiner's request for non-inventor declarations regarding the meaning of "peroral." In it, he states that the Zaoral patent did not teach him, and opined

57a
*Appendix B*

that it would not teach others skilled in this art to administer DDAVP in oral dosage form for gastrointestinal absorption by humans and that the meaning of "peroral" administration in the Zaoral patent meant that DDAVP could be administered through the mouth for sublingual or buccal absorption. *See* Gold Decl. Ex. 3.

Dr. Czernichow's second declaration was submitted in 1990, and addressed the Vavra reference by the Board of Patent Appeals.  In it, he states that he specializes in endocrinology and diabetes.  He states that the PTO's decision that the Vavra reference in combination with Zaoral *et al.*, suggests the use of DDAVP in oral dosage form for gastrointestinal absorption in humans is a "substantial extrapolation of the results provided in the cited references and presents a conclusion that those skilled in this art would not make."  *See* Gold Decl. Ex. 12.  He stated that the "testing protocols applied in Vavra are highly questionable and persons skilled in the art would be very cautious in making any prediction based on these results;" the "fundamental understanding of persons skilled in peptide chemistry was that peptides were degraded in the human gut;" and that the Vavra reference regarding rats wouldn't change this understanding as to humans. *Id.*

His CV does not mention any affiliation with Ferring, but the record reveals that Dr. Czernichow was a Ferring consultant and received research funding from Ferring from 1985 to 1986, and again from about 1988 to 1990. *See* Czernichow Dep. at 24-27. Dr. Czernichow testified that as early as 1975, he was in contact with Ferring in regard to his research using the nasal formulation of DDAVP. *See* Czernichow Dep. at 22-23.

58a
*Appendix B*

<u>*Dr. Robinson*</u>

Dr. Iain Robinson, a neuroendocrinologist, filed a declaration in support of the '398 patent in November of 1990, which specifically addressed the Vavra reference by the Board of Patent Appeals after Plaintiff's appeal of the rejection. *See* Gold Decl. Ex. 13.  In it, Dr. Robinson states that he "carefully considered the reference cited by the Board, Vavra, et al., … in relation to its teachings regarding the activity of DDAVP by the subcutaneous and oral route.  I must respectfully disagree with the suggestion by the Board that Vavra, in combination with the Zaoral patent ['491] suggests the administration of DDAVP orally for gastrointestinal absorption." *Id.*  He further stated that the Vavra reference fails as an effective reference because no evidence is presented as to the relative stability of the two peptides in either subcutaneous tissue or gastrointestinal fluids." *Id.*

No CV was provided to the PTO examiner with this declaration.  During his deposition, Dr. Robinson revealed that he was employed as a pre-clinical research director at Ferring from 1985-1986, that during his tenure as research director, Ferring sponsored Dr. Vilhardt's research on the effects of DDAVP, and that Drs. Robinson and Vilhardt were friends and in regular contact during this time.  *See Robinson Dep.* at 30-31; 159-160, 167.  Robinson testified that he was also a paid Ferring consultant for some months before his job as research director in 1985 and then was again a paid Ferring consultant from 1986-1989. *See Id.* at 38-39.  He also testified that after he left Ferring, the company sponsored a research program in his laboratory for about three years. *See Id.* at 171.

59a

*Appendix B*

In addition to these previously undisclosed associations with Ferring and Dr. Vilhardt, Dr. Robinson also testified that at the time of his 1990 declaration, he had no expertise in DDAVP, that he did not recall having done any research on drug delivery systems or on the absorption of peptides in the gastrointestinal tract, and that he did not understand why he was retained to provide a declaration on DDAVP. *Id.* at 94.

### Dr. Barth

Dr. Barth, a Professor of Organic Chemistry and Biochemistry, also submitted a declaration in support of the patent in 1990, which specifically addressed the Vavra reference and expressed his disagreement with the Board's suggestion that "Vavra in combination with Zaoral ['491] suggests the efficacy [of] oral DDAVP in humans. [] My years of experience have persuaded me that there is no justification for transferring pharmacology data obtained from one species of laboratory animals to another or to humans." *See* Gold Decl., Ex. 14.

In deposition testimony, Dr. Barth stated that he has been employed by the Academy of Science of the Czech Republic since 1963 and that from 1984 to 1987, he worked on several projects for Ferring in return for "allowances and accommodation and costs." *See* Barth Dep. at 9. He testified that from 1988 to 2000, he worked for about one month of each year on projects in Copenhagen with or for Ferring, but did not know whether those projects were funded by Ferring. *Id.* at 14-15, 17. During the deposition, Ferring's attorney "clarified" on the record that his understanding was that under the Czech system, nothing of value went personally from Ferring to Dr. Barth, but that it went through the Czech Academy of Science, by whom Dr. Barth was then

60a

*Appendix B*

employed. *Id.* at 9. Dr. Barth testified that he was not a Ferring consultant, nor paid as a Ferring consultant. *See Id.* at 36, 38. However, he is described as a Ferring consultant in the Ferring Privilege Logs, in reference to prosecution of the '398 patent (*See* Robinson Decl. Ex. I., entries 21,30).

Dr. Vilhardt testified that he sent Barth a partial draft declaration telling him what he should state in his affidavit. *See* Vilhardt Dep. at 359-361. Dr. Vilhardt also testified that Dr. Barth was an old friend of his. *Id.* at 367.

"The defense of inequitable conduct is entirely equitable in nature, and thus is not an issue for a jury to decide." *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1318 (Fed. Cir. 2000). "Although the premises of inequitable conduct require findings based on all the evidence, a procedure that may preclude summary determination, a motion for summary judgment may be granted when, drawing all reasonable factual inferences in favor of the non-movant, the evidence is such that the non-movant can not prevail." *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998).

"Inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *PerSeptive Biosystems, Inc.*, 225 F.3d at 1318; *See also Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358 (Fed. Cir. 2003). Both intent and materiality are questions of fact that must be proved by clear and convincing evidence. *Dayco*, 329 F.3d at 1363. Summary judgment is not proper when "facts of materiality or intent are reasonably disputed." *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.3d. 1182, 1189-90 (Fed. Cir. 1993).

61a

*Appendix B*

As a general principle, materiality and intent are balanced -- a lesser quantum of evidence of intent is necessary when the omission or misrepresentation is highly material, and vice versa. At the same time, however, there must be some threshold showing of intent to be balanced; we will not find inequitable conduct on an evidentiary record that is completely devoid of evidence of the patentee's intent to deceive the PTO. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 2002 U.S. App. LEXIS 15418, at *33 (Fed. Cir. 2002) ("Materiality does not presume intent, which is a separate and essential component of inequitable conduct.").

*Amgen Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313, 1358 (Fed. Cir. 2003) (some citations omitted).

*Materiality*

The governing regulations in effect during the patent prosecution stated that "information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1 .56(a) (1991) *See* Gold Decl., Ex. 22. The regulations further provided the following:

A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of

62a
*Appendix B*

> the application and who is associated with the
> inventor, with the assignee or with anyone to
> whom there is an obligation to assign the
> application.  All such individuals have a duty
> to disclose to the Office information they are
> aware of which is material to the examination
> of the application.

*Id.* The Manual of Patent Examining Procedure in effect at
that time provided:

> Affidavits or declarations should be
> scrutinized closely and the facts presented
> weighed with care.  The affiant's or
> declarant's interest is a factor which may be
> considered, but the affidavit or declaration
> cannot be disregarded solely for that reason.

The Manual of Patent Examining Procedure § 716(3) (5th
ed. 1983-1994), (*See* Gold Decl. Ex. 21).

Declarations and affidavits submitted to the PTO
examiner in support of a pending patent application are
generally considered to be material. *See Refac Int'l. Ltd. v.
Lotus Development Corp.*, 81 F.3d 1576, 1583 ("Affidavits
are inherently material, even if only cumulative.").  If
affiants or declarants have an interest in the pending patent,
that interest may be material as well. *See Id.* at 1581 ("It
would surely have been important for the examiner, and any
reasonable examiner, to know of [affiant's] association with
[patent assignee]...").  However, materiality of these
omissions is fact-dependent, and therefore it cannot be said,
as a matter of law, that every omission regarding a previous
connection with a patent applicant or assignee is material.
*See Id.* at 1584-85.

63a
*Appendix B*

<u>Intent</u>

As direct evidence of intent is "rarely available in instances of inequitable conduct[,]" *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997), intent is more often established "by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred." *GFI, Inc. v. Franklin Corp. et al.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001). Evidence of negligence in failing to disclose material information "can support an inference of intent only when, viewed in light of the all the evidence, including evidence of good faith, the conduct is culpable enough to require a finding of intent to deceive." *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1442 (Fed. Cir. 1991) (citations omitted). As previously stated, summary judgment is not proper when "facts of materiality or intent are reasonably disputed." *Paragon*, 984 F.3d at 1190. However, "[w]hile intent is a factual inquiry, and the standard of proof is high, the entrance of summary judgment is not, as a consequence, automatically precluded." *Id.* at 1189. "[S]moking gun evidence is not required in order to establish an intent to deceive." *Id.* at 1190. "In looking to the record for evidence of a genuine issue respecting intent to deceive the PTO, all of the circumstances, including those indicative of good faith, must be considered," but "merely conclusory statements of completely insupportable, specious, or conflicting explanations or excuses will not suffice to raise a genuine issue of fact." *Id.*

*Analysis*

Ferring argues that no reasonable person could believe that the affiliations of the declarants would have been important to the examiner in considering the impartiality of

64a

*Appendix B*

their views, and that the relationships challenged by Barr "simply do not qualify as material affiliations such that a reasonable examiner would have considered them important." *See* Pl's Memo. at 6. Ferring further argues that "Barr has failed to establish any intent to deceive the PTO, even by inference." *Id.* Ferring finally argues that there are at least substantial questions of fact as to materiality and intent, such that summary judgment should be precluded. *See Id.* The Court disagrees.

In *Paragon*, the Federal Circuit concluded that an inference of an intent to deceive the PTO was established by the submission of deceptive declarations. *See Paragon*, 984 F.2d 1182. In that case, after an interview with the PTO examiner, the applicant agreed to provide three affidavits from disinterested parties to support a non-obviousness argument. The applicant in *Paragon* submitted three affidavits by professionals in the field, which attested to the advantages of the patent over the prior art. In the affidavits, the affiants averred that they had not previously been, or would in the future be employed by the corporation which was assigned the patent rights. It was later discovered that "each of the affiants held stock in [the corporation] and that one of them or all three had been consultants for which they received remuneration." *See Paragon*, 984 F.2d at 1191. The Federal Circuit Court held that the failure to disclose these connections evidenced a sufficient intent to withhold material information from the PTO.

Inequitable conduct during patent prosecution was also addressed in *Refac*, 81 F.3d 1576. In that case, the Federal Circuit affirmed the District Court's finding of intent to deceive where one of three Rule 132 affiants failed to disclose an eight week-long period of employment at the company prosecuting the patent, which had occurred about

65a
*Appendix B*

six months prior to his submission of an affidavit on the company's behalf. The Federal Circuit upheld the lower court's finding of inequitable conduct and concluded that it could *not* "hold as a matter of law that omission of a relevant part of one's employment history on an affidavit intended to show the adequacy of the patent specification to one skilled in the art, when such an affidavit by the inventor was earlier rejected, does *not* constitute inequitable conduct." *Refac.* 81 F.3d at 1584-85 (emphasis added). In other words, deliberate omission of a relevant part of an affiant's employment history on an affidavit in support of a patent would be inequitable conduct.[2] The Federal Circuit acknowledged in *Refac* that even a mere eight-week employment relationship with a company may constitute a "relevant" fact requiring disclosure when submitting an "affidavit intended to show the adequacy" of a patent specification. The Court held that since the examiner did not allow the claims in response to the inventors' own proffers, "the inventors were on notice that the examiner would consider it important to know of the affiants' pre-existing . . . connection with the inventors." *Id.* at 1584.

Ferring submitted these affidavits to the PTO in an attempt to overcome rejection of its application. Plaintiffs were required to provide the PTO with sufficient information for a reasonable examiner to consider and weigh the proffered declarations and the opinions contained therein within their proper context. This Court finds the disclosure inadequate. This is particularly significant considering the very cumbersome and indeed mysterious prosecution history

---

[2] As held by the Federal Circuit Court, "[w]e need not quibble about whether a consultant' is or is not 'employed' by a company." *Paragon*, 984 F.2d at 1192 (Fed. Cir. 1993).

66a
*Appendix B*

of this patent, and that several iterations of renewed attempts followed several rejections of the claims before the PTO finally allowed the patent to issue. Even if the conflicted individuals in this case *were* perfectly capable of objectivity and provided declarations accordingly, it is beyond dispute that the PTO should have nonetheless been informed of the connections and prior relationships between these experts and Ferring.

The Court finds unavailing Ferring's argument that *Paragon* is inapposite because the examiner in that case specifically required that affidavits be submitted by "disinterested parties" as opposed to non-inventors, as in the case at bar. It should have been, and the Court concludes on all the evidence presented, that it must have been clear to Dr. Vilhardt at the preliminary meeting with the examiner that a non-inventor affidavit was sought for purposes of obtaining objective evidence that the invention was not anticipated by the prior art or obvious. Later, after affirmance of the examiner's rejection by the Board of Patent Appeals, it should have been all the more clear that objective opinion evidence of the unobvious nature of this invention was required.

"If a bare declaration of lack of intent to mislead where a material affidavit is submitted to the PTO were to raise a genuine issue, summary judgment would be precluded in all cases except where no response at all is made." *Paragaon*, 984 F.2d at 1191. The Court considers it relevant that Drs. Robinson and Czernichow had substantial consulting and employment relationships with Ferring. The evidence as to Dr. Barth is also troubling. In the interests of candor, his affiliations with Ferring and friendship with Vilhardt also should have been disclosed to the examiner. The effect of the fraudulent omissions from the Czernichow

67a

*Appendix B*

and Robinson declarations is magnified by the lack of candor in the Barth affidavit.

On the totality of the facts in this case, this Court finds an intent to deceive where Defendants failed to disclose that both Drs. Robinson and Czernichow and probably Barth were consultants to Ferring for significant periods and that Dr. Robinson was an actual employee of Ferring. Ferring's funding of Dr. Czernichow's research on DDAVP from 1985 to 1986 was just prior to, or contemporaneous with, Czernichow's first declaration for Ferring submitted in 1986. At the time of his second declaration in 1990, Dr. Czernichow had again been very recently or contemporaneously receiving funding from Ferring. Yet, Dr. Czernichow's CV made no mention of his then current or very recent relationships maintained with Ferring. *See* Gold Decl., Ex. 23. This is so, despite the very clear understanding of Ferring that the PTO was interested in receiving non-inventor testimony, which, again, had to have indicated that an objective perspective was sought. The Court is left to wonder why such an obvious problematic interest would not be revealed at the outset, so as to avoid any cause for suspicion. The purpose of such disclosure is to ensure that the examiner has all material information on which to make a judgment. Heeding this duty of candor may have prevented the veil of suspicion and mystery that now surrounds this prosecution history.

> Typically, a finding of inequitable conduct hinges on whether the evidence as a whole indicates that patentees or their representatives acted with the intent to deceive. When balanced against high materiality, the showing of intent can be proportionally less.

68a

*Appendix B*

Brasseler, v. Stryker Sales Corp., 267 F.3d 1370, 1380-81 (Fed. Cir. 2001) (citations omitted).

The undisputed evidence in this case supports the finding of inequitable conduct by the patentee and its agents and the grant of summary judgment. The reluctance of the PTO to issue the '398 patent was evident. Each affidavit submitted in support of its issuance was thus highly material to the prosecution history. That three of the challenged declarations were submitted after several iterations of rejected attempts to obtain the patent's issuance speaks loudly as to motive and intent. While credibility determinations from a courtroom observation may at times be necessary on the issue of intent, here, the entire record presents clear and convincing evidence of an intent to mislead the examiners, even viewing the evidence, as it must be viewed, in the light most favorable to Plaintiff. The submission of the Czernichow and Robinson declarations, and to a lesser extent that of Barth, support a finding of intent to mislead the PTO. "The inference [of an intent to mislead] arises not simply from the materiality of the affidavits, but from the affirmative acts of submitting them, their misleading character, and the inability of the examiner to investigate the facts." *Paragon*, 984 F.2d at 1191.

Because "the habit of charging inequitable conduct in almost every major patent case has become an absolute plague," *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988), where, as in this case, the Court finds that the initial threshold for materiality and intent have been met by clear and convincing evidence, it must then go on to determine "whether the applicant's conduct is *so culpable* that the patent should be held unenforceable." *Dayco Prods., Inc. v. Total Containment, Inc.* 329 F.3d 1358, 1363 (Fed. Cir. 2003) (emphasis in original). It is. The

69a

*Appendix B*

deceit was practiced over a long period of time by more than one person and appears to have been outcome determinative. As earlier discussed, the close and undisclosed long-standing associations between the declarants in this case and Ferring and Vilhardt should have been disclosed in order to avoid the foreseeable inference of fraud that logically arises from the undisputed facts of this case. *See Molins PLC v. Textron*, 48 F.3d 1172, 1182 (Fed. Cir. 1995) ("Those who are not 'up front' with the PTO run the risk that, years later, a fact-finder might conclude that they intended to deceive.").

The totality of the circumstances in this case reveal that no genuine issues of material fact as to inequitable conduct remain so as to preclude summary judgment. The Court therefore finds the patent unenforceable on that ground. For the reasons set forth, the motion for summary judgment based on inequitable conduct is granted in favor of Defendant.

## II.  *Motion for Summary Judgment based on Non-Infringement*

Defendant's position as to non-infringement is less clear than the evidence supporting this Court's determination that Ferring's '398 patent is unenforceable due to inequitable conduct. In the interest of a complete record and to limit the transactional costs imposed on the parties by this litigation, the Court will now consider this alternate basis for summary judgment.

Ferring alleged that Barr's ANDA no. 76-470 infringes claims 1-3, 5-9, and 11 of the '398 patent. Barr asserts that the tablets described in its ANDA do not infringe any claims in the '398 patent because: 1) Barr's product contains desmopressin acetate, rather than 1-deamino-8-D-

70a
*Appendix B*

arginine vasopressin as claimed in the patent; 2) the tablets do not contain a composition or an amount of 1-deamino-8-D-arginine vasopressin that is for "absorption in the gastrointestinal tract"; 3) the tablets do not contain amounts of 1-deamino-8-D-arginine vasopressin within the specified dosages in claims 4, 5, 7 and 8; and 4) the tablets do not have any "gastrointestinally *adsorbable*" as opposed to *absorbable* amount of 1-deamino-8-D-arginine vasopressin as claimed in claims 6-9.[3] Barr also contends that Ferring did not pursue infringement on a doctrine of equivalents theory prior to this summary judgment motion, and thus is barred from asserting this theory now.[4]

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. ... The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F. 3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). A patent is infringed only where the patentee shows that an allowed claim in the patent is found either literally or by equivalents in the accused device.

---

[3]Since the lawsuit was filed, a Certificate of Correction has been granted to Ferring by the PTO for Claim 6. The certificate changes the "d" in "adsorbable" to a "b" for "absorbable." Clearly this was a simple typographical or scrivener error of the sort upon which substantial rights should not depend.

[4]Plaintiff's Opening Claim Construction Brief asserts that Plaintiff reserves the right to argue that Barr infringes the asserted claims under the doctrine of equivalents, should the Court construe some of the claim terms differently than Plaintiff's proposed interpretation.

71a

*Appendix B*

> Upon construction of the claims, summary
> judgment may follow when it is shown that
> the infringement issue can be reasonably
> decided only in favor of the movant, when all
> reasonable factual inferences are drawn in
> favor of the non-movant. Such judgments
> usually turn on the claim construction.

*Voice Techs. Group, Inc. v. VMC Sys., Inc.* 164 F.3d 605, 612 (Fed. Cir. 1999).

To prevail on non-infringement, Barr need only show that "one limitation of each asserted claim is not met" in its accused ANDA product. *Techsearch LLC v. Intel Corp.*, 286 F.3d 1360, 1381 (Fed. Cir. 2002); *see also Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) ("The failure to meet a single limitation is sufficient to negate infringement of the claim..."). The Court is persuaded that Barr's ANDA does not infringe the '398 patent because the patent discloses the claim term "1-deamino-8-D-arginine vasopressin," which was not satisfied either literally or by equivalents in Barr's ANDA, which contains "desmopressin acetate." Because the construction of this disputed term should be dispositive, the Court will limit its analysis accordingly.

## Claim Construction

"To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history." *Markman*, 52 F.3d at 979 (Fed. Cir. 1995) (citations omitted). "The court may, in its discretion, receive extrinsic evidence in order to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent." *Id.* at 980 (quotations omitted).

72a

*Appendix B*

"Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.*

The "claim construction inquiry ... begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa per Anzioni,* 158 F.3d 1243, 1248 (Fed. Cir. 1998). There is a "heavy presumption" that the terms used in the claims "mean what they say, and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed. Cir. 2002). Claims are to be construed from the perspective of one skilled in the field of the patent. *Brookhill-Wilk I, LLC. v. Intuitive Surgical, Inc.,* 334 F.3d 1294, 1298 (Fed. Cir. 2003).

At the time of this patent prosecution, the antidiuretic qualities of desmopressin were already well known, but the means of administration (usually intranasally by use of a rhinyle) were considered awkward or undesirable. It had "been traditionally accepted that proteins and peptides, such as DDAVP, are decomposed in the stomach and intestines without substantial, or any absorption taking place." '398 Patent. The stated objects of the '398 patent invention included "to avoid or substantially alleviate the ... problems of the prior art" and "to provide DDAVP compositions which dissolve in the gastrointestinal tract in order to allow for the gastrointestinal absorption of DDAVP." *Id.* The invention of the '398 patent was to achieve an antidiuretic effect in a diabetic patient merely by swallowing a pill containing DDAVP for gastrointestinal absorption. The DDAVP disclosed in the patent is *1-deamino-8-D-arginine vasopressin.*

73a
*Appendix B*

Claims 1-5 cover the patented compositions and claims 6-11 cover specific methods of administration. The dispositive term "1-deamino-8-D-arginine vasopressin" is first recited in Claim one, which discloses:

> An antidiuretic composition for humans comprising a gastrointestinally absorbable, antidiuretically effective, amount of 1-deamino-8-D-arginine vasopressin and a pharmaceutically acceptable carrier in solid oral dosage form for absorption in the gastrointestinal tract of said humans.

'398 Patent, col. 4, 11. 24-29. Defendant contends, and this Court agrees, that the term "1-deamino-8-D-arginine vasopressin" ("DDAVP" or "desmopressin") means exactly that, and the claims must be construed to instruct one practicing the art of the patent to use the active compound (or free base) desmopressin, and not as extending to its salts.

The Merck Index defines "desmopressin" as an "analog of vasopressin possessing high antidiuretic activity" and provides "1-desamino-8-D-arginine vasopressin"[5] as a construct of "desmopressin." *The Merck Index* 10th Ed. (1983) at 422. *See* Karen Robinson Decl., Ex. P.

Plaintiffs assert that Defendant's desmopressin acetate product infringes the patent because the term "1-deamino-8-D-arginine vasopressin" would be understood by one of ordinary skill in the art as "the active compound

---

[5]"Desamino" is deemed a variation of the word "deamino." *See* Webster's Third New International Dictionary defining "desamination" as a different spelling of "deamination."

74a
*Appendix B*

desmopressin and any of its salts." *See* Pl.'s Memo. at 12.
Plaintiffs admit that in their own products, as presently made
and sold, they do not practice their own invention covered by
the '398 patent. *See* Hearing Tr. at 31. They in fact also use
desmopressin acetate," a different chemical compound and
exactly what Defendant seeks to use in its ANDA. The
claims of the patent cannot be construed in light of the
accused product nor in light of Plaintiff's own currently
marketed products. They must be construed in light of the
public record.

At the outset, the Court considers recent Federal
Circuit cases, which have addressed related issues. In *Merck
& Co. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367
(Fed. Cir. 2003), the Court concluded that a sodium salt form
of a claimed acid used to treat osteoporosis and Paget's
disease literally infringed a patent although the sodium salt
form was not explicitly specified in the claim itself. The
patent claims specifically used the term "acid" in disclosing
the method of treatment. In holding that the patent should be
read to extend to the acid's salt forms, the Circuit Court
relied on the following three factors: 1) the specification
contained numerous references to the salt forms of the
claimed acid in describing its application; 2) the testimony
from all qualified witnesses indicated that persons skilled in
the field would understand that the acid was administered in
the form of the salt; and 3) extensive evidence that the
persons in the field used the same lexicography as the
inventors by referring to the active ingredient in the form of
a salt. *See Id.* at 1370-71.

*Merck* is readily distinguished from the case at bar in
that Ferring's '398 patent specification does not define
DDAVP or "1-deamino-8-D-arginine vasopressin" to include
the salt form. Nor did the inventors disclose numerous (or

75a
*Appendix B*

any) usages of salt forms in the patent specification. The Circuit Court in *Merck* placed substantial reliance on the specification's numerous references" to the salt form of the claimed acid in reaching its conclusion that salt forms were covered by the patent. The '398 patent specification provides no comparable basis for imputing the salt forms of DDAVP into the '398 patent. Nor does all of the expert testimony in this case convincingly indicate that a person skilled in the field would understand "1-deamino-8-D-arginine vasopressin" to be the same as any of its salts.

Plaintiffs expert, Dr. Verbalis, an endocrinologist, stated in his expert report that the "composition claimed in claim 1 is a solid oral dosage form comprising the active ingredient desmopressin acetate." *See* Steinhauer Decl., Ex. 4 at 8. He also testified that anyone in his "field at the time would...understand that it had to mean desmopressin acetate because if you look further down in Column 1...not only did they define DDAVP, or 1-deamino-8-D-arginine vasopressin, as the product of the Zaoral patent, they further described it in terms of its current use, at the time that this patent was filed." *See* Steinhauer Decl., Ex. 2 at 217. When asked if he reads 1-deamino-8-D-arginine vasopressin to refer to desmopressin acetate and not desmopressin in its free base, he responded: "When I read the name of a peptide like that, I allow that it could be any of the salts that are commonly used to manufacture those peptides." *Id.* at 21.

A second expert for Plaintiffs, Dr. Coy, when asked if there is a difference between the salt form and the free base form used in a compound, conceded that there is "a difference in the formulation, because one is - contains a counterion and one does not contain a counterion...this may affect things like solubility and physical chemical properties, basically nothing else." *See* Gioconda Decl., Ex. N at 389.

76a
*Appendix B*

He also stated that "[o]nce they're injected they're identical,"(*see Id.*), but admitted that his own peptide patents recite "the pharmaceutically acceptable salts" to ensure that the salts are covered by the claims of his patents. *See Id.* at 367, 398.

A third expert for Plaintiffs, Lewis Kinter, Ph.D., a medical physiologist, stated in his expert report: "Whether salt or free base, it makes no difference at all with respect to the pharmacological activities of a drug, once in a solution." *See* Steinhauer Decl., Ex. 5 at 18. He also stated that the "terms '1-deamino-8-D-arginine vasopressin,' DDAVP, or desmopressin would be construed by a pharmacologist, physician or other scientist of ordinary skill involved with DDAVP to include all of the salt forms mentioned[.]" *See Id.*

Defendant's expert, Dr. Amidon, a professor of pharmacy, stated the following in an expert report:

> The claim term "1-deamino-8-D-arginine vasopresin" is a relatively simple chemical name for desmopressin of known chemical formula $C_{46}H_{64}N_{14}O_{12}S_2$. The salt desmopressin acetate designates a different chemical formula ($C_{48}H_{68}N_{14}O_{14}S_2$), consistent with the fact that it is a different compound. By using the chemical formula in defining the claimed invention, the '398 patent leaves no ambiguity that it is referring to desmopressin specifically, rather than to any of the other possible modified chemical compounds that can be prepared from the specific desmopressin compound. *Because a person formulating drug products would assume the drafters of the claim meant to use*

77a

*Appendix B*

> *the       term       "1-deamino-8-D-arginine*
> *vasopressin" in a scientifically accurate*
> *manner, I do not believe that the claims cover*
> *a composition using desmopressin acetate*
> *instead of desmopressin.*

*See* Steinhauer Decl., Ex. 12 (emphasis added). This Court agrees. Dr. Amidon correctly notes that despite Dr. Vebalis' averment that the '398 patent describes administering desmopressin acetate, the patent in fact "never mentions desmopressin acetate." *Id.* He also notes that this admission is significant because the difference between desmopressin and desmopressin acetate is highly significant to a person investigating potential formulations for oral delivery." *Id.*

Incredibly, Dr. Verbalis' expert report defines Claim one of the patent as describing "the active ingredient *desmopressin acetate*," without even a tip of the hat to the fact that no salt is actually named in the claim. *See* Steinhauer Decl., Ex. 4 at 8 (emphasis added). Indeed, on the next page of his report, he contradicted that definition, stating: "the active ingredient, in this case, *desmopressin*, is gastrointestinally absorbable..." *Id.* at 9 (emphasis added). Dr. Coy's testimony confirmed that the chemical formulas for the free base and salt forms were distinct, and from his testimony, it can be inferred that it is proper patent practice to claim the salt forms of a patented peptide. The Court is not persuaded by Plaintiffs' expert testimony, that the patent should be extended to cover salt forms of desmopressin.

In *Stephens et al. v. Tech International., Inc.*, 2004 U.S. App. LEXIS 27064 (December 29, 2004), the Federal Circuit recently considered whether an accused salt form of a

78a
*Appendix B*

patented product was covered by the patent, in the context of determining whether an infringement suit was frivolous.[6] The patent disclosed a means of removing unwanted substances from human urine samples. After conducting an infringement analysis, the Court held that the plaintiff had adequate grounds to believe that there was direct infringement, and that the suit was therefore not frivolous. The Court held:

> While the '647 patent does not use the word "salt," the compelling evidence in this case that persons of skill in the field of urinalysis know of chromic acid and sodium dichromate's interchangeable use for removal of unwanted substances in urine samples outweighs that fact.

*Stephens*, 2004 U.S. App. LEXIS 27064, at *13. The Court then held: "Because the use of chromic acid encompasses the use of sodium dichromate in the field of urinalysis, Spectrum had adequate grounds to believe that Tech directly infringed the '647 patent." *Id.* Importantly, the Circuit Court limited the scope of its holding by declaring: "We do not announce that all claims of an acid inherently claim the acid's salt form; it must still be determined whether or not persons having skill in the applicable art deem the acid and salt to be interchangeable." *Id* at *13.

The Court does not interpret the *Stephens* decision to materially alter the standards of claim construction and

---

[6]Plaintiffs appealed the District Court's grant of attorney's fees to defendant after finding the case to be exceptional, based in part on its finding that the infringement suit was frivolous.

79a
*Appendix B*

infringement analysis when the accused product is a salt form of a claimed compound. The *Stephens* decision is silent as to the weight that should be given to the presence or absence in a patent specification of references to salt forms, and should not be read as limiting or disapproving the rule in *Merck*.

Despite the lack of any reference to salts in the specification in this case, Plaintiffs argue that the specification's reference to the Zaoral patent ('491), which does include salt forms, indicates that their invention should also be construed as to include salt forms of the active ingredient. The Court disagrees. The '398 patent specification defines "1-deamino-8-D-arginine vasopressin" as "DDAVP" and states: "this invention relates to the antidiuretic compound 1-deamino-8-D-arginine vasopressin, which is commonly known as DDAVP. DDAVP exhibits a high and specific antidiuretic activity and is useful in treating diabetes insipidus as disclosed in U.S. Pat. No. 3,497,491 [Zaoral]." *See* U.S. Pat. No. '398. "Mere reference to another application, patent, or publication is not an incorporation of anything therein into the application containing such reference..." *See* Manual of Patent Examining Procedure § 608.01(p), Ex. G. It does not follow that Plaintiffs or the Court can enlarge the right to exclude others by the reference to the '491 patent. The Federal Circuit in *Markman* instructed that the "written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Markman*, 25 F.3d at 979-980. "When a patent drafter discloses but declines to claim subject matter ... this action dedicates that unclaimed subject matter to the public." *Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002). Ferring had the opportunity to

80a

*Appendix B*

claim the salt forms and in failing to do so, failed to cover Barr's desmopressin acetate product.

Plaintiffs also argue that "l-deamino-8-D-arginine vasopressin" should include salts under *Pfizer v. Dr. Reddy's Laboratories*, 359 F.3d 1361 (Fed. Cir. 2004) and Federal Food and Drug Administration ("FDA") definitions. That case is readily distinguished on its facts. In it, Pfizer owned a patent which covered the administration of the drug amlodipine in both its besylate and maleate salt forms. Pfizer obtained an extension of that patent under the Patent Term Restoration Act of 1984 (codified at 35 U.S.C. § 156), but in its application had identified the drug in only the besylate salt form. The Federal Circuit held that the patent term extension applied to the drug's active ingredient, amlodipine and to its salts and esters. The Court looked to the codification of the patent extension, which specifically defined a "drug product" for purposes of the extension to mean to include "the active ingredient ... and any salt or ester of the active ingredient." *See* 35 U.S.C. §156(f)(l)(A); (f)(2).

The Federal Circuit also considered 21 C.F.R.§ 60.3(b)(10), which is specifically referenced in 35 U.S.C. §156, and defines a "human drug product" to be "the active ingredient of a new drug or human biologic product (as those terms are used in the Act and the Public Health Service Act), including any salt or ester of the active ingredient." *See* 21 C.F.R. § 60.3(b)(l0). "Pharmaceutical equivalents" is defined to be "drug products in identical dosage forms that contain identical amounts of the identical active drug ingredient, i.e., the same salt or ester of the same therapeutic moiety..." *See* 21 C.F.R. § 320.1(c). In *Pfizer*, the Federal Circuit specifically construed and applied the patent term extension statute, which is not the task before this Court.

*Appendix B*

Similarly, the FDA definitions cited by Plaintiffs relate to patent term extensions and bioequivalence for purposes of new drug approval processes, which are not implicated in this analysis. Neither *Pfizer* nor the FDA definitions appreciably alter the Court's task of claim construction in this case, nor do they relieve Ferring of the traditional obligation to specify accurately the invention claimed.

Finally, Plaintiffs refer to the Physicians' Desk Reference, which lists pharmaceuticals and discloses their contents for physicians. "DDAVP®" is a trade name for Ferring's intranasal and injection products, each of which contains desmopressin acetate. *See* Tr. at 12. Accordingly, the desk reference indicates that Ferring's DDAVP® products contain desmopressin acetate. *See* Steinhauer Decl., Ex. 8. This reference book, which defines accurately Plaintiffs' products as sold on the market, which undisputedly contain desmopressin acetate, does not define, amend or amplify the claims in Plaintiffs' '398 patent.

Barr submitted a supplemental memorandum on June 9, 2004, arguing that Ferring contradicted its infringement argument in this case by submission of a "Citizen Petition" to the FDA for consideration by that body in connection with Barr's ANDA application. In the petition submitted on or around February 2, 2004, Ferring requested that the FDA establish unique evidentiary requirements of bioequivalence limited to ANDAs of oral products containing desmopressin. Ferring argued that as the first and only approved oral peptide, it presents "complex and novel bioavailability issues." *See* Donovan Decl., Ex. A. It argued that because the product is "primarily indicated for use in children, enhancing the requirements is especially appropriate. *See Id.* Barr now argues that Ferring's Citizen Petition is a factual admission that Barr's ANDA tablet is not bioequivalent, as

82a
*Appendix B*

Ferring asserts in this litigation. Ferring denies any contradiction between Ferring's arguments in this litigation and in the Citizen Petition.

Ferring requested in its Citizen Petition that the FDA require ANDAs for products containing desmopressin to address the unusual properties of desmopressin (including a very low absorption rate and high potency). Ferring asked the FDA to require such ANDAs to include more stringent evidentiary proofs, including comparative clinical studies as to variability of absorption and duration of action, and separate evidence of bioequivalence for each dose level.

The Citizen Petition does appear to this Court to invoke the traditional estoppel against taking inconsistent positions in companion proceedings, and suggests by implication that the testing proffered in support of the initial NDA filed by Aventis and approved by the FDA in 1995[7] is now considered inadequate. On the other hand, the filing of such a Citizen Petition may be nothing more than a hardball litigation tactic, motivated by a desire to keep out competition for as long as possible after the expiration of the patent and raise the transactional costs for Barr. Such antics are privileged under the First Amendment right to petition and are part of the rough and tumble which characterizes the free market. The Citizen Petition casts serious doubt on the genuineness of Ferring's insistent contention that Barr's ANDA is bioequivalent and its product would infringe. On balance, the Court is constrained to determine that the Citizen Petition does not rise to the level of an admission of fact precluding Ferring's claims of infringement.

---

[7]*See* U.S. FDA Center for Drug Evaluation and Research, www.accessdata.fda.gov.

83a
*Appendix B*

*Doctrine of Equivalents*[8]

In Plaintiffs' amended opposition memorandum, they argue that even if the Court construes the claims of the patent as suggested by Barr, there is still infringement under the Doctrine of Equivalents. Plaintiffs argue that even if differences exist between desmopressin and its acetate form before being swallowed, once either reaches the gastrointestinal tract, it is the same desmopressin. *See* Pl. Opp. at 18. Defendant responds that this doesn't matter because the patent doesn't address the invention's interaction with gastric fluids or breakdown in the gastrointestinal tract before absorption.

> A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device. A claim element is equivalently present in an accused device if only "insubstantial differences" distinguish the missing claim element from the corresponding aspects of the accused device.

*Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1423-1424 (Fed. Cir. 1997)(citations omitted).

Plaintiffs themselves now produce and sell desmopressin acetate, the same product that Defendant proposes to sell, and that they charge as infringing. Tellingly, Plaintiffs concede that their product is not the

---

[8]The Court assumes without deciding the Plaintiffs properly preserved and presented this argument.

84a

*Appendix B*

same as that described in the patent, which the Defendant allegedly infringes. *See* Hearing Transcript at 31 (The Court: "[H]e tells me that neither side of the case practices the patent. Everybody sells desmopressin acetate." Mr. Mondolino (attorney for Plaintiffs): "Well, we agree. We don't practice our own invention."). In the face of such an admission, the Court could not in logic conclude that Defendant infringes a patent, even by equivalents, by producing the same product as Plaintiffs who don't practice their own invention. "The doctrine of equivalents cannot be used to erase meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed. Cir. 1994) (citations omitted). The Court does not find the change in formula to be an insubstantial change when Plaintiffs themselves admit that the acetate product is not their patented invention. Here, Plaintiffs failed to claim the salt forms of DDAVP and the Court is constrained by the "fundamental principle that claims define the scope of patent prosecution." *Id.* at 1052. Plaintiffs cannot now expand their patent through the doctrine of equivalents.

There is no genuine dispute that the term "1-deamino-8-D-arginine vasopressin" does not literally define or include an acetate or other salt form of desmopressin. Had the inventors intended to claim desmopressin acetate, they could have said so. It cannot be said with any certainty that an ordinary person skilled in the art would *know* that reference in the patent to "1-deamino-8-D-arginine vasopressin" is an instruction to use the acetate form. "[A]s between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its

85a
*Appendix B*

claimed structure." *Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997).

The Court concludes that Defendant's desmopressin acetate product does not literally or by equivalents infringe Plaintiffs' patent and accordingly grants summary judgment on that alternate basis. In light of this conclusion, the Court does not reach Defendant's motion for partial summary judgment for invalidity of Claims 6 and 11.

### Conclusion

For the reasons set forth above, the Court grants summary judgment in favor of Defendant on the bases of inequitable conduct and non-infringement. Defendant's motion for partial summary judgment of invalidity of Claims 6 and 11 is denied.

Counsel shall settle a final declaratory judgment on five (5) days notice.

SO ORDERED.

Dated: White Plains, New York
February 7, 2005

                                        _____
                                        Charles L. Brieant
                                        United States District
                                        Judge

86a

## APPENDIX C — ORIGINAL ORDER BY THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT DENYING THE PETITION FOR PANEL REHEARING AND REHEARING EN BANC

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

05-1284

FERRING BV., Plaintiff-Appellant, and AVENTIS PHARMACEUTICALS, INC., Plaintiff-Appellant, v. BARR LABORATORIES, INC., Defendant-Appellee.

*2006 U.S. App. LEXIS 10765*

April 10, 2006, Decided
April 10, 2006, Filed

### ORDER

A combined petition for panel rehearing and for rehearing en banc having been filed by the Appellant,[*] and a response thereto having been invited by the court and filed by the Appellee, and the petition for rehearing and response, having been referred to the panel that heard the appeal, and thereafter the petition for rehearing en banc and response having been referred to the circuit judges who are in regular active service,

UPON CONSIDERATION THEREOF, it is

ORDERED that the petition for panel rehearing be, and the same hereby is, DENIED and it is further

ORDERED that the petition for rehearing en banc be, and

---

[*] This petition was filed by Ferring B.V.

87a

*Appendix C*

the same hereby is, DENIED.

The mandate of the court will issue on April 17, 2006.

88a

## APPENDIX D — REVISED ORDER BY THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT DENYING THE PETITION FOR PANEL REHEARING AND REHEARING EN BANC

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2005-1284

FERRING B.V., Plaintiff-Appellant, and AVENTIS PHARMACEUTICALS, INC., Plaintiff-Appellant, v. BARR LABORATORIES, INC., Defendant-Appellee.

*2006 U.S. App. LEXIS 10811*

April 12, 2006, Decided
April 12, 2006, Filed

Before MICHEL, Chief Judge, NEWMAN, MAYER, LOURIE, RADER, SCHALL, BRYSON, GAJARSA, LINN, DYK, and PROST, Circuit Judges.

### ORDER

A combined petition for panel rehearing and rehearing en banc was filed by Ferring B.V.[1], and a response thereto was invited by the court and filed by Barr Laboratories, Inc. The petition for rehearing was referred to the panel that heard the appeal, and thereafter the petition for rehearing en banc, response and the amicus curiae brief were referred to the circuit judges who are authorized to request a poll whether to rehear the appeal en banc. A poll was requested, taken, and failed.

---

[1]The Pharmaceutical Research and Manufacturers of America filed an amicus curiae brief.

89a
*Appendix D*

Upon consideration thereof,

IT IS ORDERED THAT:

(1) The petition for panel rehearing is denied.

(2) The petition for rehearing en banc is denied.

(3) The mandate of the court will issue April 19, 2006.

NEWMAN, LOURIE, and GAJARSA, Circuit Judges, would rehear the appeal en banc.

90a

## APPENDIX E —37 C.F.R. § 1.56 (1990)

§ 1.56 Duty of disclosure; fraud; striking or rejection of applications.

(a) A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. The duty is commensurate with the degree of involvement in the preparation or prosecution of the application.

(b) Disclosures pursuant to this section must be accompanied by a copy of each foreign patent document, non-patent publication, or other non-patent item of information in written form which is being disclosed or by a statement that the copy is not in the possession of the person making the disclosure and may be made to the Office through an attorney or agent having responsibility for the preparation or prosecution of the application or through an inventor who is acting in his or her own behalf. Disclosure to such an attorney, agent or inventor shall satisfy the duty, with respect to the information disclosed, of any other individual. Such an attorney, agent or inventor has no duty to transmit information which is not material to the examination of the application.

(c) Any application may be stricken from the files if:

91a

*Appendix E*

(1) An oath or declaration pursuant to § 1.63 is signed in blank;

(2) An oath or declaration pursuant to § 1.63 is signed without review therof by the person making the oath or declaration;

(3) An oath or declaration pursuant to § 1.63 is signed without review of the specification, including the claims, as required by § 1.63(b); or

(4) The application papers filed in the Office are altered after the signing of an oath or declaration pursuant to § 1.63 referring to those application papers.

(d) No patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or gross negligence. The claims in an application shall be rejected if upon examination pursuant to 35 U.S.C. 131 and 132, it is established by clear and convincing evidence (1) that any fraud was practiced or attempted on the Office in connection with the application, or in connection with any previous application upon which the application relies, or (2) that there was any violation of the duty of disclosure through bad faith or gross negligence in connection with the application, or in connection with any previous application upon which the application relies.

(e) The examination of an application for compliance with paragraph (d) of this section will normally be delayed until such time as:

(1) All other matters are resolved, or

92a

*Appendix E*

(2) Appellant's reply brief pursuant to § 1.93(b) has been received and the application is otherwise prepared for consideration by the Board of Patent appeals and Interferences, at which time the appeal will be suspended for examination pursuant to paragraph (d) of this section.

The prosecution of the application will be reopened to the extent necessary to conduct the examination pursuant to paragraph (d) of this section including any appeal pursuant to § 1.191. If an appeal has already been filed based on a rejection on other grounds, any further rejection under this section shall be treated in accordance with § 1.93(e).

(f) Any member of the public may seek to have an application stricken from the files pursuant to paragraph (c) of this section by filing a timely petition to strike the application from the files. Any such timely petition and any accompanying papers will be entered in the application file if the petition and accompanying papers (1) specifically identify the application to which the petition is directed, and (2) are either served upon the applicant in accordance with § 1.248, or filed with the Office in duplicate in the event service is not possible. Any such petition filed by an attorney or agent must be in compliance with § 10.18.

(g) A petition to strike an application from the files submitted in accordance with the second sentence of paragraph (f) of this section will be considered by the Office. An acknowledgement of the entry of such a petition in a reissue application file will be sent to the member of the public filing the petition. A member of the public filing such a petition in an application for an original patent will not receive any communications from the Office relating to the petition, other than the return of a self-addressed postcard

93a

*Appendix E*

which the member of the public may include with the petition in order to receive an acknowledgement by the Office that the petition has been received. The Office will communicate with the applicant regarding any such petition entered in the application file and may require the applicant to respond to the Office on matters raised by the petition. The active participation of the member of the public filing a petition pursuant to paragraph (f) of this section ends with the filing of the petition and no further submission on behalf of the petitioner will be acknowledged or considered unless such submission raises new issues which could not have been earlier presented, and thereby constitutes a new petition.

(h) Any member of the public may seek to have the claims in an application rejected pursuant to paragraph (d) of this section by filing a timely protest in accordance with § 1.291. Any such protest filed by an attorney or agent must be in compliance with § 10.18.

(i) The Office may require applicant to supply information pursuant to paragraph (a) of this section in order for the Office to decide any issues relating to paragraphs (c) and (d) of this section which are raised by a petition or a protest, or are otherwise discovered by the Office.

(j) If any disclosure pursuant to this section does not include a copy of each foreign patent document, non-patent publication, or other non-patent item of information in written form which is being disclosed or a statement that a copy thereof is not in the possession of the person making the disclosure, applicant will be so notified and given a period of time within which to file the copy or a statement that a copy is not in the possession of the person making the

94a

*Appendix E*

disclosure. The time period set may be extended under §
1.136.

95a

**APPENDIX F — 37 C.F.R. § 1.56 (2006)**

§ 1.56 Duty to disclose information material to patentability.

(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application. There is no duty to submit information which is not material to the patentability of any existing claim. The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98. However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct. The Office encourages applicants to carefully examine:

96a

*Appendix F*

(1) prior art cited in search reports of a foreign patent office in a counterpart application, and

(2) the closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

(b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

(1) Each inventor named in the application;

97a

*Appendix F*

(2) Each attorney or agent who prepares or prosecutes the application; and

(3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

(d) Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

(e) In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.