1    nobody argued --

2         THE COURT:  But the bottom line is, if you win that

3    case, you are going to establish issue preclusion as to the

4    validity of the patent.

5         MR. LOVE:  Sure.

6         THE COURT:  Just as if you are a defendant in an

7    infringement claim.

8         MR. LOVE:  But the harm of a Walker Process claim

9    is not the fact of the patent itself, it's what they do with

10   it.  They take it to maintain unlawfully a monopoly.  They

11   took it and used it against the generic manufacturer.

12        They gained the Hatch-Waxman regulation so they can

13   get the 30 months on the market.  It's all of that conduct

14   that harmed us.  It's not the fact of the patent, and I will

15   talk about preemption in a second.  It's not like they did

16   something that -- the abuse of process case that they cite in

17   their memo in Brennan.  That wasn't the harm.

18        The harm itself is the monopoly that keeps the

19   generic off the market and we pay overcharges.

20        THE COURT:  But it's the -- the only thing that

21   makes it wrong would be a knowing use of the patent, a

22   voidable patent.

23        If I have a real good patent, I can do that, I can

24   keep you off the market, and they are doing it all the time.

25        MR. LOVE:  You asked earlier about, you know,

Sue Ghorayeb,  Official Court Reporter

22

1    depending on what happens in the Supreme Court, how it would

2    affect this case.

3            THE COURT:  Yes.

4            MR. LOVE:  It really depends on the findings.  You

5    made findings, they might send it back for other reasons.

6    They might find some of your findings were not clearly

7    erroneous and some were.  It really depends.  But nothing is

8    issue preclusion against us.  We know what they did there,

9    even if you hadn't found it first.

10           THE COURT:  Yes, but they never found fraud.

11           MR. LOVE:  No.  But they didn't have to, because

12   the generics didn't have a counterclaim.  They didn't need to

13   use it -- as far as I am aware, to use it as a sword.  They

14   didn't have to go that far.  All they had to do was prove

15   inequitable conduct in order to defend against the claim.

16           THE COURT:  If they could prove fraud, they would

17   have done that.

18           MR. LOVE:  Well, why go to the next, you know -- if

19   you don't have to, why go there.

20           THE COURT:  I am wondering whether from the point

21   of view of prudent case management, because September 11th is

22   right around the corner really, whether we should wait and

23   see if they grant cert.

24           MR. LOVE:  You know, obviously, it's up to Your

25   Honor.  What we would suggest is that this case move forward.

Sue Ghorayeb,  Official Court Reporter

1    It's already been stayed I think --

2            THE COURT:  Well, I don't know --

3            MR. LOVE:  -- a year and eighteen months.

4            THE COURT:  -- if we will reach it by then anyway,

5    because we do have some vacation schedules to deal with.

6            I think I should take the matter under submission

7    today, and if cert. is granted, anyone should write me a

8    letter, anyone who knows about it, with a copy to the -- with

9    a copy to the other side.

10           MR. LOVE:  Again, we don't want to be sort of the

11   longest case on your docket.

12           THE COURT:  Well, you are not.  You are not

13   anywhere as near.

14           MR. LOVE:  We -- actually, we have just agreed to a

15   scheduling order for discovery to continue --

16           THE COURT:  Fine.

17           MR. LOVE:  -- and everything.  And --

18           THE COURT:  That's fine.

19           MR. LOVE:  Okay.  Well, I know that David, Mr.

20   Sorensen is going to want to speak to that.

21           Do you want to hear, at least, just briefly about

22   the preemption?  I will take five minutes.

23           THE COURT:  Just briefly, if you will.  I have some

24   other people who want to be heard too, but you can tell me

25     briefly about the preemption.

        Sue Ghorayeb,   Official Court Reporter
                                                            24

1              MR. LOVE:  Okay, very briefly, and then I believe

2      that they are going to have another argument with regard to

3      Aventis.

4              The preemption argument suffers from the same flaw,

5      the same misunderstanding of what the Walker Process claim

6      is.  Again, in Walker Process, the Supreme Court said, "No.

7      The Walker claim can go forward as an antitrust claim,

8      because it is an antitrust claim and not a patent claim."

9              They relied on, excuse me, on Cipro, but Cipro

10     again cites cases, preemption cases that are nothing, nothing

11     like or nothing similar to a Walker Process antitrust claim.

12     They are abuse of process claim.

13             They -- the Brennan case, it simply argues that

14     "what happened in front of the PTO hurt us," and that was

15     that.  They don't take that -- they don't have to prove, as

16     Dow Chemical, the Federal Circuit in Dow Chemical said,

17     "additional elements outside of the PTO."

18             There is no question that if we only argue the

19     fraud on the PTO, we wouldn't have any claim here.  It is the

20     fact that they took the patent after the fraud, put it in the

21     Orange Book, filed the sham litigation, and then filed the

22     citizen's petition, which was also false, which of course is

23     completely independent of other fraud on the PTO and why we

24    have an antitrust claim.  It's a very, very different,

25    distinct claim.

               Sue Ghorayeb,  Official Court Reporter

                                                        25

1          I would add that under any of the tests that the

2     Fed -- that the D.C. Circuit has, and we have quoted these in

3     our brief, the additional elements test, the primary

4     marketplace conduct or the allegations of bad faith, in fact,

5     these cases say "if you allege fraud on the PTO, then there

6     is no preemption."

7          I will finish with, Your Honor, that again, if you

8     look at Molecular, it talks about this distinction.  It

9     distinguishes Remeron and Cipro.  But then, I found it funny,

10    looking back at some of these cases, that when I looked back

11    at ARC America, that was an argument, the same thing; a

12    preemption argument made by defendants that, that end pairs

13    like myself, who I represent, the indirects, shouldn't be

14    able to bring these claims because of preemption under the

15    federal antitrust statutes.

16         One would think that that would be a much, much

17    stronger argument.  I mean here we are bringing state

18    antitrust statute claims, and here is -- there is a whole

19    regime of federal antitrust claim, and the Supreme Court

20    said, "no."  In fact, federal antitrust law derives from the

21    common law in the States.  That's where it comes from.

22          THE COURT:  Anyone who said that doesn't know

23   American history.

24          MR. LOVE:  It was Senator Sherman.

25          THE COURT:  Yes.


          Sue Ghorayeb,  Official Court Reporter

                                              26


1           MR. LOVE:  And he said --

2           THE COURT:  And you know what?  His brother burned

3    Atlanta, but he did more damage to the country.

4           MR. LOVE:  In any event, just to finish, Your

5    Honor, the Court there said, because antitrust it's always

6    been regulated at a state level, even before the 1890 Sherman

7    Act, that there is a presumption against preemption of state

8    law antitrust claims.

9           And I know Mr. Sorensen would like to briefly talk

10   about it.

11          THE COURT:  Well, thank you very much and I will be

12   glad to hear Mr. Sorensen.

13          MR. LOVE:  Thank you, Your Honor.

14          MR. SORENSEN:  Good morning, Your Honor.  David

15   Sorensen for the direct purchaser class plaintiffs and

16   Rochester Drug.

17          I wanted to add a few more points.  One, it's

18   important to look at the Walker Process case, the Supreme

19   Court case, and the Seventh Circuit case.  When you look at

20   those two cases, it's very plain that the Supreme Court was

21  holding that when you prove a Walker Process fraud, you

22  simply remove immunity to an antitrust claim that might

23  otherwise be there, but once it's removed, it's an antitrust

24  claim, just like any other antitrust claim.

25          The Seventh Circuit construed it as a patent claim,

Sue Ghorayeb,  Official Court Reporter

27

1   which is why they affirmed the dismissal.  The Supreme Court

2   reversed.

3           I just want to read one portion of the Supreme

4   Court's opinion.  This is at Page 176 of the Supreme Court's

5   opinion.  "Walker counter-claimed under the Clayton Act, not

6   the patent laws.  While one of its elements is the fraudulent

7   procurement of a patent, the action does not directly seek

8   the patent's annulment.  The gist of Walker's claim is that

9   since Food Machinery obtained its patent by fraud, it cannot

10  enjoy the limited exception to the prohibitions of Section 2

11  of the Sherman Act, but must answer under that section and

12  Section 4 of the Clayton Act in treble damages to those

13  injured by any monopolistic action taken under the fraudulent

14  patent claim."

15          It's very plain from that portion of the opinion,

16  the opinion itself, that what the Supreme Court was saying is

17  once the immunity is gone, you have an antitrust case, that

18  you have to prove like any other antitrust case.

19          It is extremely important to note that there is

20   nothing in Walker Process that limits its holding to

21   competitors.  That's the factual situation in which it arose,

22   that's true, but there is nothing in that opinion that says

23   its holding is limited to competitors.

24          And, in fact, what's important is that Supreme

25   Court law overall on antitrust makes it plain that the

                 Sue Ghorayeb,  Official Court Reporter
                                                              28

1   antitrust laws are about protecting competition, not

2   competitors.  It's in Brunswick v. Pueblo, 429 U.S. 477.

3          THE COURT:  Oh, we heard that so many times, we

4   don't need to hear it again.

5          MR. SORENSEN:  That's fine, Your Honor.

6          THE COURT:  You know.

7          MR. SORENSEN:  I will skip over that one.

8          THE COURT:  Okay.

9          MR. SORENSEN:  It has also been the holding in the

10   Supreme Court, at least since 1906, in the Chattanooga case,

11   that direct purchasers, the plaintiffs that we represent,

12   have standing to seek overcharge damages for violations of

13   the antitrust laws.  In the Reiter v. Sonotone case, in 1979,

14   again, "the essence of the antitrust laws is to ensure fair

15   price competition in an open market."

16          THE COURT:  We really know that.

17          MR. SORENSEN:  Okay.

18          THE COURT:  And I know that you have done, all of

19    you, a very complete presentation, and the Court has to study

20    it and read these cases.  So, unless you have some other item

21    you want to highlight, I will be prepared to take it under

22    advisement.

23          MR. SORENSEN:  Yes, Your Honor, two things.

24          One, it is our position, along with my colleagues,

25    that the Court should not wait or stay this case in any


              Sue Ghorayeb,  Official Court Reporter
                                                       29


1    fashion awaiting petitions for cert., which most likely are

2    going to be denied.  That would involve, in our view,

3    unnecessary and excessive delay in the case.

4          And, two, the defendants' motion to dismiss the

5    claims is based on their Walker Process argument, but that is

6    not what our Complaints and claims are limited to.  That's

7    just a piece of it.  We also have a sham litigation claim,

8    which is distinct, as recognized by Nobelpharma.

9          THE COURT:  What's the sham litigation claim?

10          MR. SORENSEN:  Under the PRE Supreme Court test,

11    you have to prove objectively baseless litigation and

12    subjective data.

13          THE COURT:  What was the baseless litigation?

14          MR. SORENSEN:  In this case, that was the patent

15    infringement suit brought by Ferring and Aventis.

16          Now, in this particular case that, it obviously

17  follows this Court's and the Second Circuit's affirmance, but

18  we are not limited to that.  They are distinct claims, Walker

19  Process.

20          THE COURT:  Just because you lose, it doesn't

21  necessarily mean that the litigation is sham.

22          MR. SORENSEN:  True.

23          THE COURT:  50 percent of the cases lose.

24          MR. SORENSEN:  That, that may be, Your Honor, but

25  when you perpetrate fraud over a period of years, as Ferring

1  and Aventis did, in our view, at least at this stage, that

2  can qualify as sham litigation.

3          The point here is that their motion is directed at

4  Walker Process.  It doesn't touch the remainder -- the other

5  bases of our Complaint; sham litigation, sham Orange Book

6  listings in the Orange Book of the patents, and the sham

7  citizen's petition.  There is nothing about their motion --

8          THE COURT:  What was sham about the citizen's

9  petition?

10          MR. SORENSEN:  Your Honor, Ferring filed a

11  citizen's petition asking that the FDA require Barr to submit

12  additional tests of bio-equivalents knowing -- they should

13  have known that what they were seeking was baseless.  The FDA

14  told them it was baseless when they rejected it.  And Aventis

15    had done its own study, which also proved that it was

16    baseless.

17          So, they filed a citizen's petition merely for

18    delay, because every day of delay is more profit for the

19    brand manufacturers.  So they do it for delay.  It's sham.

20    It has no basis when it was filed.

21          THE COURT:  All right.

22          MR. SORENSEN:  Unless, you know, you have any

23    questions, I think --

24          THE COURT:  Well, thank you very much.

25          If there is nothing further, the Court will take it

              Sue Ghorayeb,  Official Court Reporter

                                                          31

1     under advisement.  I am not making a determination one way or

2     another as to whether we have to wait for the cert. to be

3     decided.  I think if I concluded we don't, I could not

4     guarantee a workmanlike job would get completed before

5     September anyway, but we will do the best we can for it.

6     Miss Wootton.

7           MS. WOOTTON:  Yes.  I believe there is a second

8     motion pending.

9           THE COURT:  Oh, all right.

10          MS. MCVOY:  Yes, Your Honor, and I don't mind

11    trying to --

12          THE COURT:  Is there anything that's different

13    about the second motion?

14         MS. MCVOY:  Yes, Your Honor.  It's Julia McEvoy for

15    Defendant, excuse me, Defendant Aventis Pharmaceuticals, Inc.

16         This is a very different motion.  It is a motion

17    that challenges the sufficiency of plaintiffs' fraud

18    allegations with respect to Aventis.

19         You will recall that Aventis was the licensee of

20    the patent at issue in the prior litigation, Your Honor, and

21    I just want to point out, with respect to --

22         THE COURT:  What is the connection between Aventis

23    and Ferring?

24         MS. MCVOY:  Aventis is the exclusive licensee for

25    the sale of DDAVP tablets in the United States.

Sue Ghorayeb,   Official Court Reporter

32

1          THE COURT:  Is there any overlap of ownership?

2          MS. MCVOY:  None whatsoever, Your Honor.  In

3     effect, Aventis is merely the distributor of the products

4     manufactured.

5          THE COURT:  Strangers otherwise?

6          MS. MCVOY:  Otherwise strangers, that's correct.

7          The plaintiffs have alleged that this license

8     agreement somehow and the fact that there were dealings

9     between these two companies brings Aventis within the realm

10    of knowledge of the alleged fraud.  But established Second

11    Circuit precedent provides that in order to plead knowledge

12    of an alleged fraud, you have got to say who knew it, when

13    they knew it, how they learned it.

14         THE COURT:  We all know that, that's Rule 9, but

15    every time we get a motion like that, it's granted with leave

16    to replead.

17         If that's your issue, you ought to take the

18    deposition of the person who is claiming that they knew it

19    and when they knew it and so forth.

20         Those Rule 9 motions are just exercise, because

21    they result in a new Complaint --

22         MS. MCVOY:  Well, I think this case --

23         THE COURT:  -- amended Complaints.

24         MS. MCVOY:  -- this case is different though, Your

25    Honor.  What happened here, and you will recall when we

Sue Ghorayeb,  Official Court Reporter

1    reported to you in March, we had agreed to a discovery

2    schedule by which we provided -- we, the defendants, provided

3    the plaintiffs in the antitrust cases the entire record from

4    the patent litigation.

5         There were discovery requests in the patent

6    litigation that asked for all documents concerning the

7    license between the two companies.

8         THE COURT:  Right.

9         MS. MCVOY:  And all documents relating to the

10    alleged -- allegedly fraudulent declarations provided to the

11    Patent & Trademark Office.   The plaintiffs had those

12    materials, as well as the transcripts of the depositions, for

13    nine months.

14              THE COURT:   What was the allegedly fraudulent

15    omissions, if you can tell?

16              They are not alleging any affirmative

17    misrepresentation of fact to the Patent Office, right?

18              MS. MCVOY:   That's correct.

19              And that's why Rule 9 is so much more critical to

20    this case, because the allegation is that Ferring's

21    declarants failed to disclose relationships between the

22    declarants and Ferring.   So, just looking at the patent file

23    in this case, there is no way anybody, including Aventis,

24    would have known, unless Ferring told Aventis, that there was

25    a problem with the declarations.


              Sue Ghorayeb,   Official Court Reporter

1              After reviewing the discovery materials from the

2    patent litigation for nine months and filing their First

3    Amended and Consolidated Complaints, the plaintiffs could not

4    come up with any way to tie Aventis to Ferring.   That's why

5    this case is different than the normal Rule 9 case where

6    plaintiffs are allowed to replead.

7              Otherwise, Your Honor, in order not to try your

8    patience today, I will treat --

9          THE COURT:  It's not a question of patience; it's a

10   question of your time as well as mine, and we have other

11   matters to hear.  Oral argument is meant to highlight and

12   flesh out all these extensive papers that have already been

13   handed in and you don't have to repeat everything.

14          Is there anyone who wants to be heard on this

15   particular issue?

16          MR. SORENSEN:  Yes, Your Honor.

17          THE COURT:  If Aventis is a separate entity, is it

18   the contention that had they done due diligence, they would

19   have learned that it was a fraudulent patent?

20          I don't know where you get their scienter.

21          MR. SORENSEN:  Your Honor, Aventis is no stranger

22   to Ferring.  They have been partners with respect to this

23   product in its various forms for more than 30 years.

24          THE COURT:  I thought that they were merely

25   licensees of the patent.


               Sue Ghorayeb,  Official Court Reporter
                                                        35


1          MR. SORENSEN:  As we have alleged in our Complaint,

2    which is taken on as true on the defendants' motion to

3    dismiss it, we allege, for example, in Paragraph 42, that

4    Ferring itself stated that it had a "key commercial

5    partnership, key commercial partnership."

6          THE COURT:  Yes.  I am a licensee, I am making

7    money, that's a key commercial partnership.

8              MR. SORENSEN:  Your Honor, their, their --

9              THE COURT:  I don't know how you impute knowledge

10   of the fraud to somebody who becomes a licensee, does due

11   diligence presumably before taking a license, and looks to

12   the Patent Office and finds a misleading omission.

13             MR. SORENSEN:  Your Honor, there is a thirty-year

14   history of a business relationship here, it's not just a

15   couple of years.

16             THE COURT:  Thirty years when you have a commercial

17   relationship doesn't tell you your partner is a crook.

18             MR. SORENSEN:  Your Honor, Your Honor, when

19   Aventis -- Aventis applied for the NDA for this product, the

20   new drug application, by which if the FDA approves it,

21   Aventis can sell it in the United States.  Aventis holds the

22   NDA for DDAVP.

23             In applying for the NDA, Aventis itself, not

24   Ferring, Aventis has to make a certification, subject to

25   criminal penalties, of whether there is a patent that claims

              Sue Ghorayeb,   Official Court Reporter

                                                    36

1    this product and a patent on which a reasonable patent

2    infringement suit could be brought.  Aventis made that

3    certification in around 1989.

4              THE COURT:  Based on what the Patent Office record

5    shows.

6          MR. SORENSEN:  By 1989, the patent application had

7    been rejected twice, by 1989, and yet Aventis goes ahead and

8    files the --

9          THE COURT:  It was finally issued, wasn't it --

10         MR. SORENSEN:  Finally issued.

11         THE COURT:  -- after they got those great

12   affidavits?

13         MR. SORENSEN:  Your Honor, Your Honor, my point is

14   that by 1989, if not earlier, Aventis, to fulfill its

15   statutory obligations, was required to communicate with

16   Ferring about the status of this patent.  They had to talk to

17   each other.

18         THE COURT:  Sure.  And do you think when they

19   talked that Ferring, who wanted to enter into a license

20   agreement or who already had entered into it, tells them,

21   "Oh, by the way, you ought to know something; those two

22   phonies who put in the affidavits, they really are people

23   that we didn't disclose."

24         MR. SORENSEN:  Your Honor, it didn't have to be

25   that express.

                 Sue Ghorayeb,  Official Court Reporter
                                                           37

1          THE COURT:  All right.  I will have to consider it.

2          MR. SORENSEN:  Well, wait a second, Your Honor.

3          THE COURT:  Yes.

4          MR. SORENSEN:  Aventis was required to inquire.

5    Are we going to assume, on their motion to dismiss our

6    Complaint, that Ferring also defrauded Aventis and Aventis is

7    simply an innocent victim here?  Is that what we are supposed

8    to assume?

9          I don't think -- I don't think so, Your Honor.

10          THE COURT:  You have to honor Rule 9, which you may

11    find to be kind of wasteful and stupid, but you have to honor

12    it.

13          MR. SORENSEN:  Your Honor --

14          THE COURT:  I will have to take it under

15    advisement, because I think you have a problem.

16          MR. SORENSEN:  Your Honor, just a few more points.

17          THE COURT:  Yes.

18          MR. SORENSEN:  Let's get to Rule 9.  I wouldn't

19    call a rule of federal procedure stupid.

20          THE COURT:  Well, the reason it's stupid is, every

21    time we grant one of those motions, we get an Amended

22    Complaint.

23          MR. SORENSEN:  Exactly.  We have not had discovery

24    on Aventis's knowledge.  The patent case was not focussed on

25    it.  Defense counsel is referring to discovery requests that

                Sue Ghorayeb,  Official Court Reporter
                                                    38

1    are not in front of you and not of record.  They don't even

2    cite them completely.

3          We are not bound by that discovery.  We have a

4    right to take our own discovery on this issue that's peculiar

5    to us and their defense.

6          THE COURT:  Well, you have to be able to plead your

7    fraud before.  You can't go look for the proof before you got

8    it.

9          MR. SORENSEN:  Your Honor, we are also entitled on

10   this motion to reasonable inferences from the facts we

11   allege.

12         THE COURT:  That is true.

13         MR. SORENSEN:  And under Rule 9(b), we are also

14   entitled to plead knowledge of the fraud generally, not with

15   any kind of particularity that defense counsel insists on;

16   that is not the law.

17         We have pled the who, what, where, when of the

18   fraud on the PTO.  We have done that.  What we can allege

19   generally, which we have also done, is Aventis's knowledge.

20         We have a whole series of factual allegations,

21   beginning with the relationship, but going through the NDAs

22   and going through what happened between 1989 and 1991, when

23   the patent was granted.  That's when Ferring submits

24   additional misleading declarations, including by someone

25   named Robinson, who is a former research director.

1          Well, Aventis would know who Robinson is.  They

2     have been working with Ferring for 30 years on this product.

3     So, all Aventis had to do was, what's going on with this

4     patent, which they had to do, Your Honor, in 1991, because

5     they had to amend their NDA once the patent was granted.  So,

6     they have to stay in communication between '89 and at least

7     '91 about this patent.

8          THE COURT:  All right.  I will study it and see

9     what I can do with it.

10         MR. SORENSEN:  Thank you, and one last point.

11         Under Second Circuit law, you cannot escape in the

12    way the defendants are claiming, by shutting your eyes and

13    being recklessly -- acting with reckless disregard of the

14    truth.

15         THE COURT:  Oh, we all know that.  Come on.

16         MR. SORENSEN:  Okay.

17         THE COURT:  Thank you very much.

18         MR. SORENSEN:  Thank you.

19         THE COURT:  I think it's a very interesting matter,

20    and I will mark it fully submitted, decision reserved.

21         I appreciate the attendance of all of you today and

22    we will get to it as soon as we can.

23         Please call the next matter.

24         (Case adjourned)

25

                    Sue Ghorayeb,  Official Court Reporter